UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------x
                            :

THE ROMAN CATHOLIC DIOCESE OF
BROOKLYN, NEW YORK,

                    *Plaintiff*,

    vs.

GOVERNOR ANDREW M. CUOMO in his
official capacity,

                   *Defendant*.
---------------------------------------------------------x

Case No.     20 CV 4844

**COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff The Roman Catholic Diocese of Brooklyn, New York (the "Diocese" or "Plaintiff"), by and through its attorneys, Gibson, Dunn & Crutcher LLP, for its Complaint against Defendant Governor Andrew M. Cuomo, in his official capacity, alleges as follows:

## NATURE OF THE CASE

1.     This case concerns the government's wholesale infringement of a fundamental First Amendment right—the free exercise of religion—that, if allowed to stand, will prevent parishioners in Brooklyn and Queens from being able to attend mass even though the executive order at issue is not even remotely tailored to the compelling interest required to justify interference with that fundamental right.  Injunctive relief is therefore necessary to protect and preserve Plaintiff's and its parishioners' constitutional rights in the face of this government overreach.

2.     On October 6, 2020, New York Governor Andrew Cuomo announced a new series of overbroad COVID-19 restrictions directed at "Houses of Worship" in certain neighborhoods that will effectively force over two dozen churches within the Diocese of Brooklyn to close their doors, even though those churches have been reopened for months in

strict adherence to all medical and governmental guidance, without any COVID-related incidents whatsoever.  The Governor now proposes to limit in-person attendance at *all* "Houses of Worship" to *the lesser of* 10 people or 25% of church capacity in certain designated geographical areas, and to *the lesser of* 25 people or 33% of church capacity in others.  As applied to the Diocese, whose impacted churches overwhelmingly seat upwards of 500 to 1,000 parishioners, the percentage caps (which track existing attendance restrictions) are rendered wholly illusory, and thus the churches will be placed in the untenable position of limiting attendance at Sunday mass and other foundational Catholic services such as baptisms, weddings, and funerals, to just 10 worshippers in designated "red" zones or just 25 worshippers in designated "orange" zones.  Meanwhile, all other essential businesses can remain open without any capacity limitations whatsoever, and in the orange zones, even most non-essential businesses can remain open without any capacity limitations.  This express targeting of religious practice for unwarranted, disparate treatment—including the very "physical acts that constitute the free exercise of religion," such as "'assembling with others for a worship service [and] participating in sacramental use of bread and wine," *Cent. Rabbinical Cong. of U.S. & Canada v. N.Y.C. Dep't of Health & Mental Hygiene*, 763 F.3d 183, 193 (2d Cir. 2014) (quoting *Employment Div. v. Smith*, 294 U.S. 872, 877 (1990))—violates Plaintiff's core First Amendment rights and cannot stand, especially as applied to the Diocese's churches, which have operated safely for months now, strictly adhering to existing government guidelines and unquestionably protecting their parishioners from any spread of COVID-19.  The Diocese therefore now files suit to enjoin the application of the 10- and 25-person capacity limitations on its churches within these "red' and "orange" zones.  To be clear, the Diocese does not challenge—and, indeed, has supported and will continue to adhere to—the percentage capacity caps, consistent with how its churches have

been operating safely for months.  But the Governor's new restrictions go way too far, infringe way too much, and have no legitimate basis, as applied to the Diocese's churches.

3.      At his press conference announcing the new restrictions, the Governor openly **admitted** that the rules "are most impactful on houses of worship."  But it is well-settled that "official action that targets religious conduct for distinctive treatment" is subject to the most "rigorous of scrutiny."  *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 534 (1993).  The Governor's action here cannot come close to satisfying this strict scrutiny, especially as-applied to the Diocese, which has at all times gone above and beyond in implementing health and safety precautions in response to the pandemic, and has seen no spike or outbreak of COVID-19 relating to church attendance.  At his press conference, the Governor alluded to COVID spread among **other** communities that are alleged to have flouted prior guidance.  But this purported basis for the new rules belies any contention that the restraints on Plaintiff's religious liberty are narrowly tailored:  To the extent the Governor is aware of or suspects that certain communities or congregations are not adhering to public health regulations, the proper, more narrowly tailored solution is to enforce **existing** law as to those alleged violators, or to tailor any new restrictions (assuming new restrictions are necessary, an issue on which Plaintiff takes no position) to the specific alleged violations, **not** to impose categorical restrictions on the free exercise of religion of all citizens across entire zip codes, including those—like Plaintiff—who have voluntarily exceeded State public health requirements to great success.

4.      When the COVID-19 pandemic hit United States soil, the Diocese of Brooklyn wasted no time implementing voluntary, proactive safety countermeasures to combat it, even when that meant altering centuries-old religious traditions sacred to the Catholic Church.  As

early as January 2020, when news of the coronavirus began to dominate United States airwaves, albeit largely from thousands of miles away, Plaintiff suspended the receiving of the Precious Blood by its parishioners and strongly encouraged that Holy Communion be taken by hand.  And when the pandemic began to ravage the streets of New York City, Plaintiff only increased its countermeasures, culminating in the Diocese ordering the closure of all of its churches and parishes effective March 16—*before* New York State officially went on "pause."  When the State issued its lockdown measures shortly thereafter, Plaintiff faithfully abided by both the government- and self-imposed restrictions, shuttering its churches for months on end.

5.      Reopening church doors was achieved only through countless hours spent meticulously crafting protocols that would permit parishioners to safely return to worship.  The Diocese assembled an internal committee, chaired by Joseph Esposito, the former Commissioner of New York City Emergency Management and Chief of Department of the New York City Police Department, to study and implement COVID-19 safety measures.  When the church doors reopened, all churches within the Diocese operated under the strict protocols put in place by the committee to ensure that worship was conducted in the safest manner possible:  Parishioners were required to wear masks; every other pew was left empty; occupied pews were spaced to accord with social distancing protocols; traffic flow was managed to avoid parishioners passing one another; and sacred church practices, including Holy Communion, were either reformed or altogether suspended to preserve the health of the congregation.  At every turn, the Diocese, through the work of the committee, went consistently above and beyond what the government mandated.

6.      But it has worked.  Parishioners have successfully returned to worship, albeit in smaller numbers and with heightened diligence.  None of the Catholic churches in the Diocese

(or elsewhere in New York City) has experienced any new outbreak or spread of COVID-19. And yet this delicate balance between religious liberty and public health and safety has now been upended by the Governor's broad-brush response to combatting apparent pockets of COVID-19 spikes in some faith communities by imposing on all faith communities in the affected areas disparate treatment—whether or not those communities have been compliant with the preexisting rules and operating safely, as the Diocese's churches have.  This blunt instrument—which was announced by press release rather than by executive order and was thus shielded from public comment—effectively orders the Diocese's churches within the "red" and "orange" zones to once again shut their doors.  That process, albeit excruciatingly painful to a community that flourishes through in-person worship, may have been necessary in March, when the pandemic raged unabated and neither the church nor the State was in position to combat it effectively.  But it is altogether unnecessary now, when the Diocese has already proven that its rigorous countermeasures are effective and has not experienced even a single COVID-19 outbreak since reopening church doors.

7.     The Supreme Court has long recognized that although there exists "an acknowledged power of a local community to protect itself against an epidemic threatening the safety of all," such restrictions may be exercised "in such an arbitrary, unreasonable manner, or might go so far beyond what was reasonably required for the safety of the public, as to authorize or compel the courts to interfere for the protection of such persons."  *Jacobsen v. Commonwealth of Massachusetts*, 197 U.S. 11, 28 (1905).  That is this case.  Given the substantial burdens on religious practice the Governor's capacity limitations would impose, the lack of any evidence whatsoever that their application to the Diocese is tailored to any public health interest, and the heavy burden on the government to justify restrictions expressly and directly targeted at

constitutionally protected religious activity, the restrictions at issue here cannot withstand First Amendment scrutiny as-applied to Plaintiff.

8.   This Court should accordingly follow the lead of courts throughout the country and conclude that broad-brush restrictions on religious exercise, such as the Governor's latest executive order, as applied here to these Roman Catholic churches, should be enjoined. *See, e.g.*, *Roberts v. Neace*, 958 F.3d 409 (6th Cir. 2020); *Maryville Baptist Church, Inc. v. Beshear*, 957 F.3d 610 (6th Cir. 2020); *Soos v. Cuomo*, 2020 WL 3488742 (N.D.N.Y. June 26, 2020); *Berean Baptist Church v. Cooper*, 2020 WL 2514313 (E.D.N.C. May 16, 2020); *Tabernacle Baptist Church, Inc. of Nicholasville v. Beshear*, 2020 WL 2305307 (E.D. Ky. May 8, 2020) (all enjoining government actions attempting to restrict the free exercise of religion on COVID-related public health grounds). The COVID-19 pandemic has now been raging in this country for over six months and, unfortunately, looks to have many more months ahead of it. The Diocese takes the pandemic—and the threat it poses to its parishioners—extremely seriously. But it cannot be that the pandemic alone justifies restrictions that, in another time, would plainly contravene the Constitution. "[R]estrictions inexplicably applied to one group and exempted from another do little to further [public safety] goals and do much to burden religious freedom." *Roberts*, 958 F.3d at 414-15. And "[w]hile the law may take periodic naps during a pandemic, [courts] will not let it sleep through one." *Id.* at 415. This Court should therefore enjoin the Governor from enforcing the 10- and 25-person maximum attendance restrictions as applied to Roman Catholic churches in the designated geographic "red" and "orange" zones in Brooklyn and Queen.

## **PARTIES**

9.   Plaintiff The Roman Catholic Diocese of Brooklyn, New York is a division of the Roman Catholic Church. The Diocese was founded in 1853 and heads 186 Catholic parishes and

210 Catholic churches in the Brooklyn and Queens regions of New York.  The Diocese is headquartered at 310 Prospect Park West in Brooklyn, New York.  The Diocese brings this action for itself and on behalf of its churches and parishes and their member-parishioners.

10.     Defendant Andrew Cuomo is the Governor of the State of New York.  On October 6, 2020, Governor Cuomo announced an initiative that, *inter alia*, slashes the capacity limits for houses of worship in certain areas identified by zip code, including those in Brooklyn and Queens where the Diocese operates.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction over Plaintiff's constitutional claim pursuant to 28 U.S.C. § 1331.

12.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this district.

## STATEMENT OF THE CASE

**I.     The Diocese Provides A Place Of Worship To Catholics In Brooklyn And Queens For Over 165 Years.**

13.     The Diocese of Brooklyn was founded in 1853.  During that time, more than five million tired and poor Irish Catholic immigrants arrived at the port of New York in search of a better life.  In addition to shelter and opportunity, these immigrants sought the opportunity to freely practice their religion and openly follow the tenets of the Roman Catholic faith.  The Diocese sought to address that need for all those immigrants who settled in Brooklyn and Queens.

14.     Today, the combined population of Brooklyn and Queens stands at more than 4.9 million, of whom 1.5 million identify as Catholics.  The Diocese of Brooklyn serves this community in various ways.  Due to the multicultural and diverse populations of the two

boroughs, masses are regularly held in 33 different languages across the Diocese, throughout 186 parishes with 210 churches.  Through 26 ethnic ministries, the Diocese promotes cultural events and provides an opportunity for immigrants to belong to the larger community while preserving and sharing their uniqueness and traditions.  In the year 2019 alone, the Diocese celebrated 15,885 Baptisms, 11,957 First Communions, 9,549 Confirmations and 1,951 Marriages, and had an average weekly attendance of almost 230,000 spread across over 1,000 weekly Sunday Masses in Brooklyn and Queens.

15.     Throughout its 165-plus year existence, the Diocese has provided irreplaceable gifts to its parishioners and the surrounding community.  Its parishes have enriched the lives of the people of its community by providing spiritual leadership, a place to worship freely, and a moral compass through New York's greatest triumphs as well as its darkest moments.

**II.     The Diocese Proactively Shutters To Combat The Spreading Pandemic.**

16.     In early 2020, the COVID-19 pandemic descended on New York City and the United States at large.  The Diocese acted swiftly in response, implementing drastic countermeasures even before required to do so by government mandate, even when those measures cut to the heart of the Catholic Church's time-honored religious rituals.

17.     The Diocese began rolling out COVID-19 safety measures as early as January 31, 2020, with the Office of the Vicar General issuing a strong recommendation to Diocesan pastors and administrators that Holy Communion—the most sacred and time-honored ritual of the Catholic Church—be received only by hand, a shift from the general practice detailed below.

18.     In a memo issued to pastors and administrators on March 4, 2020, the Most Reverend Raymond Chappetto further emphasized that recommendation, writing, "It is VERY STRONGLY suggested that Holy Communion be received in the hand as long as this [coronavirus] threat continues."  The memo also suspended the distribution of the Precious

Blood—the drinking of wine from a chalice as part of Holy Communion—and required that the clergy disinfect their hands before distributing Holy Communion.

19.      According to Catholic belief, upon consecration, the substance of the bread offered during Holy Communion becomes the Body of Christ, and the substance of the wine offered during Holy Communion becomes the Blood of Christ.  Ordinarily, parishioners are provided a wafer either in their hand or on their tongue, and at many churches those parishioners are also provided with the option of receiving wine.  However, in response to the pandemic, the Diocese instructed that Holy Communion no longer be taken on the tongue, and that wine no longer be distributed during Communion at all.

20.       The March 4 memo implemented a number of other safety measures, which scaled back, or eliminated altogether, other religious rituals important to Catholic worship.  The memo, for example, suspended the Sign of Peace as traditionally marked with a handshake and ordered that Holy Water fonts be emptied.

21.      On March 11, 2020, as COVID-19 continued to spread throughout New York City, the Office of the Vicar General issued a letter that again "strongly recommended" that Holy Communion be received by hand and that rehashed the other safety measures implemented by the Diocese, including the suspension of the Precious Blood and the Sign of Peace by a handshake.

22.      Just four days later, in response to rapidly changing conditions in the City, and in advance of any governmental shutdown orders, the Diocese announced that it would be canceling all public masses effective the next day.  That difficult decision followed on the heels of guidance issued by the Most Reverend Nicholas DiMarzio, the Bishop of Brooklyn, dispensing parishioners from their obligation to attend Mass.

23.     On March 19, the Diocese, at the direction of Bishop DiMarzio, ordered all of its parishes and churches altogether shuttered.

24.     In the days and weeks that followed, Governor Cuomo issued a series of regulations restricting public gatherings and other non-essential activities in response to the COVID-19 pandemic.  Most notably, on March 20, Governor Cuomo issued the "New York State on PAUSE" order, which required all non-essential businesses across the State to shut down in-person operations entirely.  Pursuant to that order, on March 23, Governor Cuomo implemented a total ban on non-essential gatherings of any size, held for any reason.

25.     The Diocese of Brooklyn and its over 200 churches immediately and strictly complied with this ban.  Indeed, the Diocese voluntarily closed its doors in the interest of public health and safety ***prior*** to Governor Cuomo's "PAUSE" order, emphasizing that it would "comply with" any of "the State's regulations," and "urged" parishioners "to take the necessary precautions, including remaining at a safe distance from others."

26.     Governor Cuomo's pandemic-related orders remained in effect throughout the spring and into the summer.  New York City, one of the epicenters of the pandemic, was among the last places in the State to begin the process of reopening.  It was not until late May that houses of worship were permitted to open for private worship and small gatherings of 10 people or less, not until June 8 that the City officially began phase one of its reopening efforts, and not until June 22 that houses of worship could officially open their doors to congregants at a 25% capacity as part of the second phase of the City's reopening.  Phase four of the City's reopening efforts, which permitted houses of worship to operate at 33% capacity, did not commence until July 20 (though, as discussed below, the Diocese has voluntarily refrained from admitting that additional capacity).

27.     The Diocese of Brooklyn remained closed even as the City began to reopen, faithfully abiding by its own safety measures and exceeding those implemented by the State. Although the State permitted houses of worship to open their doors at 25% capacity on June 22, churches within the Diocese, following guidance from Diocesan leadership, did not conduct in-person weekday services until June 29, and did not reopen for weekend public mass until the July 4 weekend.  During that opening and at all times thereafter, the Diocese and its member churches strictly complied with the 25% capacity requirement, and as discussed in more detail below, directed and implemented numerous other significant safety protocols, procedures, and monitoring.

28.     During the period of total closure, numerous weddings, funerals, and baptisms were canceled.  As the government-imposed restrictions eased in May and June, some of these ceremonies were allowed to take place, but were strictly capped at 10 people.  All mass services were similarly cancelled during the period of closure, and parishioners across Brooklyn and Queens were instructed to pray and worship from the safety of their homes.

29.     This period of closure was extremely painful for the Diocese of Brooklyn and its faith community.  In addition to the physical and emotional toll that the pandemic took on the community, parishioners were denied the ability to attend in-person mass, which is of critical spiritual importance in the Catholic faith.  Likewise, the cancellations or severe curtailments of baptisms, weddings, funerals, and other ceremonies of enormous religious and personal significance were difficult for many members of the Catholic faith.  Nevertheless, the Diocese abided by the State's severe restrictions—and imposed its own exacting restrictions on its various parishes, even in advance of the State mandate to shutter—because doing so was in the best interest of the health and welfare of Diocese's community.

### III.    The Diocese Successfully Responds To the COVID-19 Pandemic And Safely Reopens Its Doors.

30.     Even as churches throughout Brooklyn and Queens remained shuttered, the Diocesan leadership worked steadily behind the scenes to ensure that, when the time came, the Diocese would be able to offer congregants a safe space for religious expression and worship. To that end, the Diocese established a commission to craft procedures that would address the ongoing COVID-19 pandemic while simultaneously ensuring that their parishioners' spiritual needs would be met.

31.     The commission was chaired by Joseph Esposito, the former Commissioner of New York City Emergency Management and former Chief of Department of the New York City Police Department.  There were eleven other members of the commission, including priests and laypeople, which was designed to capture input from various stakeholders in the community. Members of the commission consulted closely with medical professionals, as well as several of Mr. Esposito's prior colleagues in Emergency Management and the Police Department.

32.     The commission met numerous times over the course of May and June, meticulously studying the COVID-19 guidelines that Governor Cuomo and New York City Mayor Bill de Blasio had published, as well as all applicable federal, State, and City ordinances and directives related to the pandemic, in order to provide appropriate instruction and guidance to church leadership.  Each Friday, the commission provided proposed protocols to Bishop Chappetto.  These protocols were then sent to each parish in the Diocese by means of weekly memoranda, as well as posted to the Diocese's public website and further transmitted to the public via social media.  To ensure that these protocols reached as wide an audience as possible, the Diocese engaged a media company to assist with the distribution.

33.     Starting in late May 2020, the Diocese's churches opened in a staged approach that has been conducted in accordance with the iterative regulations promulgated by New York State and New York City.  In doing so, all Catholic Churches within the Diocese of Brooklyn adopted the recommendations of the Diocese's COVID-19 commission on how to institute procedures to safely accommodate congregants' constitutional and spiritual right to worship and engage in Catholic religious practices.  During this initial period of reopening, churches within the Diocese did not offer mass and limited all church visitors and attendance at ceremonies such as funerals to 10 people.

34.     By late June, churches within the Diocese could officially reopen at 25% capacity under applicable City and State guidelines.  However, upon the recommendation of the Diocese's COVID-19 commission, the Diocese waited until June 29 to reopen for in-person weekday services at the 25% capacity limit, and did not reopen for weekend mass until July 4 (again, operating at only 25% capacity).  This choice to proceed cautiously and gradually was made to ensure that all proper safety protocols had been implemented by each parish within the Diocese, and because church leadership believed that reopening for weekend services over July 4 would allow for a particularly "soft" reopening given the expectation that many parishioners would be out of town for the holiday weekend.

35.     In the lead-up to the 25% capacity reopenings, church leadership assisted various parishes in obtaining all the supplies that they would need to safely open their doors.  The Diocese identified the types of supplies churches would need to have on hand to reopen, and published guidance about where parishes could obtain essential items such masks, disinfectants, fogging machines, and hand sanitizer.  Church leadership further instructed that any parish that was unable to secure the necessary supplies or implement the relevant protocols in advance of

the July 4 soft reopening date delay their reopening until they could do so and thus guarantee the safety of their parishioners.

36.     Prior to reopening, all churches were thoroughly sanitized, either by outside companies or with equipment recommended by Rocklyn Assets Corp., the property office for the Diocese.  Rocklyn Assets Corp. prepared a comprehensive instructional video for those parishes that chose to sanitize their churches without outside assistance, in order to demonstrate the proper techniques for sanitizing large spaces.

37.     Additionally, prior to reopening, all parishes were advised to report any instances of COVID-19 directly to Bishop Chappetto.  This instruction complemented a system that had been in place since March, whereby priests were encouraged to raise any COVID-related questions or concerns directly with Bishop Chappetto.

38.     Since reopening in early July, each church within the Diocese has had to adhere to strict protocols regarding church practices and services.  Iterative rounds of written protocols and a PowerPoint deck provided to parishes before and after reopening outlined these procedures in detail.  Among other requirements, churches within the Dioceses must:

- Ensure that parishioners wear a mask at all times, except for a brief moment when they receive a socially distanced Holy Communion;

- Block off every other pew so congregants cannot sit immediately in front of or behind one another;

- Mark off seats with tape six feet apart within each open pew to ensure appropriate social distancing;

- Provide hand sanitizer stations throughout the church;

- Remove all hymnals, missalettes, and other worship aids from pews;

- Only open for abridged hours both on weekdays and for weekend masses;

- Keep multiple doors open for various points of entry and exit, and direct traffic in and out of the church, to ensure that worshipers enter and exit in a socially distant manner; and

- Retain additional ushers and security guards to enforce compliance with all of the required procedures and protocols.

39.     The Diocese has also continued to abide by the changes to fundamental church practices instituted at the outset of the pandemic.  Most notably, the Diocese has retained the changes to the giving and receiving of the sacrament of Holy Communion, requiring that Communion be taken by hand and dispensing with the distribution of wine.

40.     These preventative measures have proven immensely successful.  In the three months since Catholic churches in Brooklyn and Queens have reopened, there have not been any reported outbreaks of COVID-19.  As a result, in recent weeks, the Diocese had finally begun work on plans to safely increase the capacity of its churches to 33%, as would have been permitted under the then-applicable government regulations.

**IV.     The State Implements New, Overbroad, And Unduly Burdensome Restrictions Directed At Houses of Worship And Applicable to Catholic Churches In Brooklyn And Queens.**

41.     On October 6, in response to upticks of COVID-19 cases localized in certain non-Catholic communities in New York, including in certain Brooklyn and Queens neighborhoods, Governor Cuomo announced a "New Cluster Action Initiative" (the "Initiative").  Governor Cuomo announced his Initiative by press release instead of by Executive Order, thereby depriving the public an opportunity to review and comment on the Initiative prior to its implementation.

42.     The Initiative identifies certain purported at-risk areas, by zip code, and divides those areas into "red," "orange," and "yellow" zones, with red zones representing the highest

density of new COVID-19 cases, orange zones representing a warning area, and yellow zones representing a precautionary area.

43.     As is relevant here, the Initiative targets certain areas in Brooklyn that are divided into red, orange, and yellow zones, and certain areas in Queens, each also divided into the three zones.  The Diocese operates numerous churches and parishes falling within these purportedly at-risk areas, including 13 churches and parishes falling within the severely restricted red zones and 11 falling within the orange zones.

44.     The Initiative drastically inhibits the operation of, and in fact effectively shutters, all Catholic churches in red and orange zones, requiring that they operate with a 10-person maximum in red zones, or 25-person maximum in orange zones.  While the Initiative also provides for a 25% capacity limit in red zones and a 33% capacity limit in orange zones, these percentage caps are illusory, as the Initiative limits operations to the lesser of the fixed 10- or 25-person limits or the percentage capacity limits.

45.     The restrictions do not account for, or make any distinction based on, the size of a church.  Take, for example, a church which typically houses 1,000 parishioners, safely operating at a 25% capacity as a countermeasure to COVID-19.  The Governor's Initiative requires that church to reduce its already COVID-19-reduced capacity from 250 parishioners to 10 (if located within a red zone) or 25 (if located within an orange zone).

46.     All of the Diocese's 13 churches in the red zone, and all but one of the Diocese's 11 churches in the orange zone can accommodate 500 or more people, with the remaining church seating 200.  Indeed, 12 of these churches—including four in the red zone—can accommodate 750 or more people, and two churches in the orange zone seat over 1,000.  The Initiative thus

forces even the very smallest of these churches, operating safely at 25% capacity, to cut its occupancy by 80% (from 50 parishioners to 10, if within the red zone).

47.     The Initiative also entirely shutters any schools falling within red or orange zones, including those Catholic schools operated by the Diocese, thereby depriving students of an in-person Catholic education, despite no evidence of COVID-19 outbreaks at those facilities.

48.     And while the Initiative shutters non-essential businesses located in red zones and restricts dining to takeout only, all "essential" businesses—a broad category that includes everything from grocery stores to banks to pet shops—remain open without capacity limitations. In orange zones, commercial businesses remain largely unaffected, with almost all essential and non-essential businesses remaining open without capacity limitations of any kind.  In the orange zones, only high risk, non-essential businesses, like gyms, are subject to closure, and restaurants are limited to outdoor dining with a four-person maximum per table (but no overarching capacity limit).

49.     During a press conference announcing the Initiative, Governor Cuomo recognized that his order will disproportionately impact houses of worship, noting, "Obviously these rules, the new rules are most impactful on houses of worship."  The Governor further claimed that "[t]his virus is not coming from non-essential businesses," but rather "[t]his is about mass gatherings" and "one of the prime places of mass gatherings are houses of worship."

50.     In the course of explaining his action on this "sensitive topic," Governor Cuomo referenced his "love for the Orthodox [Jewish] community" and how, in his view, "[t]he Torah speaks about how certain religious obligations can be excused if you are going to save a life."   It appears the Governor may have been responding to certain press reports documenting COVID-

19 outbreaks within the Orthodox Jewish community.[1]  The Governor also claimed that "we've

seen one church infect people," an apparent reference to a headline from a press clipping that

simultaneously appeared on the screen at the press conference.  This article, however, was a

report on an outbreak at an upstate Slavic Pentecostal Church at which masks were treated as

optional and video evidence suggested that almost everyone was unmasked.

51.     Despite his focus on COVID-19 outbreaks in certain geographically concentrated,

socially insular religious communities located within the targeted areas (and his vague allusion to

an outbreak at an upstate facility with insufficient COVID-19 protocols), the Governor has made

no attempt to ameliorate the disproportionate hardship the Initiative will effect on other

communities, like the Diocese's faith community, that have successfully implemented COVID-

19 countermeasures and that have experienced no COVID-19 outbreaks to date.

**V.      The New Restrictions Effectively Shutter The Diocese, Despite Its Proven Success At
          Combating The Pandemic.**

52.     Since reopening, churches across the Diocese have seen a steady increase in the

number of people seeking to attend mass or visit a church to pray.  Indeed, certain parishes have

had to rely on overflow rooms for parishioners (which the Diocese subjects to the same capacity

limitations) to ensure that the 25% capacity limit could be honored, while still providing a space

for congregants to worship in person.  This return to in-person worship has been a lifeline to

many in the religious community, and heartening for those in church leadership who were pained

by the months of (admittedly necessary) closure during the peak of the pandemic.  Effectively

closing the doors of the church again now would be devastating to the community, and would

---

[1] *See, e.g.*, Gina Bellafante, "When Covid Flared Again in Orthodox Jewish New York," N.Y.
Times (Oct. 5, 2020); Kristina Sgueglia & Melanie Schuman, "New York sees startling uptick in
Covid-19 cases in Orthodox Jewish neighborhoods," CNN (Sept. 30, 2020).

grossly infringe on the First Amendment rights of Catholics in the affected areas of Brooklyn and Queens.

53.     Assembly in the church is at the core of Catholic faith.  By gathering in person, Catholics show support for each other and their fellow congregants.  Additionally, the sacrament of Holy Communion, a central component of the spiritual lives of Catholics, may only be received in person.  As emphasized by Bishop Chappetto, the Order's effective prohibition on in-person assembly and worship would be "devastating and spiritually harmful."

54.     The Order would also infringe upon other critical religious ceremonies, such as baptisms, weddings, and funerals.  In-person assembly for these and similar services is essential to the Catholic community.  By causing the cancellation or severe curtailment of such services, the Order would impose irreparable harm on the Diocese of Brooklyn and those it serves.

55.     Nor is it any relief to the Diocese and those it serves that the Order allows for gatherings of 10 or 25 people in the red and orange zones, respectively.  As emphasized above, such caps—when considered against the number of people that would otherwise be (safely) served by the affected churches, even after honoring a 25% capacity limit—would eviscerate the congregation, including because it would render it effectively impossible to conduct public mass. And these caps would require priests to perform the impossible task of choosing a small minority of parishioners to participate in worship in person, while leaving the remaining would-be worshipers out on the street.  In addition, the opportunity to conduct lifecycle events such as weddings, funerals, and baptisms inside the church among a broad (but controlled) compliment of family, friends, and clergy is spiritually significant.

## CLAIM FOR RELIEF
**Free Exercise – First Amendment; 42 U.S.C. § 1983**

56.     Plaintiff repeats and realleges the allegations set forth above as though fully set forth herein.

57.     The First Amendment's Free Exercise Clause provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof."  U.S. Const. amend I.  Where, as here, a law targets religious practice for disparate treatment and is neither neutral nor generally applicable, that law is assessed under the Supreme Court's strict scrutiny rubric.

58.     The Governor, acting under color of State law, has deprived and will continue to deprive Plaintiff of its First Amendment rights.

59.     Specifically, the Governor has instituted an Initiative that plainly and unconstitutionally targets religious practice for at least three reasons.  *First*, its text limits "Houses of Worship" located in red zones to 25% capacity with a 10-person maximum and "Houses of Worship" in the orange zone to 33% capacity with a 25-person maximum.  Similar restrictions do not apply to secular businesses like grocery stories and pet food shops.  *Second*, the way the order operates in practice, including the numerous exceptions to the capacity limitations that apply to secular businesses, make clear that the order targets religious practice.  Even in the most restrictive "Cluster" in the order—the red zone—where only "essential" secular businesses are permitted to remain open, the capacity limitations the Governor's order imposes on Houses of Worship simply do not apply to non-religious institutions.  *Third*, the Governor's own words conceding that "the new rules[] are most impactful on houses of worship" make clear that his order targets religious practice for disparate treatment and is neither neutral nor generally applicable.  The Initiative's burdens on religious practice also are not slight:  The Initiative will

force the closure of numerous Churches and effectively forbid essential in-person religious practice—practice that the Church is able to undertake (and has undertaken) in a safe way. Because the Initiative specifically targets the practice of religion, strict scrutiny applies.

60.     The Initiative's red and orange zone caps of 10 and 25 people, respectively, do not survive strict scrutiny because those caps are not narrowly tailored to the government's interest in promoting public health and safety, particularly as applied to the Diocese.  Defendant can offer no evidence that COVID-19 infections have arisen at any Church in the Diocese but rather has identified COVID-19 infections that he claims arose from the practices of entirely distinct religious communities—including one as far away as Rochester.  To the extent the Governor is concerned with COVID-related compliance issues in those other communities, there is clearly a less restrictive means of combatting that issue:  Enforce the existing rules in those communities.  The Initiative also fails to take into account the significant investments of time, money, and effort the Church has undertaken to ensure its worship is fully consistent with and even exceeds the State's public safety standards, including its altering of fundamental Catholic practices to ensure the safety of parishioners and the community at large.  The capacity caps in particular also ignore the distinction between sizes of houses of worship—a particular problem as applied to churches in the Diocese, all but two of which seat more than 500 people and some more than 1,000.  Finally, the Initiative is clearly untailored as applied to the Diocese given the starkly different consequences the order imposes on secular business, allowing, for instance, hundreds of people to shop at a grocery store but limiting worship in a 1,200 seat church to a mere 10 parishioners (nine including clergy).

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment against Defendants as follows:

A.      A declaration that application of the Initiative's 10- and 25-person maximum attendance restrictions to Plaintiff and its member Roman Catholic parishes/churches in the designated "red" and "orange" zones, respectively, violates the First Amendment;

B.      A temporary restraining order and preliminary and permanent injunctions enjoining Governor Cuomo from enforcing the 10- and 25-person maximum attendance restrictions in designated "red" and "orange" zones, respectively, as applied to Plaintiff and its member Roman Catholic churches in those zones;

C.      An award of fees, costs, expenses, and disbursements, including attorneys' fees and costs to which Plaintiffs are entitled pursuant to 42 U.S.C. § 1988; and

D.      Such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff demands a trial by jury in this action of all issues so triable.

Dated: New York, New York
      October 8, 2020

                    GIBSON, DUNN & CRUTCHER LLP

                    By:    <u>Randy M. Mastro</u>
                              Randy M. Mastro
                              Akiva Shapiro
                              William J. Moccia
                              Lee R. Crain

                              200 Park Avenue
                              New York, New York 10166
                              Tel.:  (212) 351-4000
                              Fax:  (212) 351-4035
                              RMastro@gibsondunn.com
                              AShapiro@gibsondunn.com

                              *Attorneys for Plaintiff*