UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

THE ROMAN CATHOLIC DIOCESE OF
BROOKLYN, NEW YORK,

                              Plaintiff,

          vs.

GOVERNOR ANDREW M. CUOMO in his
official capacity,

                         Defendant.

Case No. 20-cv-04844-NGG-CLP

## GOVERNOR ANDREW M. CUOMO'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

LETITIA JAMES
Attorney General
State of New York
*Attorney for Defendant*
  *Governor Andrew M. Cuomo*
28 Liberty Street
New York, New York 10005

SETH J. FARBER
ERIN R. MCALISTER
MARYAM JAZINI-DORCHEH

Assistant Attorneys General
 of Counsel

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................. 1

FACTUAL BACKGROUND .................................................................................... 2

A.   The COVID-19 Pandemic And The State's Early Response ................................. 3

B.   New York's Phased Reopening ............................................................................ 4

C.   The Pandemic Is Not Over ................................................................................... 5

THE PRESENT LAWSUIT AND MOTION FOR A PRELIMINARY INJUNCTION .............. 8

STANDARD OF REVIEW ...................................................................................... 9

ARGUMENT ....................................................................................................... 10

I.   PLAINTIFF CANNOT ESTABLISH A LIKELIHOOD OF SUCCESS ON
THE MERITS ................................................................................................ 10

    A.  The Executive Order Should Be Upheld Under The Jacobson Standard ............... 10

    B.  The Executive Order Does Not Violate The First Amendment............................. 15

        1.  The Executive Order Is Facially Neutral And Does Not Prevent Plaintiff's
Free Exercise Of Religion.......................................................................... 15

        2.  The Executive Order Does Not Discriminate Against Religious Practice
Because It Does Not Permit "Comparable" Secular Conduct ......................... 17

        3.  Even If Strict Scrutiny Applies – Which It Does Not – Plaintiff's Claims
Would Still Fail....................................................................................... 20

II.  THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST WEIGH IN
FAVOR OF NEW YORK'S MISSION TO PROTECT ITS CITIZENS FROM A
GLOBAL PANDEMIC ..................................................................................... 22

III. PLAINTIFF HAS NOT SHOWN A LIKELIHOOD OF IRREPARABLE HARM ............. 24

CONCLUSION.................................................................................................... 25

i

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Agudath Israel of America v. Cuomo,*
    20-CV-4834 (E.D.N.Y.)..................................................................................... passim

*Amato v. Elicker,*
    2020 WL 2542788 (D. Conn. May 19, 2020)...........................................................19

*Antietam Battlefield KOA v. Hogan,*
    2020 WL 2556496 (D. Md. May 20, 2020)...............................................................12

*Ass'n of Jewish Camp Operators v. Cuomo,*
    2020 WL 3766496 (N.D.N.Y. July 6, 2020) ................................................... passim

*Best Supplement Guide, LLC v. Newsom,*
    2020 WL 2615022 (E.D. Cal. May 22, 2020) .........................................................12

*Calvary Chapel of Bangor v. Mills,*
    2020 WL 2310913 (D. Me. May 9, 2020) ........................................................12, 20

*Calvary Chapel Dayton Valley v. Sisolak,*
    140 S. Ct. 2603 (2020)............................................................................................16

*Calvary Chapel Dayton Valley v. Sisolak,*
    2020 WL 4274901 (9th Cir. July 2, 2020) ...............................................................16

*Calvary Chapel Dayton Valley v. Sisolak,*
    2020 WL 4260438 (D. Nev. June 11, 2020)............................................................16

*Calvary Chapel Lone Mtn. v. Sisolak,*
    2020 WL 3108716 (D. Nev. June 11, 2020).............................................................12

*Cassell v. Snyders,*
    2020 WL 2112374 (N.D. Ill. May 3, 2020) .............................................................12

*Church of Lukumi Babalu Aye, Inc. v. Hialeah,*
    508 U.S. 520 (1993)........................................................................................ 15-16, 20

*Compagnie Francaise de Navigation a Vapeur v. La. Bd. of Health,*
    186 U.S. 380 (1902)................................................................................................19

*Congregation of Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona,*
    915 F. Supp. 2d 574 (S.D.N.Y. 2013)......................................................................15

ii

*Corbett v. Cuomo*,
  20 Civ. 4864, Dkt. No. 13 (S.D.N.Y. July 2, 2020)...............................................12

*Cross Culture Christian Ctr. v. Newsom*,
  445 F. Supp. 3d 758 (E.D. Cal. 2020).....................................................................12

*Elim Romanian Pentecostal Church v. Pritzker*,
  962 F.3d 341 (7th Cir. 2020) ........................................................................ passim

*Elmsford Apt. Associates, LLC v. Cuomo*,
  2020 WL 3498456 (S.D.N.Y. June 29, 2020) ........................................................12

*Employment Div., Dept. of Human Res. of Ore. v. Smith*,
  494 U.S. 872 (1990).................................................................................................15

*Fortress Bible Church v. Feiner*,
  694 F.3d 208 (2d Cir. 2012)....................................................................................15

*Geller v. Cuomo*,
  2020 WL 4463207 (S.D.N.Y. Aug. 3, 2020) .........................................................10

*Geller v. De Blasio*,
  2020 WL 2520711 (S.D.N.Y. May 18, 2020) ..................................................12, 20

*Gish v. Newsom*,
  2020 WL 1979970 (C.D. Cal. Apr. 23, 2020) ........................................................12

*Grand River Enter. Six Nations, Ltd. v. Pryor*,
  481 F.3d 60 (2d Cir. 2007).......................................................................................24

*Henry v. DeSantis*,
  2020 WL 2479447 (S.D. Fla. May 14, 2020) .........................................................12

*Ill. Republican Party v. Pritzker*,
  2020 WL 3604106 (N.D. Ill. July 2, 2020).............................................................12

*In re Abbott*,
  954 F.3d 772 (5th Cir. 2020) ...................................................................................12

*Jacobson v. Massachusetts*,
  197 U.S. 11 (1905)........................................................................................ passim

*L&M Bus Corp. v. Bd. of Educ.*,
  2018 WL 2390125 (E.D.N.Y. May 25, 2018) ....................................................9, 22

*League of Indep. Fitness Facilities & Trainers, Inc. v. Whitmer*,
  814 F. App'x 125 (6th Cir. 2020) ...........................................................................12

iii

*Legacy Church, Inc. v. Kunkel*,
  2020 WL 1905586 (D.N.M. Apr. 17, 2020) ....................................................................12, 20

*Lighthouse Fellowship Church v. Northam*,
  2020 WL 2110416 (E.D. Va. May 1, 2020) ........................................................................12

*Luke's Catering Service, LLC v. Cuomo*,
  2020 WL 5425008 (W.D.N.Y. Sept. 10, 2020) ...................................................................11

*Maryland v. King*,
  567 U.S. 1301 (2012)...........................................................................................................25

*McCarthy v. Cuomo*,
  2020 WL 3286530 (E.D.N.Y. June 18, 2020) ...............................................................12, 17

*McGhee v. City of Flagstaff*,
  2020 WL 2308479 (D. Az. May 8, 2020)............................................................................12

*Million Youth March, Inc. v. Safir*,
  155 F.3d 124 (2d Cir. 1998)................................................................................................23

*N.Y.S. Rifle & Pistol Ass'n v. City of N.Y.*,
  86 F. Supp. 3d 249 (S.D.N.Y. 2015), *aff'd*, 883 F.3d 45 (2d Cir. 2018)...............................23

*Nken v. Holder*,
  556 U.S. 418 (2009)...............................................................................................................9

*Open Our Oregon v. Brown*,
  2020 WL 2542861 (D. Or. May 19, 2020) .........................................................................12

*Otoe-Missouria Tribe v. N.Y.S. Dep't of Fin. Svcs.*,
  769 F.3d 105. (2d Cir. 2014)...............................................................................................22

*People ex. rel. Schneiderman v. Actavis PLC*,
  787 F.3d 638 (2d Cir. 2015)..................................................................................................9

*Phillips v. City of N.Y.*,
  775 F.3d 538 (2d Cir. 2015).................................................................................10, 14, 19

*Prince v. Mass.*,
  321 U.S. 158 (1943)........................................................................................................11, 19

*Prof'l Beauty Fed. of Cal. v. Newsom*,
  2020 WL 3056126 (C.D. Cal. June 8, 2020) ......................................................................12

*Roberts v. Neace*,
  958 F.3d 409 (6th Cir. 2020) ..............................................................................................18

*Salinger v. Colting*,
    607 F.3d 68 (2d Cir. 2010)......................................................................22

*Slidewaters LLC v. Wash. Dep't of Labor & Indus.*,
    2020 WL 3130295 (E.D. Wash. June 12, 2020) ................................12

*Soos v. Cuomo*,
    2020 WL 3488742 (N.D.N.Y. June 26, 2020)....................................19

*South Bay United Pentecostal Church v. Newsom*,
    140 S. Ct. 1613 (2020) (Roberts, C.J., concurring) ....................... passim

*Talleywhacker, Inc. v. Cooper*,
    2020 WL 3051207 (E.D.N.C. June 8, 2020) ......................................12

*Turturro Law, P.C. v. Cuomo*,
    No. 20-cv-4824 (E.D.N.Y.) ..................................................................20

*Vis Vires Grp., Inc. v. Endonovo Therapeutics, Inc.*,
    149 F. Supp. 3d 376 (E.D.N.Y. 2016) ...............................................24

*Weinberger v. Romero-Barcelo*,
    456 U.S. 305 (1982)..............................................................................23

*Winter v. Natural Res. Def. Council, Inc.*,
    555 U.S. 7 (2008)........................................................................9, 22, 24

*WTC Families for a Proper Burial, Inc. v. City of N.Y.*,
    567 F. Supp. 2d 529 (S.D.N.Y. 2008)................................................15

**CONSTITUTIONS**

First Amendment .................................................................................15, 21, 23

Free Exercise Clause.................................................................................8, 13, 14

**STATE STATUTES**

N.Y. Exec. Law § 29.......................................................................................3

**EXECUTIVE ORDERS**

Executive Order 202 .....................................................................................3-4

Executive Order 202.10 ....................................................................................4

Executive Order 202.32 ....................................................................................4

Executive Order 202.33 ...................................................................................... 4-5

Executive Order 202.42 ......................................................................................... 4

Executive Order 202.45 ......................................................................................... 5

Executive Order 202.68 ................................................................................. passim

Defendant Andrew M. Cuomo, sued in his official capacity as Governor of the State of New York ("Governor Cuomo" or "Governor"), respectfully submits this memorandum of law, together with the accompanying Declaration of Debra S. Blog, Director of the Division of Epidemiology at the New York State Department of Health ("Blog Decl."), in opposition to Plaintiff's motion for a preliminary injunction (ECF No. 3-7).

## PRELIMINARY STATEMENT

The State of New York, along with the rest of the world, continues to confront the greatest public health crisis in living memory. The COVID-19 pandemic has caused over 16,000 deaths in New York City alone—an enormous number that could have been far higher had the State not taken urgent action to halt the spread of the virus by mandating temporary restrictions on businesses and social gatherings. Thanks to these measures, New York was able to flatten the curve for new infections and fatalities and is now working toward lifting restrictions in a measured way, balancing the lives, health, and safety of its citizens with the need to protect their livelihoods. But the danger of a resurgence in cases remains clear and present, and certain cluster areas in the State are seeing a spike in infection rates. To combat this worrisome trend in these hot spots, Governor Cuomo issued Executive Order 202.68 ("EO 202.68") in order to limit the number of people at gatherings in these hot spots to stop the rise in cases before they increase exponentially, as happened earlier in the year.

By this lawsuit, Plaintiff, a division of the Roman Catholic Church with churches located in the hot spots, would unfortunately hamper these efforts by enjoining EO 202.68, in part, as it is applied to Plaintiff. Plaintiff urges the Court to overlook the rising COVID-19 cases so as to ensure that it can have large gatherings in the form of church services, even while COVID-19 cases are increasing significantly in the neighborhoods where the churches are located and

1

despite the risks posed by potential super-spreading events. Plaintiff's motion is fatally flawed because it cannot meet *any* of the elements required to obtain preliminary relief. Indeed, the branch of the present motion seeking a temporary restraining order for the same relief was denied by the Order of Judge Eric Komitee, dated October 9, 2020 (ECF No. 15).

First, there is no clear or substantial likelihood of success on the merits. *See* Point I, *infra*. Plaintiff's case fails because EO 202.68 is substantially related to protecting the public health and, therefore, readily survives review under the highly deferential *Jacobson v. Massachusetts*, 197 U.S. 11 (1905), standard. Even if the *Jacobson* framework did not apply, EO 202.68 does not violate Plaintiff's right to the free exercise of religion under either rational basis review or strict scrutiny. EO 202.68 is rationally related to the government's critical interest in avoiding spikes in COVID-19 cases and the concomitant threat to public health. In addition, Plaintiff flatly errs in claiming that EO 202.68 targets religious gatherings or has less restrictive limitations for secular activities. Regardless, even if strict scrutiny applied here (and it does not), the fight against COVID-19 is a governmental interest of the highest order, and EO 202.68 is narrowly tailored because it focuses on restricting gatherings in areas where cases are spiking.

Second, the balance of equities and the public interest tip overwhelmingly in favor of New York's mission to protect New Yorkers from the imminent dangers presented by COVID-19. *See* Point II, *infra*.

Finally, Plaintiff cannot establish irreparable harm, given that EO 202.68 *permits* religious gatherings in all three impacted zones, just with restricted capacity. *See* Point III, *infra*.

Accordingly, Plaintiff's motion for a preliminary injunction should be denied.

## FACTUAL BACKGROUND

The ongoing COVID-19 pandemic has caused over 25,000 deaths in New York State,

over 16,000 of which were in New York City alone,[1] and hundreds of thousands of deaths

worldwide. For much of this spring, New York was the epicenter of the global crisis.[2] Thanks to

the lifesaving efforts of medical professionals, essential workers, state and local governments,

and ordinary New Yorkers who have heeded calls to shelter-in-place and practice social

distancing, this State's daily death toll has been reduced from a peak of approximately 800 per

day to an average of less than 10 per day.[3] The threat is not over, however, as hundreds of New

Yorkers remain hospitalized.[4] Continued vigilance is essential in order to prevent a deadly

second wave of the pandemic from afflicting the State and requiring additional extensive

shutdowns of schools and businesses. *See generally* Blog Decl. ¶¶ 46-50.

## A.     The COVID-19 Pandemic And The State's Early Response

COVID-19 is a highly infectious and potentially deadly respiratory disease caused by a

newly discovered coronavirus that spreads easily from person-to-person. Blog Decl. ¶ 7, Ex. B.

Because there is no pre-existing immunity against this new virus, it has spread worldwide in an

exceptionally short period of time. On January 31, 2020, the World Health Organization

("WHO") declared a "public health emergency of international concern." Blog Decl. ¶ 9, Ex. C.

Less than two months later, on March 11, 2020, WHO characterized the COVID-19 outbreak as

a pandemic. Blog Decl. ¶ 10, Ex. D.

On March 7, 2020, pursuant to N.Y. Exec. Law § 29, Governor Cuomo issued Executive

Order 202, implementing the State Comprehensive Emergency Management Plan and declaring

a statewide disaster emergency. Blog Decl. Ex. I. By Executive Order 202, the Governor

---

[1] Fatalities, New York State Department of Health ("DOH"), https://covid19tracker.health.ny.gov/views/NYS-COVID19-Tracker/NYSDOHCOVID-19Tracker-Fatalities?:embed=yes&:toolbar=no&:tabs=n.
[2] *See* https://nyti.ms/3kUJgbs.
[3] *See* New York, Covid Tracking Project, https://covidtracking.com/data/state/new-york#historical.
[4] *See id*.

suspended all State and local laws, rules, and regulations to the extent necessary to address the COVID-19 emergency. *Id*. Following the issuance of Executive Order 202, Governor Cuomo issued multiple supplemental Executive Orders, continuing the temporary suspension and modification of certain laws relating to the state of emergency. *See, e.g.*, Blog Decl. ¶¶ 27-36.

Among the more important measures the Governor adopted as part of the "New York on PAUSE" initiative were restrictions on non-essential gatherings. Specifically, on March 23, 2020, the Governor issued Executive Order 202.10, which banned "[n]on-essential gatherings of any size for any reason." Duford Decl. Ex. M.

**B.     New York's Phased Reopening**

Over the course of May and June, as the State's infection and death rates began to stabilize and then decline, New York transitioned from the "New York on PAUSE" initiative to the "New York Forward" initiative, a phased plan to guide the reopening of non-essential businesses. Blog Decl. ¶ 38. The "New York Forward" initiative was intended to begin reopening New York's economy in a slow, measured way that would prevent any new spikes in COVID-19 cases. *See id.* ¶¶ 38-41.

On May 21, 2020, Governor Cuomo issued Executive Order 202.32, as part of the phased re-opening to permit non-essential outdoor gatherings of up to ten people for religious services or Memorial Day observance, provided the participants follow the social distancing and cleaning and disinfection protocols established by DOH. Blog Decl. Ex. N. The following day, the Governor issued Executive Order 202.33, which further modified the ban to permit non-essential outdoor gatherings of up to ten individuals for any lawful purpose, provided the participants follow certain social distancing, cleaning and disinfection protocols. Blog Decl. Ex. O.

On June 15, 2020, the Governor issued Executive Order 202.42, which extended

Executive Order 202.33 until July 15, 2020, and further modified the restriction to permit non-essential outdoor gatherings of up to twenty-five individuals for any purpose or reason, provided the gathering was in a region that had reached Phase Three of the re-opening plan and the participants follow the social distancing, cleaning and disinfection protocols established by DOH. Blog Decl. Ex. P. Also on June 15, 2020, the Governor issued Executive Order 202.45, which permits non-essential gatherings of up to 50 individuals for any purpose or reason, provided the gathering is in a region that has reached phase four of the re-opening plan, and the participants follow the social distancing, cleaning, face covering and disinfection protocols established by DOH. Blog Decl. Ex. Q.

Through this measured reopening plan, which has been data-driven and guided by public health experts, the State was able to keep the number of new infections and new deaths relatively flat at a time when cases were spiking throughout the rest of the nation. Blog Decl. ¶¶ 41-2.

### C.     The Pandemic Is Not Over

Nevertheless, with the colder weather looming due to the fall season, there is a greater potential for super-spreader gatherings where one individual can infect many others. Super-spreader events tend to happen in indoor spaces, with people in close proximity. Social occasions lead to more clusters than exposure in the workplace or home, and mass transmissions have occurred at weddings, temples, bars, and karaoke parties. And the risk is even higher if people are raising their voices in some way, such as singing or shouting. Blog Decl. ¶ 69. Notably, the more people an individual interacts with at a gathering and the longer the interaction lasts, the higher the risk of becoming infected with COVID-19 and of the disease spreading. Blog Decl. ¶ 71. The spread of the disease expands out from the mass gathering as the people who contract it interact with others, potentially at other mass gatherings. Blog Decl. ¶¶ 68-9.

5

Since early September 2020, DOH has observed clusters spike in a number of areas, including one large area in Brooklyn, and smaller areas in Queens, Broome, Orange and Rockland Counties. *Id.* ¶ 92. In the 20 zip codes that Governor Cuomo deemed most problematic, the positivity rate was 5.5 percent on October 6, 2020, far exceeding the 1.2 percent rate for the rest of the State.[5] "Over the last week, the statewide rate of infection has regularly topped one percent—it was 1.45 percent in tests reported to the state on [October 5] —reflective of much higher rates of infection in hot spots."[6]

Responding to this new surge, on October 6, 2020, in a public briefing, Governor Cuomo announced "a new cluster action initiative" ("cluster initiative") to address COVID-19 hot spots that have cropped up.[7] The cluster initiative is composed of three steps: (1) take dramatic action within the cluster; (2) take action in the area surrounding the cluster to stop the spread; and (3) take precautionary action in the outlying communities. Blog Decl. ¶ 98. The clusters were developed from data showing where COVID-19 positive cases are occurring.[8]

EO 202.68 directs DOH to determine areas in the State that require "enhanced public health restrictions based upon cluster-based cases of COVID-19 at a level that compromises the State's containment of the virus." The Order addresses these hot spots by creating three zones "[b]ased upon the severity of the cluster activity." The "red zones" have experienced the sharpest increase in COVID-19 cases – the rate of positive tests in the red zone in New York City is approximately 8% – whereas the rest of the City hovers at around 1%. Blog Decl. ¶ 93.

The most severe mitigation measures thus are in the "red zones," with gradually fewer restrictions in "orange" and "yellow" zones as one moves further from the epicenter. *Id.* ¶ 99.

---

[5] https://www.nytimes.com/2020/10/06/nyregion/cuomo-shutdown-coronavirus.html.
[6] *Id.*
[7] https://www.governor.ny.gov/news/governor-cuomo-announces-new-cluster-action-initiative#initiativemaps
[8] *See* https://www.governor.ny.gov/news/governor-cuomo-announces-new-cluster-action-initiative/

Specifically, in the red zones, DOH has adopted mitigation measures that, in essence, postpone all non-essential gatherings and close schools and non-essential businesses:

- "Non-essential gatherings of any size shall be postponed or cancelled";
- "All non-essential businesses, as determined by the Empire State Development Corporation based upon published guidance, shall reduce in-person workforce by 100%";
- "[A]ny restaurant or tavern shall cease serving patrons food or beverages on-premises and may be open for takeout or delivery only"; and
- "[T]he local Department of Health shall direct closure of all schools for in-person instruction, except as otherwise provided in Executive Order."

However, unlike schools, businesses, restaurants and bars, houses of worship located in the red zone need only reduce capacity: "houses of worship shall be subject to a capacity limit of 25% of maximum occupancy or 10 people, whichever is fewer." *Id.* at ¶ 100.

In moderate severity warning areas, or "orange zones," DOH shall adopt mitigation measures that includes the "closure of all schools for in-person instruction" as well as the following other mitigation measures:

- "Non-essential gathering shall be limited to 10 people";
- "[C]ertain non-essential businesses, for which there is a higher risk associated with the transmission of the COVID-19 virus, including gyms, fitness centers or classes, barbers, hair salons, spas, tattoo or piercing parlors, nail technicians and nail salons, cosmetologists, estheticians, the provision of laser hair removal and electrolysis, and other personal care services shall reduce in-person workforce by 100%"; and
- "[A]ny restaurant or tavern shall cease serving patrons food or beverages inside on-premises but may provide outdoor services, and may be open for takeout or delivery, provided however, any one seated group or party shall not exceed 4 people."

However, unlike schools and personal care businesses, houses of worship located in orange zones may remain open and are not limited to 10 people: "houses of worship shall be subject to a maximum capacity limit of the lesser of 33% of maximum occupancy or *25 people*, whichever is fewer." *Id.* (emphasis added).

In precautionary or "yellow zones," DOH must adopt the following measures:

- "Non-essential gatherings shall be limited to no more than 25 people";

7

- "[A]ny restaurant or tavern must limit any one seated group or party size to 4 people"; and
- "[DOH] shall issue guidance by October 9, 2020 regarding mandatory testing of students and school personnel, and schools shall adhere to such guidance."

However, in yellow zones, houses of worship are not limited to 25 people, but instead are "subject to a capacity limit of 50% of its maximum occupancy."

As Governor Cuomo explained at the October 8, 2020 press conference discussing the new cluster action initiative, "working with the top public health experts, New York State developed a science-based approach to attack these clusters and stop any further spread of the virus, including new rules and restrictions directly targeted to areas with the highest concentration of COVID cases and the surrounding communities."[9]

The key purpose of EO 202.68 is to tackle the risk posed by mass gatherings, including in houses of worship. Explaining the rationale of EO 202.68, the Governor said: "A mass gathering causes infections, infections cause a cluster, a cluster causes community spread."[10] Stated another way, the EO effectively mitigates infection risk and reduces transmission by reducing density in places where people gather, including houses of worship. Blog Decl. ¶¶ 103, 108.

**THE PRESENT LAWSUIT AND MOTION FOR A PRELIMINARY INJUNCTION**

Plaintiff is the Roman Catholic Diocese of Brooklyn, which is the division of the Catholic Church covering Brooklyn and Queens and includes 186 parishes and 210 churches. ECF No. 1, Complaint ("Compl.") ¶ 9. Plaintiff commenced this action by filing a complaint, on or about October 8, 2020, alleging a single count: that EO 202.68 violates the Free Exercise Clause. *See id.* Plaintiff claims that EO 202.68 is facially discriminatory and that its gathering restrictions imposed on houses of worship do not survive "strict scrutiny," which it argues is the

---

[9] *See* https://www.governor.ny.gov/news/governor-cuomo-announces-new-cluster-action-initiative
[10] *See https*://www.governor.ny.gov/news/video-audio-photos-rush-transcript-governor-cuomo-announces-new-cluster-action-initiative

applicable standard. *Id.* ¶¶ 3, 57-60; Memorandum of Law in Support of Plaintiff's Application

for a Temporary Restraining Order and Preliminary Injunction ("Pl Br."), ECF No. 4, at 16-20.

Plaintiff filed its motion for a temporary restraining order ("TRO") and preliminary

injunction on October 8, 2020, requesting that the Court enjoin Governor Cuomo from enforcing

EO 202.68 on gatherings in Plaintiff's houses of worship. ECF No. 3-7. By Memorandum and

Order dated October 9, 2020 (ECF No. 15), Judge Eric Komitee denied the branch of the motion

seeking a TRO with leave to apply for a preliminary injunction. By its counsel's letter of October

10, 2020 (ECF No. 16), Plaintiff made such application for a preliminary injunction.

## STANDARD OF REVIEW

A preliminary injunction is "an extraordinary remedy never awarded as of right." *Winter*

*v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Plaintiff bears the burden of showing

(1) that it is likely to succeed on the merits, (2) that it is likely to suffer irreparable harm in the

absence of preliminary relief, (3) that the balance of equities tips in its favor, and (4) that an

injunction is in the public interest. *Id.* at 20. The final two factors – the balance of the equities

and the public interest – "'merge when the Government is the opposing party.'" *L&M Bus Corp.*

*v. Bd. of Educ.*, 2018 WL 2390125, at *13 (E.D.N.Y. May 25, 2018) (quoting *Nken v. Holder*,

556 U.S. 418, 435 (2009)). A movant is held "to a heightened standard" where, as here, an

injunction "will provide the movant with substantially all the relief sought and that relief cannot

be undone even if the defendant prevails at a trial." *People ex. rel. Schneiderman v. Actavis PLC*,

787 F.3d 638, 650 (2d Cir. 2015). In such cases, "the movant must show a clear or substantial

likelihood of success on the merits and make a strong showing of irreparable harm, in addition to

showing that the preliminary injunction is in the public interest." *Id.* (quotation marks omitted).

Here, the injunction Plaintiff seeks would provide it "with substantially all the relief

sought," and it could not be "undone." Indeed, if Plaintiff succeeds in holding large religious services in neighborhoods where COVID-19 cases are spiking, then any resulting spread of illness, and potential deaths, certainly could not be undone. For this reason, Judge Matsumoto applied this heightened standard in *Agudath Israel of America v. Cuomo*, 20-CV-4834 (E.D.N.Y.), in which Orthodox Jewish organizations and rabbis sought to enjoin the very Executive Order at issue here. *See* Exhibit to Declaration of Seth Farber, dated October 13, 2020 (Transcript of 10/9/20 Hearing ("*Agudath* Tr.") at 45:5-18). Judge Matsumoto ultimately found plaintiffs unable to meet any of the elements necessary to obtain preliminary relief. Here, Plaintiff's preliminary injunction motion must also fail, not only for the reasons discussed in the *Agudath Israel* decision, but for the reasons discussed below.

## ARGUMENT

## I.   PLAINTIFF CANNOT ESTABLISH A LIKELIHOOD OF SUCCESS ON THE MERITS

### A.   The Executive Order Should Be Upheld Under The *Jacobson* Standard

This is the latest in a series of actions brought in New York and across the country that have challenged state and local government restrictions on in-person gatherings enacted to reduce the death toll from COVID-19. Such actions contradict a long line of precedent, dating back to *Jacobson*, 197 U.S. 11, in which the Supreme Court declared that "a community has the right to protect itself against an epidemic of disease which threatens its members," and that in such times judicial scrutiny is reserved for a measure that "has no real or substantial relation to" the object of protecting the public or is "beyond all question, a plain, palpable invasion of rights secured by the fundamental law." *Id.* at 27, 31; *see also Geller v. Cuomo*, 2020 WL 4463207, at *10 (S.D.N.Y. Aug. 3, 2020) (relying on *Jacobson* to uphold ban of non-essential gatherings of over 50 people); *Phillips v. City of N.Y.*, 775 F.3d 538, 543 (2d Cir. 2015) ("'The right to

practice religion freely does not include liberty to expose the community . . . to communicable

disease.'") (quoting *Prince v. Mass.*, 321 U.S. 158 (1943)).

The most recent Supreme Court decision in the *Jacobson* line is *South Bay United*

*Pentecostal Church v. Newsom*, 140 S. Ct. 1613 (2020) (Roberts, C.J., concurring), which is

dispositive here. The *South Bay* plaintiffs challenged an Executive Order issued by the Governor

of California that limited "attendance at places of worship to 25% of building capacity or a

maximum of 100 attendees." *Id.* at *1. Concurring with the Court's denial of plaintiffs'

application for preliminary injunctive relief, Chief Justice Roberts stated as follows:

> The precise question of when restrictions on particular social activities should be
> lifted during the pandemic is a dynamic and fact-intensive matter subject to
> reasonable disagreement. Our Constitution principally entrusts '[t]he safety and the
> health of the people' to the politically accountable officials of the States 'to guard
> and protect.' When those officials "undertake[] to act in areas fraught with medical
> and scientific uncertainties," their latitude "must be especially broad.

*Id.* at *2-*3 (denying injunctive relief against order aimed at limiting spread of COVID-19); *see*

*also Ass'n of Jewish Camp Operators v. Cuomo*, 2020 WL 3766496, at *8 (N.D.N.Y. July 6,

2020) (joining "the many courts throughout the country that rely on *Jacobson* when determining

if a governor's executive order has improperly curtailed an individual's constitutional right

during the COVID-19 pandemic"); *Luke's Catering Service, LLC v. Cuomo*, 2020 WL 5425008,

at *14-15 (W.D.N.Y. Sept. 10, 2020) (applying *Jacobson* to deny preliminary injunction and

grant cross-motion to dismiss, in challenge to New York's 50-person limit on event venues);

*Elim Romanian Pentecostal Church v. Pritzker*, 962 F.3d 341, 347 (7th Cir. 2020) ("Perhaps a

state could differentiate between the maximum gathering permitted in a church and a cathedral

with seats for 3,000, but we do not evaluate orders issued in response to public-health

emergencies by the standard" as, for example, rule-making.); *Agudath* Tr. at 38:15-19.[11]

As shown by the Supreme Court's decisions in *Jacobson* and *South Bay* and various lower court rulings, New York has the right to protect itself from a deadly, world-wide pandemic that has already claimed the lives of over 210,000 Americans, including over 16,000 New York City residents. The Governor's decision to close or restrict businesses and to postpone or limit gatherings in certain areas based on a sharp spike in COVID-19 cases in those areas is eminently reasonable. The Executive Order has a real and substantial relation to protecting the public under *Jacobson* because it seeks to contain further spread of this highly infectious disease where authorities have found that clusters of cases threaten the State's containment of the virus.

Plaintiff's attempts to distinguish *Jacobson* and *South Bay* are unavailing. It erroneously claims, for example, that pursuant to EO 202.68, "[e]ven in the most restrictive red zones, where only 'essential' secular businesses are permitted to remain open, the Governor's capacity

---

[11] This principle of deference to states' determinations as to how to protect their citizens from the COVID-19 pandemic has resulted in a chorus of decisions upholding state laws and directives. *See, e.g.*, *League of Indep. Fitness Facilities & Trainers, Inc. v. Whitmer*, 814 F. App'x 125 (6th Cir. 2020) (MI order closing indoor gyms); *In re Abbott*, 954 F.3d 772 (5th Cir. 2020) (TX temporary ban on unnecessary procedures, including abortion); *Corbett v. Cuomo*, 20 Civ. 4864, Dkt. No. 13 (S.D.N.Y. July 2, 2020) (NY order requiring travel quarantine); *Ill. Republican Party v. Pritzker*, 2020 WL 3604106 (N.D. Ill. July 2, 2020) (IL gatherings restriction); *Elmsford Apt. Associates, LLC v. Cuomo*, 2020 WL 3498456 (S.D.N.Y. June 29, 2020) (NY eviction moratorium); *McCarthy v. Cuomo*, 2020 WL 3286530 (E.D.N.Y. June 18, 2020) (NY gathering restriction); *Slidewaters LLC v. Wash. Dep't of Labor & Indus.*, 2020 WL 3130295 (E.D. Wash. June 12, 2020) (WA order closing certain business); *Calvary Chapel Lone Mtn. v. Sisolak*, 2020 WL 3108716 (D. Nev. June 11, 2020) (NV order limiting size of religious services); *Prof'l Beauty Fed. of Cal. v. Newsom*, 2020 WL 3056126 (C.D. Cal. June 8, 2020) (CA order closing non-essential business); *Talleywhacker, Inc. v. Cooper*, 2020 WL 3051207 (E.D.N.C. June 8, 2020) (NC order closing non-essential business); *Best Supplement Guide, LLC v. Newsom*, 2020 WL 2615022 (E.D. Cal. May 22, 2020) (CA order closing non-essential business); *Antietam Battlefield KOA v. Hogan*, 2020 WL 2556496 (D. Md. May 20, 2020) (MD gathering restriction); *Open Our Oregon v. Brown*, 2020 WL 2542861 (D. Or. May 19, 2020) (OR order closing non-essential business); *Geller v. De Blasio*, 2020 WL 2520711 (S.D.N.Y. May 18, 2020) (NY gathering restriction); *Henry v. DeSantis*, 2020 WL 2479447 (S.D. Fla. May 14, 2020) (FL order closing businesses and restricting movement); *Calvary Chapel of Bangor v. Mills*, 2020 WL 2310913 (D. Me. May 9, 2020) (ME gatherings restriction); *McGhee v. City of Flagstaff*, 2020 WL 2308479 (D. Az. May 8, 2020) (AZ stay-at-home order and order closing business); *Cross Culture Christian Ctr. v. Newsom*, 445 F. Supp. 3d 758 (E.D. Cal. 2020) (CA gathering restriction); *Cassell v. Snyders*, 2020 WL 2112374 (N.D. Ill. May 3, 2020) (IL stay-at-home order); *Lighthouse Fellowship Church v. Northam*, 2020 WL 2110416 (E.D. Va. May 1, 2020) (VA gathering restriction); *Gish v. Newsom*, 2020 WL 1979970 (C.D. Cal. Apr. 23, 2020) (CA stay-at-home order); *Legacy Church, Inc. v. Kunkel*, 2020 WL 1905586 (D.N.M. Apr. 17, 2020) (NM gathering restriction).

limitations on Houses of Worship simply do not apply to non-religious institutions." Pl. Br. at 17. But Plaintiff's argument misses the point: activities comparable to its own for purposes relevant to public health, *i.e.*, public gatherings with scheduled starting and ending times such as public lectures, concerts or theatrical performances, *remain entirely closed. See* Blog Decl. Ex. EE ¶¶ 57, 62.  In actuality, EO 202.68 *accommodates* religious activity over secular activity. Indeed, in the red zone, *all* non-essential gatherings are banned entirely, non-essential business are 100% closed, restaurants are closed for indoor and outdoor dining, and schools are entirely closed. Houses of worship, on the other hand, are only subject to a limit of 25% occupancy or 10 people, whichever is fewer. Similarly, in the orange zones, non-essential gatherings are limited to 10 people, schools and high risk businesses are entirely closed, and restaurants are closed for indoor dining. Houses of worship, on the other hand, are still only subject to a limit of 33% occupancy or 25 people, whichever is fewer. Finally, in yellow zones, non-essential gatherings are limited to 25 people, restaurants cannot seat parties of more than four for indoor dining, and indoor dining is already restricted to 25% capacity in New York City. Houses of worship, on the other hand, are only subject to a 50% occupancy limit.

In addition, as discussed in further detail below, any industries that are permitted to be open at full capacity in the red or orange zones are quite different from houses of worship, and thus simply are not appropriate comparators. *See S. Bay*, 140 S. Ct. 1613 (finding that operating grocery stores, banks, and laundromats was dissimilar to worship services); *Elim Romanian Pentecostal Church*, 962 F.3d at 347 (finding church service unlike grocery stores, pharmacies, and warehouses, and more like concerts and movie theaters).

To the extent Plaintiff implies that the *Jacobson* standard does not apply to claims concerning the Free Exercise Clause, it is incorrect. *South Bay* dealt with a free exercise claim,

and Chief Justice Roberts nonetheless applied *Jacobson*. The Seventh Circuit in *Elim Romanian Pentecostal Church*, 962 F.3d at 347, also recently applied *Jacobson* to a Free Exercise claim and cited to *Jacobson* to uphold an order that restricted religious gatherings to ten people. That court also relied on *Jacobson* to reject the plaintiff's argument that the court should overturn the order because warehouses were allegedly more dangerous than religious services or because it was arbitrary for the state not to "differentiate between the maximum gathering permitted in a small church and a cathedral with seats for 3,000." *Id.*

Similarly, the district court in *Association of Jewish Camp Operators*, 2020 WL 3766496, at *8, relied on *Jacobson* in denying a Free Exercise challenge to an Executive Order prohibiting overnight camps. The court rejected the plaintiffs' argument that *Jacobson* did not apply, finding that the Second Circuit in *Phillips*, 775 F.3d 538 "explicitly stated that it followed the reasoning of *Jacobson* when concluding that a mandatory vaccination policy, as a condition for admission to school, did not violate the Free Exercise Clause." *Ass'n of Jewish Camp Operators*, 2020 WL 3766496, at *8.

Relying on these cases, among others, the Eastern District Court of New York recently applied the *Jacobson* standard to the very Executive Order at issue here. *See Agudath Israel*, No. 20-cv-4834 (Order of Judge Kiyo Matsumoto dated October 9, 2020). The court found under *Jacobson* that EO 202.68 has "a very real and substantial relation to protecting the public health." *Agudath* Tr. at 48:10-11.

Because *Jacobson* applies to Plaintiff's claims, and such claims cannot survive muster thereunder, Plaintiff has no likelihood of success on the merits. The preliminary injunction can be denied on this basis alone.

14

**B.     The Executive Order Does Not Violate The First Amendment**

   1.   *The Executive Order Is Facially Neutral And Does Not Prevent Plaintiff's Free Exercise Of Religion*

Even if the deferential *Jacobson* standard did not apply, Plaintiff's claim still could not

succeed under standard First Amendment analysis. To "state a free exercise claim, a plaintiff

generally must establish that 'the object of [the challenged] law is to infringe upon or restrict

practices because of [its] religious motivation,' or that the law's 'purpose . . . is the suppression

of religion or religious conduct.'" *Congregation of Rabbinical Coll. of Tartikov, Inc. v. Vill. of

Pomona*, 915 F. Supp. 2d 574, 619 (S.D.N.Y. 2013) (quoting *Church of Lukumi Babalu Aye, Inc.

v. Hialeah*, 508 U.S. 520, 533 (1993)). The right of the free exercise does not relieve an

individual or entity of the obligation to comply with a "valid and neutral law of general

applicability." *Employment Div., Dept. of Human Res. of Ore. v. Smith*, 494 U.S. 872 (1990). As

a result, where a limitation on the exercise of religion is not the object, "but merely the incidental

effect of a generally applicable and otherwise valid provision, the First Amendment has not been

offended." *Id.* at 878. Therefore, a law that only incidentally imposes a burden on the exercise of

religion need only be supported by a rational basis. *WTC Families for a Proper Burial, Inc. v.

City of N.Y.*, 567 F. Supp. 2d 529, 539-40 (S.D.N.Y. 2008); *Fortress Bible Church v. Feiner*, 694

F.3d 208, 220 (2d Cir. 2012).

Here, counter to Plaintiff's claims, the Executive Order is neutral and generally

applicable. Indeed, the Executive Order applies to all non-essential industries, activities, and

gatherings, as it restricts or closes schools, public gatherings of any kind, and non-essential

businesses. Plaintiff argues that the EO's use of "the term 'houses of worship'—a term that, on

its face, is 'without a secular meaning'—makes clear that the law is neither neutral or generally

applicable, but rather targeted at religious practice." Pl. Br. at 17 (quoting *Lukumi*, 508 U.S. at

15

533-34.) However, religious practices are certainly not the only conduct subject to restriction by the Executive Order, which Plaintiff does not dispute.

The fact that there are restrictions specific to houses of worship does not mean that the Executive Order is not generally applicable. Indeed, the Nevada District Court denied a motion for a preliminary injunction against a similar Executive Directive that covered many industries, activities, and gatherings, but had a specific rule limiting houses of worship to 50% capacity. *Calvary Chapel Dayton Valley v. Sisolak*, 2020 WL 4260438, at *1 (D. Nev. June 11, 2020). The plaintiff argued that this rule targeted religion and had lesser restrictions on comparable secular activity. *Id.* However, the court found that there were both "secular activities comparable to in-person church services that are subject to more *lenient* restrictions" and others "subject to more *stringent* restrictions." *Id.* (emphasis in original). As a result, the directive was not "an implicit or explicit attempt to specifically target places of worship" but was instead "neutral and generally applicable." *Id.* Thus, the court rejected plaintiff's facial Free Exercise challenge." *Id.*[12]

Similarly here, the Executive Order applies to all non-essential activities and thus does not specifically target places of worship. Accordingly, it need only be supported by a rational basis. *Ass'n of Jewish Camp Operators*, 2020 WL 3766496, at *10 ("The Supreme Court has established 'the general proposition that a law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice.'") (quoting *Church of Lukumi Babalu Aye, Inc.*, 508 U.S. at 531). The rational basis for the Executive Order is manifest – the State's continuing exercise of its police power to mitigate the ongoing public health crisis of COVID-19.

---

[12] Both the Supreme Court and the Ninth Circuit subsequently denied plaintiffs' requested injunctive relief. *Calvary Chapel Dayton Vall. v. Sisolak*, 140 S. Ct. 2603 (2020); *Calvary Chapel Dayton Valley v. Sisolak*, 2020 WL 4274901, at *1 (9th Cir. July 2, 2020) (citing *S. Bay*, 140 S.Ct. 1613).

There are undeniable increases in COVID-19 cases in and around the neighborhoods that are subject to the Executive Order, and the rates of new cases and the positivity rates in these neighborhoods is significantly higher than in the rest of New York City. Guidance from all public health organizations is clear that social distancing is the best tool to prevent or reduce the spread of COVID-19. The Executive Order seeks to temporarily implement renewed restrictions on gatherings in these neighborhoods to end these spikes before they get worse and to prevent this renewed outbreak from spreading further outward. *See id.* at *16 ("[P]reventing the spread of COVID-19 is a legitimate interest, and that interest is rationally related to the prohibition on overnight camps."); *McCarthy*, 2020 WL 3286530, at *6 ("Given the seriousness of the COVID-19 pandemic, I find it exceedingly unlikely that plaintiffs will be able to demonstrate that the COVID-19 Executive Orders do not have a rational basis.").

### 2. The Executive Order Does Not Discriminate Against Religious Practice Because It Does Not Permit "Comparable" Secular Conduct

Plaintiff also incorrectly claims that the Executive Order "on its face, targets religious practice." Pl. Br. at 17. To the contrary, EO 202.68 does not target religious activity while permitting comparable secular conduct, because as explained above, it imposes *less* restriction on religious practice than on comparable secular conduct. *See* Section I.A., *supra*.

Plaintiff nonetheless contends that EO 202.68 improperly discriminates against religion, arguing for example that "hundreds of parishioners will be unable to attend mass, but anyone can shop for pet food and conduct business at a bank…. [and hence the] Governor's order thus permits broad swaths of public behavior, while imposing stark and severe limitations on comparable religious practice only." Pl. Br. at 22

Plaintiff's comparison of religious services to shopping (in stores deemed "essential") is misplaced. Shopping is unlike a religious service because customers generally arrive and leave at

17

different times and do not gather or mingle together with groups outside their own party.[13] At religious gatherings, on the other hand, people generally arrive at the same time, intermingle with each other, engage in prayer together as well singing and chanting together, and  leave at the same time. *See Agudath* Tr. 63:9-64:10. The State has been consistent with its restrictions of comparable events in which many people arrive simultaneously, intermingle, watch or engage in an event and then leave at the same time. For example, all music and performance venues and theaters remain closed throughout the entire State due to the risks posed by crowded public venues, and private events such as weddings, remain subject to certain numerical restrictions for the same reason.

Moreover, "essential businesses" are also unlike religious services, as they generally do not involve large groups of people arriving and departing at the same time and intermingling while jointly participating in the same event. Further, while social distancing can be maintained within business offices, it is less practical when individuals engage in joint prayer, singing, and chanting. The risk of spread of COVID-19 is also higher when people raise their voices, such as when singing and chanting. *See* Blog Decl. ¶ 69.

Indeed, other courts have agreed that religious gatherings are more comparable to "functions that occur in auditoriums, such as concerts and movies," than to shopping or work spaces. Thus, in *Elim Romanian Pentecostal Church*, 962 F.3d at 346, the Seventh Circuit rejected *Roberts v. Neace*, 958 F.3d 409 (6th Cir. 2020), which had acknowledged that a law lacks neutrality only when it treats secular activities better than *comparable* religious ones, but found no difference between a grocery store and a church. As the Seventh Circuit explained,

---

[13]This is also the case with respect to the list of essential businesses recited by Plaintiff, Pl. Br. at 17, to wit "grocery stores, pharmacies, convenience stores, gas stations, hardware stores, pet food stores, banks, insurance companies, payroll companies, and accounting companies, among others."

concerts, movies, and religious gatherings place "members of multiple families close to one another for extended periods, while invisible droplets containing the virus may linger in the air. Functions that include speaking and singing by the audience increase the chance that persons with COVID-19 may transmit the virus through the droplets that speech or song inevitably produce." *Id.* The court also rejected the plaintiff's counterargument that people remain together for extended periods in warehouses and offices, noting that "most offices contain spaces that provide social distancing" and that warehouse workers were unlikely to "engage in the sort of speech or singing that elevates the risk of transmitting the virus." *Id.* at 347. Chief Justice Roberts also observed that concerts and church services are comparable to each other, but different from stores "in which people neither congregate in large groups nor remain in close proximity for extended periods." *See S. Bay*, 140 S. Ct. at 1613 (Roberts, C.J., concurring).[14]

Because Plaintiff cannot establish a comparable activity that is less restricted within the relevant zones, any infringement on Plaintiff's free exercise of their religion is incidental. "Courts have upheld more extreme measures taken in response to public health needs, including quarantines, which limit a person's right to assemble with any other person." *Amato v. Elicker*, 2020 WL 2542788, at *11 (D. Conn. May 19, 2020) (citing, *inter alia*, *Compagnie Francaise de Navigation a Vapeur v. La. Bd. of Health*, 186 U.S. 380 (1902)).

A mass gathering is not less dangerous simply because it is religious in nature. Moreover, "'[t]he right to practice religion freely does not include liberty to expose the community . . . to communicable disease.'" *Phillips*, 775 F.3d at 543 (quoting *Prince*, 321 U.S. at 166-67).[15]

---

[14] The holding in the preliminary injunction decision in *Soos v. Cuomo*, 2020 WL 3488742 (N.D.N.Y. June 26, 2020), cited by Plaintiff, is therefore not applicable. In *Soos*, the plaintiffs showed that greater restrictions were being placed on gatherings for religious observances than on other types of comparable gatherings. *Id.* at *12. Plaintiff has failed to show that here. *See Agudath* Tr. 64:11-21.

[15] Further, the myriad of organizations that object to EO 202.68 shows that it does not only affect religious

3.   *Even If Strict Scrutiny Applies – Which It Does Not – Plaintiff's Claims Would Still Fail*

Strict scrutiny requires the State to show that the order "advance[s] interests of the highest order" and that it is "narrowly tailored in pursuit of those interests." *Church of Lukumi Babalu Aye, Inc.*, 508 U.S. at 546. The fight against COVID-19 is indeed a governmental interest of the highest order. "[I]t bears repeating what is at stake . . . the [State] seeks to slow the spread of a virus that has hospitalized and killed tens of thousands of New Yorkers and infected hundreds of thousands more – in less than three months' time." *Geller*, 2020 WL 2520711, at *4. It is essential that New York prevent another outbreak and rapid spread of COVID-19 infections, and the resulting severe illnesses and deaths that occurred earlier this year. The Executive Order at issue here is narrowly tailored to that interest.

Although federal courts have repeatedly refused to apply the strict scrutiny standard to COVID-related executive orders, they have also repeatedly stated in dicta that these critical public health provisions would meet either standard. *See, e.g.*, *Legacy Church, Inc.*, 2020 WL 1905586, at *38 ("The [New Mexico] Order is reasonably related to the demands of the public health crisis, coronavirus. Moreover, if the [] Order was subject to a strict scrutiny analysis, the Court would conclude that it meets strict scrutiny."); *Calvary Chapel of Bangor*, 2020 WL 2310913, at *9 n.17 ("Even if the [Maine] orders were subject to heightened scrutiny, the Governor would likely be able to show that they serve a compelling government interest (preventing the spread of COVID-19) and that they are narrowly tailored.").

The same result follows for the Executive Order at issue here, particularly given the unprecedented ferocity of the disease in New York City and the extraordinary mitigating efforts

---

communities uniquely, as, *inter alia*, a law firm, and a car dealership have also initiated suits. *Plaza Motors of Brooklyn, Inc. v.* Cuomo, No. 20-4851 (E.D.N.Y.); *Turturro Law, P.C. v. Cuomo*, No. 20-cv-4824 (E.D.N.Y.).

the State has undertaken.[16] Indeed, prior Executive Orders applied city-wide or statewide. This Executive Order is narrowly tailored, as Governor Cuomo has even declined to target areas by zip code because that was not specific enough. Further, the Executive Order sets rules for three different zones to ensure that restrictions are not unnecessarily severe for regions outside the primary hotspots. Indeed, most of the City is not within the zones. Inasmuch as the increases in cases are specific to certain neighborhoods, so is the Executive Order's application. The restrictions it imposes are necessary within these neighborhoods and communities, because the government's data shows that is where the spikes in cases *are occurring*. The First Amendment's protections do not require that the government ignore reality and common sense. Reacting quickly and decisively to prevent deadly infection spikes from spreading out of control is certainly an "interest of the highest order," and an Executive Order focused on the neighborhoods with the spikes is narrowly tailored to that interest.

Further, Plaintiff's claimed record of various social distancing and hygiene measures (Pl. Br. at 11-12) does not obviate the State's need to swiftly respond to COVID-19 outbreaks in neighborhoods near Plaintiff's churches. Plaintiff ignores the fact that infection spikes threaten to spread notwithstanding its efforts – indeed, the fact that they are occurring suggests the ineffectiveness of Plaintiff's measures. And, regardless of what caused the spikes, there is nothing irrational about the State changing tactics based on changing circumstances. *See S. Bay*, 140 S. Ct. at 1614 (Roberts, C.J., concurring) (measures to prevent spread "should not be subject to second-guessing" especially where "a party seeks emergency relief in an interlocutory posture, while local officials are actively shaping their response to changing facts on the ground").

---

[16] Indeed, this is why Plaintiff's argument that "the State can offer no evidence that COVID-19 infections have arisen or spread at any church in the Diocese," Pl. Br. at 20, is of no moment. There is *plain* evidence of a heightened community spread in the areas targeted by the Executive Order. Blog Decl. ¶¶ 92-9.

Plaintiff's claim that there have been no outbreaks of COVID-19 stemming from Catholic churches or congregations in Brooklyn or Queens (Pl. Br. at 12) overlooks the rapidity by which the disease can spread and the need to take urgent preventive action. Plaintiff does not assert how many of its congregants have been tested or that it takes their attendance, nor can it know how many are asymptomic carriers who might spread the virus. *See Elim Romanian Pentecostal Church*, 962 F.3d at 342 (noting that epidemiologists believe cases and deaths are undercounted because "persons with no or mild symptoms may not be tested, some people die of the disease without being tested, and some deaths attributed to other causes may have been hastened"). The State must be able to take action quickly to protect the public health where, as here, there is clear evidence of spikes in certain neighborhoods, and the Executive Order rationally seeks to prevent a repetition of the public health catastrophe that occurred earlier this year.

## II.  THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST WEIGH IN FAVOR OF NEW YORK'S MISSION TO PROTECT ITS CITIZENS FROM A GLOBAL PANDEMIC

The balance of equities and considerations of the public interest weigh decisively against Plaintiff's request for injunctive relief.

"As the Supreme Court reaffirmed in *Winter*[, 555 U.S. 7], a plaintiff seeking a preliminary injunction must demonstrate not just [likelihood of success and irreparable harm], but also that the 'balance of the equities tips in his favor and an injunction is in the public interest.'" *Otoe-Missouria Tribe v. N.Y.S. Dep't of Fin. Svcs.*, 769 F.3d 105, 112 n.4. (2d Cir. 2014). These factors merge when the government is the opposing party. *L&M Bus Corp.*, 2018 WL 2390125, at *13. Further, the court must ensure that the "public interest would not be disserved" by the preliminary injunction. *Salinger v. Colting*, 607 F.3d 68, 80 (2d Cir. 2010). Courts "should pay particular regard for the public consequences in employing the extraordinary

remedy of injunction." *N.Y.S. Rifle & Pistol Ass'n v. City of N.Y.*, 86 F. Supp. 3d 249, 258

(S.D.N.Y. 2015), *aff'd*, 883 F.3d 45 (2d Cir. 2018) (quoting *Weinberger v. Romero-Barcelo*, 456

U.S. 305 (1982)). This consideration includes the government's interest in public health. *Million*

*Youth March, Inc. v. Safir*, 155 F.3d 124, 125-26 (2d Cir. 1998) (it was necessary to consider the

government's interest in the public health against First Amendment rights).

The government's interest in preventing the spread of the highly infectious COVID-19

disease is critically important. Restricting all public gatherings, including religious gatherings,

within neighborhoods that are seeing a spike in cases certainly furthers that interest. *See Ass'n of*

*Jewish Camp Operators*, 2020 WL 3766496, at *21 (injunction not in public interest due to "the

unprecedented nature of the COVID-19 pandemic, the deadly nature of the virus itself, the lack

of a vaccine. . . and lack of scientific agreement about its transmission"). Plaintiff's interest in

having indoor, in-person religious gatherings of potentially hundreds of people (even if restricted

to 25%, 33% or 50% of their building capacities), in the very areas where cases are *spiking*,

cannot outweigh the imperative need to prevent the infection spikes from rapidly increasing and

spreading further. New York City saw firsthand how quickly the spread of COVID-19 can spiral

out of control, and how this can lead to an overwhelmed hospital system and a dramatic increase

in severe illnesses and deaths. It is vital that the government be able to do everything possible to

stop any case increases.

Plaintiff's efforts to impose its own health and safety protocols (Pl. Br. at 11-12) in its

churches were plainly insufficient to prevent the neighborhood spikes in COVID-19 cases that

are now targeted by the measures in EO 202.68. As explained above, religious services have

specific risk factors, including that participants generally arrive at the same time, intermingle,

engage in prayer, singing and chanting together, and leave at the same time. Further, whether or

not COVID-19 was initially spread by Plaintiff's congregations is immaterial to the significant risk that churchgoers could catch COVID-19 in these neighborhoods, which presently have as much as an 8% positivity rate, and then spread it at their religious services.

Indeed, as found in *Agudath Israel*, "the irreparable harm to the public is great when one balances hardship, death or permanent injuries to one's organs that can impair or change one's life as opposed to having to observe [] one's religion in a different way." *Agudath* Tr. at 65:24-66:3. Accordingly, the public interest and equitable considerations require the denial of Plaintiff's motion. *See Winter*, 55 U.S. at 23-24 ("proper consideration" of the public interest and equitable factor "alone require[d] denial of the requested injunctive relief").

## III.     PLAINTIFF HAS NOT SHOWN A LIKELIHOOD OF IRREPARABLE HARM

As a final matter, Plaintiff has failed to present sufficient evidence that the temporary measures implemented to combat the COVID-19 pandemic will cause it irreparable harm. *Vis Vires Grp., Inc. v. Endonovo Therapeutics, Inc.*, 149 F. Supp. 3d 376, 390 (E.D.N.Y. 2016) (plaintiffs must show "they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm.") (quoting *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007)). EO 202.68 still permits religious gatherings. As described above, religious gatherings have maximum occupancy limits *higher than* other comparable public gatherings. In addition, even the most restrictive limit in the red zones permits religious gatherings of up to ten people.

Further, Plaintiff acknowledges that it voluntarily closed its houses of worship on March 15, and they were thereafter fully closed for over two months in the city. Pl. Br. at 8-9. Plaintiff does not explain how it could weather this two-month lockdown, but now will be irreparably harmed by lesser restrictions within limited zones, for a shorter time period. *See Agudath* Tr. at

24

66:5-15 (given that plaintiffs were previously able to comply with a lockdown by modifying their religion practices, the injuries they now assert, while unfortunate, are not irreparable).

On the other hand, the State suffers irreparable harm any time that it is enjoined from enforcing its policies. *Maryland v. King*, 567 U.S. 1301 (2012) (Roberts, C.J., in chambers). In the present case, such harm is manifest because the policy Plaintiff challenges is intended to halt neighborhood spikes in COVID-19 cases and prevent deadly infections from increasing exponentially and spreading more widely. Enjoining EO 202.68 would impair the State's critical ability to rapidly address developing hotspots, and would thereby endanger the public health.

## CONCLUSION

For the reasons set forth above, it is respectfully requested that the Court deny Plaintiff's motion for a preliminary injunction and grant such other and further relief as it deems just and proper.

Dated: New York, New York  
      October 13, 2020

LETITIA JAMES  
Attorney General of the State of New York  
***Attorney for Governor Cuomo***

By: ___/s/ Seth J. Farber_____  
Seth J. Farber  
Erin R. McAlister  
Maryam Jazini-Dorcheh  
Assistant Attorneys General  
28 Liberty Street, New York, NY 10005  
(212) 416-8029