

STATE OF NEW YORK
OFFICE OF THE ATTORNEY GENERAL

LETITIA JAMES
ATTORNEY GENERAL

DIVISION OF STATE COUNSEL
LITIGATION BUREAU

Writer's Direct Dial: (212) 416-8029

**By ECF**  October 16, 2020

Hon. Nicholas G. Garaufis
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

      Re: *The Roman Catholic Diocese of Brooklyn, New York v. Cuomo*
           20-cv-4844 (E.D.N.Y.) (NGG-CLP)

Dear Judge Garaufis:

      This Office represents Governor Andrew M. Cuomo, the defendant in the above-referenced matter. As requested by the Court, I write to provide additional evidence in opposition to Plaintiff's Motion for a Preliminary Injunction, specifically to (1) describe the process of the creation, designation, and mapping of the zones through the Governor's Cluster Action Initiative; (2) identify the current positivity rates within the zones; and (3) explain the information used to monitor the zone mitigation measures during its designation, as well as the data used to guide decisions regarding the timing of zone modification.

      As set forth in the attached Declaration of Howard A. Zucker, M.D., J.D., Commissioner of the New York State Department of Health ("DOH") and member of the Governor's interagency COVID task force[1], DOH, in consultation with a task force working on arresting the spread of COVID-19, global public health experts, and the Governor's Office, developed the

---

[1] The New York State interagency task force is continuing to coordinate with local governments and healthcare partners to monitor and respond to the novel coronavirus outbreak. Members of the task force include:
- Linda Lacewell, Department of Financial Services, Superintendent
- Dr. Howard Zucker, Department of Health, Commissioner
- Melissa DeRosa, Secretary to the Governor
- Beth Garvey, Special Counsel
- Gareth Rhodes, Department of Financial Services, Deputy Superintendent
- Simonida Subotic, Deputy Secretary for Economic Development
- Kelly Cummings, Director of State Operations and Infrastructure
- Michael Kopy, Director of Emergency Management
- Patrick Murphy, Division of Homeland Security and Emergency Services, Commissioner
- RoAnn Destito, Office of General Services, Commissioner
- Pat Foye, MTA, Chairman & CEO
- Rick Cotton, Port Authority of New York and New Jersey, Executive Director
- Dan Fuller, Deputy Secretary for Education
- Sandra Beattie, Division of Budget, Deputy Director

*See* Governor's Briefing October 16, 2020 at https://www.governor.ny.gov/news/novel-coronavirus-briefing-governor-cuomo-confirms-11-additional-cases-bringing-statewide-total

cluster zones that were ultimately incorporated into Executive Order 202.68. In order to flatten the upward curve of infection rates that has occurred in this particular area, they were required to impose similar restrictions that were conducted when the State of Emergency was first declared. The decisions regarding the designation of these zones and the mitigation measures were based on, among other factors, the evaluation of all available data related to COVID-19 transmission, including, but not limited to, positivity rates, population density, testing data, mapping information, and the rate of community spread. Zucker Decl. ¶¶ 11-12, 15-22. The DOH initially considered the zip codes found through these metrics, but ultimately generated more targeted maps using streets as boundaries. *Id*. ¶¶ 17-18.

The DOH analyzes the positivity rates and other relevant data in the cluster zones on a daily basis to determine whether they are improving or worsening. The current positivity rate (as of yesterday) in all Red Zones is 4.8%, a reduction of the 7.9% positivity rate the week of September 20 through September 26 and reducing each subsequent week. *Id*. ¶ 23. Even though the positivity rates are—thankfully— currently dropping, this is largely due to the mitigation measures that have been imposed. The restrictions in the cluster zones should not be reconsidered unless and until there has been a decrease in rates for a sustained period of time, which has been designated as14 days from the initial designation or any re-designation because that is the incubation period for the virus. *Id*. ¶ 24-29. In other words, the number of individuals infected with the virus at the epicenter of the cluster could still fluctuate and increase for up to two weeks, and it would be dangerous to ease the restrictions before that period ends. After at least 14 days, DOH, along with the task force, the Governor's Office, and health departments and global health experts, will determine whether the viral spread in the zones of concern have successfully been reduced such that any outbreak can reasonably be contained using testing, contact tracing, and other metrics, without the need for more stringent measures. At this time, the decision-makers cannot speculate as to what future actions they might take or when restrictions may be lifted or modified because this process is driven by the relevant data—and relevant data only. *Id*.

The imposition of the restrictions is a matter that officials have not taken lightly but is imperative to ensure the life and safety of the public at large. The DOH must and has, therefore, taken a carefully calibrated approach to develop, daily monitor, and potentially modify these cluster zones. The capacity limits applicable to houses of worship within these zones clearly satisfy the rational-basis standard as set forth in *Jacobson v. Massachusetts*, 197 U.S. 11, 27, 31 (1905) (community's right to "protect itself against an epidemic of disease" will only face judicial scrutiny if it "has no real or substantial relation to" to the object of protecting the public or is "beyond all question, a plain, palpable invasion of rights secured by the fundamental law") and its progeny of cases. The restrictions in the cluster zones are geographically limited, as set forth above, to areas with alarming positivity rates, high risks of spread, and other relevant data. As we have argued in our opposition papers and as the evidence shows, the restrictions on religious worship services in the zones are less onerous than those on other types of comparable gatherings. As Chief Justice Roberts concluded in *South Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613 (2020) (Roberts, C.J., concurring), "the precise question of when restrictions on particular social activities should be lifted during the pandemic are a dynamic and fact-intensive matter subject to reasonable disagreement." Accordingly, because there is no question that these restrictions bear a "real or substantial relation" to protecting the public from a

second wave of the pandemic, Executive Order 202.68 should be upheld. *Jacobson*, 197 U.S. at 27, 31.[2]

In sum, the evidence submitted by the Governor at the hearing yesterday and in opposition papers this week clearly demonstrates that the State has implemented a reasoned, targeted, narrowly tailored response to the recent surge in COVID cases. This response respects the rights of worshipers while curtailing the spread of the virus and protecting the public health from this deadly disease.

Thank you for Your Honor's consideration of this matter.

Respectfully submitted,

*/s/ Seth J Farber /*
Seth J. Farber
Assistant Attorney General
Seth.Farber@ag.ny.gov

cc: All Counsel (via ECF)

---

[2] Indeed, the State's carefully constructed capacity limits on houses of worship would survive even strict scrutiny review. The State is clearly "advanc[ing] interests of the highest order" by attempting to prevent the resurgence of a virus that has killed over 25,000 New Yorkers. *Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 546 (1993). And the Executive Order is narrowly tailored because it is limited in time and to discrete areas where the government's data shows COVID-19 levels are spiking.