# GIBSON DUNN

Gibson, Dunn & Crutcher LLP

200 Park Avenue
New York, NY 10166-0193
Tel 212.351.4000
www.gibsondunn.com

Randy M. Mastro
Direct: +1 212.351.3825
Fax: +1 212.351.5219
RMastro@gibsondunn.com

October 16, 2020

VIA ECF

Hon. Nicholas G. Garaufis
United States District Judge
United States Courthouse, Room 1426 S
225 Cadman Plaza East
Brooklyn, NY 11201

Re:  *The Roman Catholic Diocese of Brooklyn, New York v. Cuomo*, No. 1:20-cv-4844

Dear Judge Garaufis:

The Attorney General's Office's submission filed this morning goes far beyond the narrow information this Court requested at the end of yesterday's hearing.  Indeed, the Attorney General's Office attempts vainly to resurrect a failing defense of the Governor's overreach by introducing yet another new declarant (Health Commissioner Zucker) not subject to cross-examination who contradicts the prior DOH witnesses' accounts and claims things he's never claimed before in multiple declarations he submitted to other federal courts on this same subject matter (including last week in the *Agudath Israel* case).  This is an affront to the Court for so many reasons, and it should not be countenanced.

At bottom, no matter how thickly lipstick is applied to this pig that is the Governor's latest Executive Order, this submission—like the testimony and evidence presented at yesterday's evidentiary hearing—only reconfirms that the Executive Order at issue in this case violates the Free Exercise rights of the Diocese, which has followed all the rules and done everything right, and, as a result, now has an undisputed proven record of success in combatting potential spread of COVID-19 in its churches and, therefore, cannot be subjected as a matter of well-established constitutional doctrine to the same onerous infringements as those who haven't and admittedly are the source of the problem.

The Court asked the Governor to provide further information on two specific, discrete issues: (1) current data with regard to the positivity results in the clusters, including whether "circumstances have improved"; and (2) "whether the State is planning to revise parameters of the limitations that it has placed on religious worship in the zones."  Ex. A hereto ("Tr.") at 105:10-14.  Instead, blatantly flouting the Court's instructions, the Attorney General's Office used its submission to mount a desperate, last-ditch effort to walk back the critical and damning admissions his own witness (self-selected over Plaintiff's objections) made yesterday when—unlike the Governor's two other declarants—he was subject to full and fair cross examination.  The State's witness, Mr. Bryon Backenson, conceded that "the decisions about which areas qualified for which zones . . . were made in the Governor's Office," not by the experts in the Department of Health.  Tr. 71:19; *id*. at 72:22-24 (same).  Mr. Backenson is a senior DOH "Director" and was able to testify to this fact with personal knowledge; indeed,

Beijing • Brussels • Century City • Dallas • Denver • Dubai • Frankfurt • Hong Kong • Houston • London • Los Angeles • Munich
New York • Orange County • Palo Alto • Paris • San Francisco • São Paulo • Singapore • Washington, D.C.

the Attorney General's Office deemed him sufficiently knowledgeable of the relevant facts that he put Mr. Backenson on the stand in place of Dr. Blog, whose written declaration was itself deficient for reasons addressed in Plaintiff's prior briefing.  And he was in position to know precisely what was true—namely, that the zones were developed, *ad hoc* and without epidemiological basis, by the Governor's office alone, which is the height of irrationality.  It is shameful that the Attorney General's Office is using its submission to muddy Mr. Backenson's damning concessions.

But now, going far beyond submitting the information the Court requested, the Attorney General's Office tries to tell a completely different story to backfill a justification for the Governor's restrictions and how they came to be.  The Governor's counsel submits a letter, for instance, stating that "DOH, in consultation with a task force working on arresting the spread of COVID-19, global public health experts, and the Governor's Office, developed the cluster zones."  Ltr. from S. Farber (Dkt. No. 29) at 1-2.  Tellingly, the unsworn letter provides no record citation for the proposition that DOH helped create the cluster zones—and Commissioner Zucker's declaration states only that the DOH retains and analyzes data, Zucker Decl. ¶ 15, not that the DOH assisted in developing the zones.  And even in this latest set of papers, the Governor continues to fail to provide any rationale whatsoever for singling out all "Houses of Worship" for disparate treatment worse than applied to such so-called "essential" businesses such as "big box" stores like Target, Staples and Trader Joe's, and even pet stores, banks, broker's offices and accounting firms.  Tr. 82:17-84:21.  The inconsistency of these distinctions renders them wholly irrational.  Tellingly, the Governor's new witness—like Dr. Blog before him—also has nothing to say about the impact of the Governor's restrictions as applied to the Diocese's churches, which have already implemented the rigorous safety protocols that the State itself promotes and, like the CDC, says are the "most important" and "effective" ways to prevent the spread of COVID-19.

In *Department of Commerce v. New York*, 139 S. Ct. 2551 (2019), the Supreme Court categorically rejected similarly shifting rationales—what the Court called a "significant mismatch between the decision the Secretary made and the rationale he provided"—and held that the government's changing story rendered infirm governmental action, even in a case applying one of the most lenient standards in the law:  "arbitrary and capriciousness."  *Id*. at 2575.  Like the federal government in *Department of Commerce*, the Governor provides only shifting sands to explain the Executive Order's "red" and "orange" zones, and none to explain his irrational restrictions on Houses of Worship.  And the Governor does so by submitting a statement from yet another witness who was not subject to cross examination—trying to undo the damning admissions offered by the only witness who was.

The Governor's own words, however, can be trusted.  When the Governor said this was a "not a policy being written by a scalpel, this is a policy being cut by a hatchet," he meant it.  Dkt. No. 28 ¶ 2.  When the Governor said "this is not a highly nuanced, sophisticated response" or "tailored approach," he meant it.  *Id*. ¶ 4.  And when the Governor said "the issue is with the ultra-Orthodox community," "it's a predominantly ultra-Orthodox cluster,"

and "Catholic" establishments are being "closed because" of their proximity to "that cluster," he meant that too. Dkt. 12 ¶ 2. The State's hearing witness—a leader of the Health Department office that collects, examines, and interprets the relevant data, Tr. 61:1-8—conceded yesterday that he was not "aware of any evidence of spread of COVID from the ultra orthodox community to the diocese's churches in Brooklyn," Tr. 100:17-22; *accord* Tr. 76:8-20, 103:8-12, making clear that application of the Governor's restrictions to the Diocese has no rational basis in fact. The First Amendment demands more. The Governor's Executive Order has unnecessarily starved these parishioners of their spiritual nourishment. This Court should end the famine.

The information that the State submits, belatedly, through Dr. Zucker's declaration—which, like all proceeding State submissions, fails to address Catholic churches or the Diocese specifically—only underscores the irrationality of the Executive Order as applied to the Diocese going forward. Dr. Zucker opines, for instance, that in fact there has been a substantial 40% decline in positivity rates in the "red zone," which he attributed to the Governor's Executive Order. Decl. ¶ 23. But that misses the point entirely as applied to the Diocese, where there were no COVID outbreaks in the first place at any time since the Diocese reopened its doors, thanks to the Diocese's implementation of comprehensive COVID protocols that the Governor has repeatedly conceded were appropriate. Mitigation efforts cannot possibly reduce transmission in a community where there has been no such thing and nothing to mitigate. Indeed, Dr. Zucker's declaration concedes that the zones do not "take into account who or what are located in that zone." Decl. ¶ 19.

Dr. Zucker also, incredibly, discloses that "[t]here is no specific percentage or threshold to determine when an area should be designated as an Orange or Yellow Zone," thereby conceding that those zones were promulgated not through any scientific or otherwise rational basis, but by mere whim. Decl. ¶ 20. Injecting even further confusion, Dr. Zucker contradicts himself a paragraph later, suggesting the "orange" and "yellow" zones are "buffer[s]" based on geographical distance from the "red" zones, calling into question whether they are supported by any testing data at all. *Id.* ¶ 21. This presumably explains the utter absence of data regarding COVID rates in "yellow" and "orange" zones in the record before this Court. Plaintiff and this Court, and possibly even the State, have no way even to begin to assess whether COVID positivity rates in those zones are in fact spiking—or whether they are above the State's 1% average transmission rate at all. *See* Decl. ¶ 7. And while Dr. Zucker claims that these zones "take[] multiple factors into account," he fails to shed light on what those factors consist of, aside from "population density." *Id.* These are precisely the types of generalities that led the Northern District of New York, this past summer, to dismiss as "conclusory" a declaration submitted by Dr. Zucker (a pediatrician by training) in another matter challenging the State's COVID restrictions. *See DiMartile v.*

*Cuomo*, 2020 WL 4877239, at *5 & n.2 (N.D.N.Y. Aug. 19, 2020).[1]  Given these admissions, the injunction Plaintiff seeks must, at the very least, permit the Diocese's 12 churches within the orange zones to reopen.

Four points warrant further brief elucidation.

***First*,** the declining infection rates in the "red" zones confirm that, even assuming *arguendo* that there was any basis for sweeping up the Diocese's churches under untailored fixed capacity restrictions on October 6, there is certainly no justification for shuttering Diocesan churches this coming weekend.  As Mr. Backenson revealed yesterday, the zones were created based not on any epidemiological input, but rather on the Governor's pick-a-number-out-of-a-hat whim.  *See* Tr. at 71:2-22.  Rates in the red zone two weeks before the Governor enacted his Executive Order were approximately 7.9%.  Dkt. 29 at 2.  But as of October 15, the positivity rates in these supposed highest-risk areas have dropped to 4.8%, as the Governor admits in his submission this morning.  Dkt. 29 at 2.  And there is still no evidence in the record *at all* as to the positivity rates in the orange or yellow zones, either prior to the Executive Order or currently.  The Governor's Executive Order, while improperly applied to the Diocese in the first instance in an overbroad effort to address COVID outbreaks in other religious communities, has only become all the more untailored, overbroad, unnecessary and unreasonable in light of these significant decreases in positivity rates in the relevant areas.  As this Court has previously recognized, even one missed religious service is one too many as far as the Constitution is concerned.  *Robinson v. U.S. Government*, 2008 WL 4283649, at *2 (E.D.N.Y. Sept. 18, 2009).  Churches must be allowed to open this weekend.

***Second*,** there is simply no merit to the State's insinuations that Catholic churches present any basis for concern whatsoever.  At yesterday's hearing, the State suggested that an asymptomatic parishioner could infect the Diocese's congregations.  This makes no sense, as the Diocese's safety protocols—the same ones the State and CDC tout as the best methods of slowing the spread of the virus—are specifically designed to *prevent* that from happening.  Thus, even if an asymptomatic parishioner were to attend mass, he or she would be socially distanced from other parishioners; would be wearing a mask; would not touch any hymnals (as they have been removed from the pews); and would not receive the Precious Blood from a shared chalice, since that practice has been suspended.  *See, e.g.*, Dkt. 5 at ¶¶ 10-11; Dkt. 6

---

[1] In its order denying the State's request for a stay, the court in *DiMartile* expressly declined to consider Dr. Zucker's declaration, finding that "Dr. Zucker renders only a conclusory opinion that arriving at and leaving a [wedding] at the same time greatly increases the probability of transmission of the COVID-19 virus." *Id*. at *5 & n.2.  The court also rejected, as unsupported, Dr. Zucker's suggestion that wedding attendees would flout COVID protocols, given the evidence that "[a]n overwhelming number of New Yorkers are adhering to public health recommendations including social distancing, hand washing and wearing a mask at least as much as they can if not completely.'" *Id*. at *6.  And the court dismissed Dr. Zucker's identification of certain, supposed clusters because he had not "provided any information to suggest that these clusters have seriously threatened New York State's public health goals or resulted in significant spread of COVID-19." *Id*. at *8.

¶¶ 12-13; Dkt. 7-6.  The Governor's "super-spreader" concerns necessarily assume non-compliance with those protocols.  At the end of the day, the Governor's argument proves too much:  The fact that the Diocese has not experienced *any* COVID outbreak in the months since it reopened its doors, *despite* the possible presence of asymptomatic, COVID-positive parishioners, only underscores that the Diocese's robust protocols are working.  The Governor has offered no reason, aside from rank speculation, to suspect that reopening the Diocese's churches subject to a 25% capacity restriction and the strict protocols already in place (and potential further restrictions the Diocese has agreed to accept as a condition of injunctive relief, including eliminating congregant singing and choirs during the Mass) would lead to COVID spread or otherwise jeopardize public health.

***Third*,** as set forth in the Diocese's motion papers, this Court should apply strict scrutiny because the Governor's Executive Order expressly targets "Houses of Worship" for distinctive treatment.  *See, e.g.*, *Roberts v. Neace*, 958 F.3d 409 (6th Cir. 2020); *Maryville Baptist Church, Inc. v. Beshear*, 957 F.3d 610 (6th Cir. 2020); *Soos v. Cuomo*, 2020 WL 3488742 (N.D.N.Y. June 26, 2020); *Berean Baptist Church v. Cooper*, 2020 WL 2514313 (E.D.N.C. May 16, 2020); *Tabernacle Baptist Church, Inc. of Nicholasville v. Beshear*, 2020 WL 2305307 (E.D. Ky. May 8, 2020); *see also* Dkt. 4 (Pl.'s Br. (hereinafter "Br.")) at 6, 16-19; (Pl.'s Reply (hereinafter "Reply)) at 4-6.  The Governor fights the application of strict scrutiny because he knows the Order cannot meet it as applied to the Diocese.

*Jacobson v. Massachusetts*, 197 U.S. 11 (1905), and *South Bay Pentecostal Church v. Newsom*, 140 S. Ct. 1613 (2020)—on which the Governor relies in urging the Court to sign off on what would effectively be *carte blanche* authority to infringe the citizenry's constitutional rights as long as the government's actions are taken under the "public health" umbrella—do not compel a different result.  *See* Br. at 5, 15 n.2; Reply at 4–5.  True, *Jacobson* recognizes that the states' police powers provide them with "discretion" to deal with issues of public health and safety.  197 U.S. at 25.  But that authority must and does have a limit, particularly when fundamental constitutional rights are at stake:   As *Jacobson* itself explains, the State's exercise of its police powers is subject to "the condition that no rule prescribed by a state, . . . shall contravene the Constitution of the United States, nor infringe any right granted or secured by that instrument." *Id.* at 25.   And the denial of an extraordinary writ in *South Bay* applied a far higher standard of review at a far earlier stage of the pandemic, when State action was "fraught with medical and scientific uncertainties." 140 S. Ct at 1613.  And perhaps most importantly, the *South Bay* "decision" on which the Governor relies was in fact a single-Justice concurrence in a denial of a writ of injunction; it is black letter law that such a refusal of the Supreme Court to take up a case "imports no expression of opinion upon the merits of the case" and does not have "any precedential value," given the "variety of considerations [that] underlie denials of the writ."  *Teague v. Lane*, 489 U.S. 288, 296 (1989) (internal quotations omitted) (discussing denial of certiorari); *cf. Schwab v. Sec'y, Dep't of Corr.*, 507 F.3d 1297, 1301 (11th Cir. 2007) ("Orders [by the U.S. Supreme Court] granting stays are not precedential decisions").  In any event, of the current members of the Court, Justices Thomas, Gorsuch, and Kavanaugh wrote that they

would have applied strict scrutiny, Justice Alito would have granted the injunction, only Chief Justice Roberts suggested a lower tier of scrutiny applied, and the other three current members of the Court, who voted to deny the injunction, did so without explanation or opinion.  And the composition of the Court will soon likely include Judge Amy Coney Barrett, who will be addressing this subject for the first time.

Indeed, in *Soos*, another court in this Circuit, citing *Jacobson* and *South Bay*, struck down New York Executive Orders and accompanying guidance imposing disproportionate limitations on religious gatherings.  The court recited the passage from Justice Roberts's concurrence in the denial in *South Bay* recognizing the "broad" "latitude" the State has to deal with public health crises and noting that "*[w]here those broad limits are not exceeded*, they should not be subject to second-guessing by an "unelected federal judiciary."  *Id.* at *7 (quoting *South Bay*, 140 S. Ct. at 1613-14 (emphasis added)).  Drawing on that language, the court explained that there are some limits on the State's police powers, albeit left unarticulated in *South Bay*, "which may not be eclipsed."  *Soos*, 2020 WL 3488742, at *8.  The *Soos* court went on to hold that while it is ordinarily "not the judiciary's role to second guess the likes of Governor Cuomo or Mayor de Blasio when it comes to decisions they make in such troubling times," courts must intervene where "*those decisions result in the curtailment of fundamental rights without compelling justification*."  *Id*. (emphasis added).  That threshold has been more than met here, where the Governor has specifically targeted and abridged the Diocese's right to worship without any reasoned, let alone compelling, justification.  So we respectfully suggest the likelihood is that the Supreme Court will ultimately find that strict scrutiny applies to this type of express restriction on the Diocese under these circumstances.

**Fourth**, even under the Governor's proposed deferential standard, the Order should be struck down as arbitrary, oppressive, and irrational.  *Jacobson* emphasizes that "the police power of a state . . . may be exerted in such circumstances, or by regulations *so arbitrary and oppressive in particular cases, as to justify the interference of the courts to prevent wrong and oppression*."  197 U.S. at 38 (emphasis added).  Thus, to the extent *Jacobson* set forth a new standard of review to apply even when First Amendment rights are at issue—which we dispute—it is this one, which still requires striking down the Executive Order.

The Governor continues to run roughshod over the Diocese's right to worship, without any basis—not a rational one, not a narrowly tailored one, simply none.  As revealed during yesterday's hearing, the zones targeted in the Governor's order were created by the "Executive Office," not by the epidemiologists (the inconsistent and incredible submission of the Governor this morning notwithstanding).  Moreover, testimony from the State's sole live witness confirms that the Diocese has been arbitrarily and unreasonably subjected to these unreasonable new restrictions.  Mr. Backenson testified that time and distance are the key metrics in evaluating risk of exposure to COVID-19.  But by each of those metrics, the Diocese is an irrational target for the Governor's Order:  It has already successfully implemented extensive social distancing measures to ensure all congregants remain at least

six feet apart.  Moreover, even a pre-COVID Catholic Sunday Mass typically lasted just about an hour—with weekday Masses shorter still—and those durations have been even further curtailed via the changes effected by the COVID protocols and efforts by individual priests to shorten their sermons.  Second Chappetto Supp. Decl. ¶¶ 2-4.[2]  It is not uncommon for supermarket shoppers—or patrons of Home Depot, Target, and Staples—to spend comparable amounts of time shopping, and yet the Governor's Order allows those establishments to remain open without *any* capacity limits.  And banks and office buildings—where employees spend entire days in what are often cramped, poorly ventilated quarters—fare far worse by these metrics, and yet they, too, remain operational.[3]  To permit businesses of equivalent (or lesser) size, where people spend equivalent (or far more) amounts of time, to remain open without any restrictions, while limiting the Diocese's churches to a maximum of 10 or 25 people, regardless of their overall capacity, is the height of irrationality.

Finally, the Governor has articulated no rational basis for applying a law that, he admits, is directed at another religious community that has routinely flouted existing pandemic-related restrictions, to a community that, through its implementation of myriad COVID protocols, has experienced not a single outbreak, as the undisputed testimony establishes and the Governor's sole witness has admitted.  Thus, even if this Court concludes that strict scrutiny does not apply, the Governor's Executive Order, as applied to the Diocese, must not be permitted to stand.  We have demonstrated likelihood of success or, at a minimum, substantial questions going to the merits, irreparable harm is presumed here under *Elrod*, and the equities favor protection of the Diocese's religious liberties on this undisputed record of success in operating safely for months now.

As always, we thank the Court for its consideration.

Respectfully,

/s/ *Randy M. Mastro*
Randy M. Mastro

cc: Counsel for Defendant (via ECF)

---

[2] Before the hearing, the Governor's argument rested largely on a general proposition, as articulated in a declaration submitted by Department of Health official Debra Blog, that the Executive Order's capacity restrictions are necessary to ensure proper social distancing.  *See* Blog Decl. ¶¶ 72–73, 101.  That, again, makes little sense as applied to the Diocese, which has already taken extensive measures to ensure its worship services are socially distant and subject to a 25% capacity limit.  Of course, Dr. Blog could not be cross-examined by Plaintiff during the hearing, as the State called Mr. Backenson instead.

[3] The venues that are closed (*e.g.*, movie theaters) are places where people stay for hours.  Even a pre-COVID Catholic Mass does not last nearly as long as a motion picture, let alone at a nine-to-five desk job. See Tr. 102:19-25, 103:3-7.