# EXHIBIT A

1               UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF NEW YORK
2
    - - - - - - - - - - - - - - - X
3
                                   :
4   THE ROMAN CATHOLIC DIOCESE OF  : 20-CV-4844 (NGG)
    BROOKLYN, NEW YORK,            :
5                                  :
            Plaintiff,             :
6                                  : United States Courthouse
                                   : Brooklyn, New York
7        -against-                 :
                                   : Thursday, October 15, 2020
8                                  : 2:00 p.m.
                                   :
9   GOVERNOR ANDREW M. CUOMO in    :
    his official capacity,         :
10                                 :
            Defendant.             :
11
12  - - - - - - - - - - - - - - - X

13    TRANSCRIPT OF CIVIL CAUSE FOR PRELIMINARY INJUNCTION HEARING
            BEFORE THE HONORABLE NICHOLAS G. GARAUFIS
14          SENIOR UNITED STATES DISTRICT COURT JUDGE

15  A P P E A R A N C E S:

16   For the Plaintiff:      GIBSON, DUNN & CRUTCHER, LLP
                             200 Park Avenue, 48th Floor
17                           New York, New York 10166
                             BY: RANDY MASTRO, ESQ.
18                               WILLIAM J. MOCCIA, ESQ.
                                 AKIVA SHAPIRO, ESQ.
19
     For the Defendant:      LETITIA JAMES
20                           ATTORNEY GENERAL OF THE STATE OF NEW YORK
                             28 Liberty Street
21                           New York, New York 10005
                             BY: SETH FARBER, ESQ.
22

23   Court Reporter:   Linda A. Marino,
                       Official Court Reporter
24                     E-mail:  lindacsr@aol.com

25   Proceedings recorded by computerized stenography.  Transcript
     produced by Computer-aided Transcription.

1        THE COURTROOM DEPUTY: This is a preliminary

2   injunction hearing.

3        Beginning with the Plaintiffs, please state your

4   appearances for the record.

5        Plaintiff?

6        MR. SHAPIRO:  This is Akiva Shapiro from Gibson

7   Dunn.  I believe Randy Mastro is on.

8        THE COURT:  Mr. Mastro, state your appearance.

9        Where are you?

10       THE COURTROOM DEPUTY:  He was just on.  Now we lost

11  him.

12       THE COURT:  Let's just wait a moment for him to

13  reappear.

14       (Pause in proceedings.)

15       MR. MASTRO:  Hi.

16       THE COURT:  Mr. Mastro, please state your

17  appearance.

18       MR. MASTRO:  Certainly, your Honor.  Randy Mastro,

19  of Gibson Dunn & Crutcher, along with my colleagues Akiva

20  Shapiro and William Moccia.

21       THE COURT:  Just for the sake of seeing all of your

22  head, could you adjust the camera?  It's disconcerting

23  otherwise.

24       MR. MASTRO:  My head is big enough already, your

25  Honor.

1            Is this better?

2            THE COURT:  It's somewhat better, yes.  Books are

3      helpful to make the adjustment.

4            MR. MASTRO:  There's a reason I went into the law:

5      Because I'm not that athletic.

6            I lost the video.

7            THE COURTROOM DEPUTY:  I see you.

8            THE COURT:  He lost his video.

9            I can hear you.

10            (Pause in proceedings.)

11            MR. FARBER:  Your Honor, this is Seth Farber for the

12      Defendant.  Unfortunately, I've been having connection

13      problems.

14            THE COURT:  All right, Mr. Farber.

15            FEMALE SPEAKER:  Can you see Randy now?

16            THE COURT:  Yes, we can.

17            MR. MASTRO:  Thank you.  Sorry about the delay.

18            THE COURT:  All right.  So, we have Mr. Mastro and

19      co-counsel and Mr. Farber.

20            That's all counsel?

21            Mr. Farber, anyone else?

22            MR. FARBER:  No, I'll be the only one appearing for

23      the Defendant today, your Honor.

24            THE COURT:  Thank you very much, sir.

25            This is the case of the Roman Catholic Diocese of

1    Brooklyn against Governor Andrew Cuomo.  The purpose of this

2    proceeding is to provide an evidentiary hearing in connection

3    with the Plaintiff's motion for preliminary injunction against

4    the Governor of the State of New York in connection with

5    limitations on religious worship in Catholic churches during

6    the COVID-19 pandemic under Executive Order 202.68.

7              So, let me just state how we're going to proceed

8    here.  The Plaintiff has two witnesses, I understand, and the

9    Defendant has one witness.  The Plaintiff has objected to the

10   Defendant's witness, and the Court has considered the

11   objection and overruled the objection.

12             So, we're going to proceed.  And how we will proceed

13   is that we will take the Plaintiff's witnesses first and then,

14   depending on how much time has transpired, we'll take a break

15   and then take the Defendant's witness.

16             First, I'll indicate that I've reviewed all of the

17   papers that have been submitted by the parties.  And my hope

18   is that we will complete all of the testimony this afternoon,

19   which will permit the Court to try to issue a decision before

20   the weekend.  So, I wish to mention that that's my hope and my

21   objective.

22             Also, before we move into the testimony, let me

23   thank Judge Eric Komitee for handling the application for

24   temporary restraining order last Friday when I was not

25   available.

1          So, at this point, is there anything preliminary

2   prior to beginning hearing from the witnesses?

3          Anything from you, Mr Mastro?

4          MR. MASTRO:  Your Honor, nothing other than will

5   your Honor take any argument at the conclusion of the hearing?

6          THE COURT:  It really depends on how late we go, but

7   I could hear some argument.  I have all of your papers which

8   discuss all those issues in great detail and that may be

9   sufficient, but if there's something that you want to put a

10  finer point on I certainly would like to hear from you --

11         MR. MASTRO:  Thank you, your Honor.

12         THE COURT:  -- and from the State's attorney.

13         And Mr. Farber, anything from you before we get

14  started?

15         Mr. Farber?

16         Well, we need Mr. Farber.

17         Is Mr. Backenson on the call?

18         MR. BACKENSON:  Yes, I am.

19         THE COURT:  I just wanted to identify you.

20         I know Commissioner Esposito for many years in

21  dealing with the City of New York.

22         And Bishop Chappetto, is this the Bishop?

23         BISHOP CHAPPETTO:  Yes, your Honor.

24         THE COURT:  So, we have all of our witnesses.  I'm

25  just waiting for Mr. Farber.

1           (Pause in proceedings.)

2           THE COURT:  Would everyone put their microphones on

3    mute until they're called upon?

4           That will make it a lot easier.  If you want to

5    object --

6           MR. FARBER:  Can anyone hear me?

7           THE COURT:  Mr. Farber?

8           MR. FARBER:  Yes, yes, your Honor.

9           THE COURT:  You're back?  Okay.

10          Are we ready?  Did you hear what I said about the

11   order of proceedings?

12          MR. FARBER:  I did, your Honor.  You asked

13   Mr. Mastro if he had anything prior to proceeding and you then

14   asked me.

15          I do not, your Honor.

16          THE COURT:  Thank you.

17          MR. FARBER:  We are ready to proceed.  I apologize

18   for my technical issues.  I don't understand them, but okay.

19   Thank you.

20          THE COURT:  Is there a phone number, just in case?

21          Did you provide a phone number to Mr. Reccoppa, my

22   courtroom deputy, just in case?

23          MR. FARBER:  Yes, he has my cell phone number.

24          THE COURT:  All right.  Let's proceed, then.

25          Mr. Mastro, you may call your first witness.

1           MR. MASTRO:  Your Honor, Bishop Chappetto.

2           And my colleague Will Moccia is going to do the

3    direct examination.

4           THE COURT:  Thank you.

5           MR. MOCCIA:  Your Honor, this is Will Moccia, Gibson

6    Dunn, on behalf of Plaintiff.

7           We call Bishop Raymond Chappetto.

8           THE COURT:  Please swear in the witness.

9           THE COURTROOM DEPUTY:  Sir, just raise your right

10   hand, please.

11          Do you solemnly swear the testimony you shall give

12   to the Court will be the truth, the whole truth, and nothing

13   but the truth, so help you God?

14          BISHOP CHAPPETTO:  I do swear that.

15          THE COURTROOM DEPUTY:  Thank you.

16          THE COURT:  Thank you.

17          Go ahead, sir.

18          MR. MOCCIA:  Thank you, your Honor.

19   **RAYMOND F. CHAPPETTO**,

20               called by the Plaintiff, having been

21               first duly sworn, was examined and testified

22               as follows:

23   DIRECT EXAMINATION

24   BY MR. MOCCIA:

25   Q    Good afternoon, Mr. Chappetto.

1  A     Good afternoon, Will.

2  Q     Could you briefly describe for the Court your current

3  occupation?

4  A     Yes.  I am a Roman Catholic bishop of the Diocese of

5  Brooklyn, and I serve as the Vicar General and the Vicar for

6  Clergy.

7  Q     And that's a clerical position within the Roman Catholic

8  Church; is that correct?

9  A     That's correct.

10 Q     How long have you held that position?

11 A     I have been the Vicar for Clergy since 2009 and I've been

12 the Vicar General of the Diocese since 2013.

13 Q     And just in brief, what are your responsibilities as

14 Vicar General?

15 A     Vicar General is sort of the vice president, you might

16 say, of the Diocese of Brooklyn.  I work very closely with

17 Bishop DiMarzio and the governance of the Diocese.

18 Q     And since assuming that role, have you continued to also

19 offer public Mass within the Diocese?

20 A     Yes, I have.

21 Q     And is that at one church?

22 A     My role consists of going around to various churches for

23 many different reasons; various celebrations, I help out in

24 different churches.  I also get specific assignments to

25 different churches for special occasions, so I do visit many

1  churches.

2  Q    When were you initially ordained as a priest in the Roman

3  Catholic Church?

4  A    I was ordained on May 29, 1971.

5  Q    And can you briefly walk us through some of the positions

6  you've held in the Diocese since your ordination?

7  A    I've been a parochial vicar -- that means an assistant

8  pastor -- at four different parishes.  I served as a

9  territorial vicar, taking care of 62 parishes in the Brooklyn

10  west region.  I was pastor of three different parishes; one in

11  Brooklyn, two in Queens.

12        Then I became an auxiliary bishop, and, after that,

13  I assumed the responsibilities in the administration of the

14  Diocese as well as my pastoral functions.

15  Q    And, so, is it fair to say that you held what would be

16  referred to in the Catholic Church as "pastoral roles"?

17  A    Yes, I have both roles; I have an administrative role and

18  a pastoral role as well.

19  Q    Just so that we're clear for the record, can you please

20  just in general terms explain what it means in the Catholic

21  Church when someone refers to a "pastoral role"?

22  A    "Pastoral role" means that you celebrate the sacraments

23  of the Church and you preside over various celebrations;

24  baptisms, funerals, weddings, of course the Eucharist every

25  Sunday and weekday Mass as well.

1  Q    I'd like to turn now, just so that we're all talking

2  about the same thing, to a few documents that have been filed

3  in this case.

4          Do you have in front of you a document titled,

5  "Declaration of Bishop Raymond F. Chappetto in support of

6  Plaintiff's application for temporary restraining order and

7  preliminary injunction"?

8  A    Yes, I do.

9  Q    Do you recognize that document?

10 A    Yes, I do.

11 Q    And, again, just so that we're clear for the record, does

12 the document at the top have a header that identifies it as

13 Document No. 5?

14 A    Yes, it does.

15 Q    And are you familiar with the contents of that document?

16 A    Yes, I am very familiar with it.

17 Q    And are you familiar with the materials that are attached

18 to it as Exhibit A?

19 A    Yes.  They are memos, and I'm familiar with them.

20 Q    And have you re-read that document since you first

21 executed it?

22 A    Yes, I have.

23 Q    And you signed that document under penalty of perjury; is

24 that correct?

25 A    That's correct.

1  Q     To the best of your knowledge as you sit here today, are

2  the contents of that document true and correct?

3  A     There are some corrections that I think one of which we

4  have corrected in a supplemental document.

5         Correction number one would be the names and number

6  of parishes that have been affected by the executive order.

7  We have corrected it in a supplemental document because we

8  received interactive maps that helped us to get a clearer

9  picture and better identify the parishes that were affected.

10 So, yes, that's the first correction, would be in the

11 supplemental document.  We do say that there are 26 parishes

12 that have been affected by the executive order.

13        The second correction is that in the listing of the

14 people who have assisted Joseph Esposito in the reopening

15 committee that was formed, the last -- it's paragraph eight on

16 page three, the last sentence is incorrect.  It must be a

17 typographical error.

18        The last sentence reads, "The commission regularly

19 consulted with a mental health expert."  It should say a

20 medical health expert.  The word "medical" should be

21 substituted for "mental."  That's the second correction.

22 Q     Thank you very much for those.

23        Aside from those two corrections that you've

24 identified, are the remaining contents of the declaration true

25 and correct as you sit here today?

1  A     Aside from those two items, the documents are correct and

2  true.

3  Q     Thank you very much.

4        The second document I want to just briefly discuss

5  is titled, "Supplemental declaration of Bishop Raymond F.

6  Chappetto in further support of Plaintiff's application for

7  preliminary injunction."

8        Do you have that document in front of you?

9  A     Yes, I do.

10 Q     And are you familiar with that document?

11 A     Yes, I'm very familiar with it, yes.

12 Q     And, again, just so the record is clear, does the header

13 at the top of that document identify it as Document 21?

14 A     That's correct.

15 Q     And have you re-read that document since you first

16 executed it?

17 A     Yes, I have.

18 Q     And you signed that document under penalty of perjury; is

19 that correct?

20 A     Yes, I did.

21 Q     And to the best of your knowledge as you sit here today,

22 are the contents of that document true and correct?

23 A     Yes, they are correct and true.

24 Q     Thank you very much.  So, I want to just now talk briefly

25 about COVID-19.

1          In your role as Vicar General, have you been

2   involved in the Diocese of Brooklyn's response to COVID-19?

3   A    Very much so.  I have been working very closely with

4   Bishop DiMarzio on all aspects of it.

5   Q    And could you please identify who Bishop DiMarzio is?

6   A    Yes.  Bishop Nicholas DiMarzio is the Bishop of the Roman

7   Catholic Diocese of Brooklyn.  I am Auxiliary Bishop.

8   Q    Thank you.  For simplicity here on out in this

9   questioning, if I refer simply to the "Diocese," I'll be

10  referring to the Diocese of Brooklyn; is that okay?

11  A    Yes, certainly.

12  Q    How did the Diocese initially respond to the COVID-19

13  outbreak in New York?

14  A    Well, we took the initiative of closing our churches to

15  the public for the safety and protection of the people.  When

16  the pandemic first broke out and we saw that it was

17  escalating, we wanted to be proactive at that point.  We took

18  the initiative of closing the churches to the public.

19  Q    And was that before or after the City and State

20  prohibited large public gatherings?

21  A    We did it before the public demand to do so.

22  Q    And what, if anything, did the Diocese do in between the

23  time it closed for public Mass and the time it reopened?

24  A    During that time, we encouraged our pastors and our

25  parishes to do virtual Masses, livestreaming Masses, so that

1  the faithful people could continue to worship, you might say,

2  at a distance.

3          We did keep in touch with people through phone

4  calls, through robocalls, through various communications, our

5  Diocesan newspaper, keeping the people informed of what was

6  happening, why it was happening, and always looking forward to

7  a change.

8  Q    And were there any specific steps taken with respect to

9  the pandemic itself to prepare for an eventual reopening?

10 A    Very much so.

11         When we came towards the end of the time, we

12 realized that we would be reopening but we wanted to be

13 prepared.  So, we formed a committee headed by Joseph

14 Esposito, and this committee's charge was to give advice and

15 recommendations to the Bishop on how to safely reopen the

16 churches.

17 Q    Is it correct that the commission developed protocols

18 that would later be implemented by the Diocese?

19 A    That's correct.  After many meetings -- we met many

20 times -- we decided to present our recommendations to the

21 Bishop for his approval.

22 Q    And you mentioned some meetings of the commission.  Well,

23 I guess let me take a step back.

24         Approximately how many people were on this

25 commission?

1  A     Approximately ten to twelve people.

2  Q     In general, can you describe their backgrounds?

3  A     They came from all different walks in life; some were

4  police officers, some were legal representatives, some were

5  Diocesan representatives who knew things about buildings.

6          So, we had various disciplines represented on the

7  commission.

8  Q     And you touched on this earlier when we were discussing

9  corrections to the declarations, but am I correct that there

10 were also consultations with medical professionals?

11 A     Yes, we had a consultation with a medical professional,

12 that's correct.

13 Q     And was it one consultation or were there ongoing

14 consultations?

15 A     I believe there were several consultations.

16 Q     And in general, how often was the commission meeting

17 during this time period?

18 A     We were meeting weekly.  For between four to six weeks,

19 we met weekly.  And then as the time came closer, we did not

20 meet as often.  But at the beginning, I would say it was every

21 week for four to six weeks.

22          And then once the document was ready, the commission

23 had served its purpose, so we disbanded and we did not meet

24 again.

25 Q     And this document that you're referring to, are those the

1    protocols that we discussed a few minutes ago?

2    A    That's correct.

3    Q    And could you just walk us through some of the protocols

4    that are in that document?

5    A    Yes.  We instructed all of our pastors to carefully mark

6    out the church -- and that means with masking tape, other

7    kinds of markings -- to make sure that the people when they

8    came back would be socially distanced, so that they would be

9    six feet apart, they'd be seated every other row.  And that

10   was the first thing, was the social distancing.

11        Then we instructed the people that they would not be

12   admitted into the church unless they had a mask on.

13        We told our pastors to get hand sanitizers at the

14   doors of the church and to post signs at the church entrances

15   instructing the people that if they did not have a mask on,

16   they would not be admitted in; and to use the hand sanitizers

17   upon entrance.

18        We also instructed them to get cleaning supplies, to

19   buy them in bulk, so that we could make sure that after every

20   service, after every Mass, the churches would be cleaned and

21   sanitized.  Many of them bought the machines to do it

22   mechanically to make sure that the churches were being cleaned

23   and sanitized in a proper way.

24        These are just some of the ways in which we

25   instructed our pastors to prepare, to get ready, so when the

1  day would come when we could reopen, then we would be entirely

2  ready and prepared to make sure the people were kept safe.

3  Q     And how about the Mass itself?  Were any changes made to

4  the parts of the Mass?

5  A     Well, we encouraged the celebrants of the Mass to make it

6  as short as possible so that the people would not be detained

7  unnecessarily.

8         We changed the way in which Holy Communion was

9  distributed.  People were told that they would receive in

10 their hand and not on the tongue, which is an option that we

11 generally do have.  But for this time period, people were told

12 that they would receive in the hand; that they would come up

13 to the altar, keeping the social distancing, they would keep

14 their masks on when they received Holy Communion, they would

15 step to the side, they would then remove their mask, they

16 would receive the Holy Communion, and then they would put

17 their mask back on again as they returned to their seats.

18 Q     And in terms of capacity at Mass, am I correct that you

19 reopened at a limited capacity?

20 A     Yes, we opened up at 25 percent capacity.  The first

21 reopening, however, was with ten people in which -- the first

22 reopening was just for visits to the church, without services.

23        And then we went to the second phase, which was

24 services with ten people.  I, myself, celebrated a funeral for

25 a priest with ten people present.  Only ten people.

1          And then we went to the third phase, which was the

2    reopening at 25 percent capacity.

3    Q    And you've remained at 25 percent even after the State

4    has permitted larger gatherings; is that correct?

5    A    Yes, we have.

6    Q    Bishop Chappetto, to your knowledge, were the protocols

7    recommended by the commission adopted by the Diocese?

8    A    Yes, they were.

9    Q    And to your knowledge, were those protocols implemented

10   by churches within the Diocese?

11   A    Yes, they were.

12          I have visited many of the churches myself because,

13   as I mentioned before, I am a Sunday Mass celebrant in the

14   different churches, and I see how the pastors have implemented

15   the protocols in a very serious way.

16   Q    And does the Diocese have a way for parishioners to

17   report any incidence of COVID-19?

18   A    They can call the pastors and let them know if there were

19   any incidences.

20   Q    And are you aware of any outbreaks of COVID-19 in any

21   churches within the Diocese since the reopening you described?

22   A    I am not aware of anything that has come to my attention.

23   Q    And if there were such incidences, would you expect them

24   to come to your attention?

25   A    I think I would be among the first to know.

1  Q    And why is that?

2  A    Because of the position that I hold.  And the pastors,

3  they all have my cell number, they know they can call me at

4  any time about any reason pertaining to the church or

5  pertaining to the situation.  So, they would inform me if

6  there was a COVID breakout from the church.

7  Q    And based on your firsthand observations while visiting

8  and saying Masses at the parishes within the Diocese, how

9  would you describe the level of compliance with the protocols?

10 A    I am very much impressed.  I have to be -- what I see is

11 complete compliance as I go around.

12          I complimented one parish that I was at recently.

13 They formed teams of people because they have four or five

14 services on a Sunday, four or five Masses on a Sunday, and

15 there's a team after each Mass that does the cleaning.  And,

16 in fact, in this particular parish, one time the team for some

17 reason was not able to make it, and one of the priests himself

18 did the cleaning to be sure that it was done.

19          So, I can tell you my own eyes have seen what

20 they're doing as far as sanitizing, cleaning, people wearing

21 masks.  I compliment the people.  I tell them it's not easy,

22 it's an annoyance to wear it, they must wear it.  And they're

23 all doing it.

24          So, I would have to say the compliance is excellent.

25 Q    For those on the call who might not be familiar with the

1   Catholic faith, could you just in brief explain what it means

2   to go to Mass?

3   A    Well, for us, the attendance at Mass is obligatory on

4   Sunday; they can go to the vigil Mass on Saturday night or

5   Mass on Sunday.  It's obligatory.

6        And the Mass consists of readings from the Sacred

7   Scriptures; a Homily, which is an explanation of those

8   readings and how they apply to our daily life; and then the

9   celebration of the Eucharist, which is the presentation of the

10  bread and wine, the consecration of the bread and wine into

11  what we believe is the Body and Blood of our Lord and Savior,

12  and then the distribution of the Holy Communion to the

13  individual people.  That is the heart and center of the

14  Eucharist, is the consecration and the distribution of the

15  Eucharist.  And then there's a dismissal, final prayer and a

16  dismissal.

17  Q    How important is it that the Mass be celebrated in

18  person?

19  A    It's absolutely essential because people who have watched

20  on TV have said, "It's a nice thing to watch it on the TV, but

21  it's not the same.  You cannot receive Communion at home."

22       The priest has no way of bringing Communion to every

23  household.  It's impossible.  So, for them to be in attendance

24  at church, it's the fullness of the Eucharist, it's the

25  complete Eucharist by receiving Holy Communion, and it's

1  really absolutely essential.

2         People were starved for Holy Communion during the

3  pandemic because while they could watch it on TV, which was

4  very nice, they couldn't receive the Eucharist.  And that was

5  the heartbreak of our people because that's what defines us as

6  Catholics.  We are what we call a "Eucharistic people."  We

7  are people of the Mass, and the Mass defines us and it really

8  tells us who we are.

9  Q    And you touched on this briefly, but if you could just

10 elaborate, please, on how the lack of in-person Mass impacted

11 parishioners during the pandemic.

12 A    It was definitely a hunger to receive the Eucharist.  It

13 was a hunger on the part of the people.  I spoke to many of

14 them personally who told me the spiritual void that they felt

15 in not being able to receive Holy Communion.  It was a great

16 loss for them.

17        So, coming back to the -- when the Mass was again

18 allowed to be celebrated with people present, it was a great

19 joy and a great relief.  The hunger that they had is now being

20 satisfied.

21 Q    I'd like to hone in a little more.  You referenced Holy

22 Communion.  I realize there are whole theological treatises

23 written on this, but, if you could, just succinctly spell out

24 from a theological perspective what the significance of Holy

25 Communion itself is.

1  A     We believe that Jesus at the Last Supper with the twelve

2  Apostles changed the bread and the wine into the Body and

3  Blood of Christ.  That was the first Mass, at the Last Supper.

4          We believe that every Mass is a recreation of the

5  Last Supper, every Mass is a celebration of the Lord's Supper.

6  And we believe that Jesus said to do this in His memory.  To

7  continue that, we celebrate Mass daily.  Every day at every

8  church there is a Mass.

9          But on Sunday, the people have the obligation to

10  attend the Mass because we believe that they are listening to

11  the Word of God and that they are participating in the Lord's

12  Supper.  The consecration of the bread and wine is the most

13  serious part of the Mass and receiving the Holy Communion for

14  a Catholic is the essence of what it means to be a Catholic.

15  Q     And prior to the pandemic, how would one normally receive

16  Holy Communion during Mass?

17  A     Prior to the pandemic, people would have a choice, and

18  the choice is up to them:  To receive Communion in their hand

19  and then to place the Holy Eucharist into their mouths by

20  themselves; or the other option that was there prior to the

21  pandemic was the opportunity receive Communion on their

22  tongue.  They would extend their tongue and the priest would

23  place the Holy Eucharist on their tongue and then they would

24  consume it that way.

25  Q     And you said that that choice has been removed; is that

1  correct?

2  A    We removed that choice for sanitary reasons so that we

3  could keep our people safe, yes.

4  Q    And again now speaking prior to the pandemic, was there

5  also an option of receiving the Precious Blood during Holy

6  Communion?

7  A    Yes, there was.  Thank you for mentioning that.

8        That was completely discontinued -- completely -- so

9  that there would be no chance of anything.

10        It is not necessary for a Catholic to receive both

11  the Holy Communion in the form of bread and the Precious

12  Blood, as we call it, in the form of wine.  It is not

13  necessary to receive the Precious Blood.  It's receiving the

14  host or the wafer -- it is the Body of Christ -- that is

15  sufficient for a Catholic.

16        So, we discontinued that so there would be no

17  misunderstanding on the part of anybody that they could

18  contract any kind of germs.

19  Q    You mentioned about at the end, there's a sending forth

20  and people leave the church.

21        Could you talk briefly about any protocols that were

22  put in place to make sure that people were safely entering and

23  existing the churches?

24  A    Yes.  We opened the doors of the church, all the doors,

25  so that they could go out the various exits.  We encourage

1   them not to the congregate outside as they would do

2   pre-pandemic so that the people could leave and go home as

3   soon as possible.

4   Q    And are you familiar with what the State of New York and

5   Governor Cuomo have referred to as the "cluster initiative"?

6   A    I'm not familiar with that.

7   Q    I can be more specific.

8        Are you aware that as part of a recent regulation,

9   the Governor has issued an executive order that would limit

10  in-person church attendance in certain geographic areas to 10

11  or 25 people?

12  A    You're referring to the orange zones and the red zones;

13  you're referring to that?

14  Q    Yes.

15  A    I am familiar with that, of course.  Yes, the orange

16  zones with a limited capacity and the red zones with an even

17  more limited capacity.  Yes, I'm very familiar with that.

18  Q    And how does that restriction impact the Diocese?

19  A    Oh, a tremendous, tremendous impact.  This is the hardest

20  thing that we are dealing with is the fact that our people

21  were coming back to Mass after that long period of absence,

22  they had just started to get used to the idea of coming back

23  and that it was safe because we made it safe, we made the

24  environment safe, and then to have this come upon us was very

25  difficult because it seems like we're going backwards instead

1    of going forwards.

2    Q    And Bishop Chappetto, is there anything else that you'd

3    like to tell the Court about the why the Diocese's churches

4    should be permitted to reopen this Sunday for Mass subject, of

5    course, to a 25 percent capacity cap and any other safety

6    measures that the Diocese has implemented and agreed to

7    implement?

8    A    I think that the essential nature of the worship of our

9    people, people need to worship, people need to be present for

10   the reception of the Eucharist, people need to be present

11   because they belong to a community of faith.  And to deny them

12   that is not very, very easy to swallow.

13          We need to have our people in church.  We need to

14   have our people receiving the Eucharist.  People want to be

15   there and we have done everything that we could possibly do,

16   to my knowledge, to make the environment safe for them so that

17   when they do come into the church they are safe.  And we will

18   continue to do that as much as possible.

19   Q    Thank you very much, Bishop Chappetto.

20          MR. MOCCIA:  Your Honor, I have nothing further for

21   the witness at this point.

22          THE COURT:  All right.  Thank you.

23          Mr. Farber, do you have any questions for the

24   witness?

25          MR. FARBER:  Thank you, your Honor.  I have a very

1   brief cross, if I might.

2          THE COURT:  All right.  Please introduce yourself to

3   Bishop Chappetto.

4          MR. FARBER:  Yes.  Good afternoon, Bishop.  My name

5   is Seth Farber.  I'm with the Attorney General's Office, and I

6   represent Governor Cuomo today.

7          BISHOP CHAPPETTO:  Thank you.

8          MR. FARBER:  Thank you, sir.

9   CROSS-EXAMINATION

10  BY MR. FARBER:

11  Q    In your declaration, you state that -- I'm referring to

12  Paragraph 15 of the -- which is on Page 6 of Document 5, the

13  first declaration you gave in this case, you state that you

14  have a reporting structure and you would know whether there

15  have been any instances of COVID-19 spread in your churches;

16  correct?

17  A    That's correct.

18  Q    And it's fair to say that you know this based on what

19  parishioners report to either their parish priest or other

20  church officials, correct?

21  A    That's correct.

22  Q    So if, for example, a parishioner were asymptomatic and

23  didn't even know they were COVID positive, of course they

24  couldn't report that to their parish priest or church

25  officials, correct?

1   A    If they don't know they have it, then they couldn't

2   report it, you're right.

3   Q    Okay.  And my understanding is in your protocol, there's

4   no particular requirement that parishioners show a negative

5   COVID test before attending church service; is there?

6   A    No, we do not have that provision in the protocols.

7   Q    Okay.  And similarly, if a parishioner actually had

8   symptoms of COVID but for whatever reason failed to report

9   that to a parish priest or a church official, you wouldn't

10  know that either, correct?

11  A    If they failed to report it, we would not know it.

12  Q    Thank you very much, Bishop.

13          MR. FARBER:  Nothing further from me.

14          THE COURT:  All right.  Thank you.

15          Anything else from Plaintiff's counsel?

16          MR. MOCCIA:  Your Honor, just a very quick redirect,

17  if I might.

18          THE COURT:  Please.

19  REDIRECT EXAMINATION

20  BY MR. MOCCIA:

21  Q    Bishop Chappetto, Mr. Farber asked you about people who

22  might come to church and not be aware or might not have

23  disclosed that they are COVID positive.

24          I just want the record to be clear if any such

25  person attended Mass, am I correct that they would be

1  physically distanced from anyone else attending the Mass?

2  A    Well, we've told people very clearly if you are sick, if

3  you have any symptoms, stay home.  That's part of the

4  protocol.  So, we've discouraged them from coming.  If they

5  felt sick or had any symptoms, we've made it very clear that

6  they were not to come to the Mass.

7  Q    Understood.  So, my question then is even assuming

8  Mr. Farber's hypothetical scenario where one actor disregards

9  that instruction, that person would still be attending Mass

10 subject to all the distancing and the no receipt of the

11 Precious Blood and everything else we discussed a short time

12 ago; is that correct?

13 A    Absolutely, yes, that's correct.

14 Q    And then I guess the other question is about the

15 reporting structure.

16        So, am I correct that in addition to just any

17 informal word of an individual parishioner telling you that

18 there's an issue, is there also a formal reporting structure

19 within the Diocese by which the pastors would be directed to

20 contact someone, either yourself or someone else higher up

21 within the Diocese, about the situation?

22 A    Yes.  At beginning of the pandemic, there were numerous

23 calls made to me because of the outbreak.  And you know, we

24 waited for that 15-day period to be sure and we received

25 several calls at the beginning.  But we're talking now at the

1  middle of March.

2          So, at that time, yes, we did get calls, but then

3  since then we've done so much and so much time has passed.

4  Mass, you know, closing the churches, we helped to flatten the

5  curve.  We helped to bring the numbers down.  We were working

6  to do that, conscientiously to do that, to make those numbers

7  come down.  We succeeded in helping and doing our part.

8  Q    And then you've now largely touched on that with this

9  answer, but I just want to clarify.  Mr. Farber read a portion

10 of Paragraph 15 of your declaration.  That paragraph also

11 says, "To my knowledge, since our churches reopened in July

12 for Mass and other religious ceremonies subject to our safety

13 protocols, there has not been any COVID-19 outbreak or spread

14 in any of our churches --"

15          MR. FARBER:  I'm going to object, your Honor.

16          THE COURT:  Overruled.

17          You can go ahead.

18 Q    Bishop Chappetto, is that statement correct?

19 A    Yes, that's correct.

20 Q    And just to reiterate, anyone attending Mass would be not

21 just physically distanced from the other parishioners but also

22 would be wearing a mask; is that correct?

23 A    Yes, they must wear the mask, that's correct.

24          MR. MOCCIA:  Thank you very much.

25          Nothing further, your Honor.

1    THE COURT:  Anything else, Mr. Farber?

2    MR. FARBER:  No, your Honor, no recross.

3    THE COURT:  Thank you very much.

4    Thank you very much, Bishop.  You're excused.

5    And I'll ask the Plaintiff to call their next

6    witness.

7    You have to turn on your microphone, please, Mr.

8    Mastro.

9    Not yet.

10    MR. SHAPIRO:  I can take over.

11    THE COURT:  I wanted to see if Mr. Mastro can do

12    this.

13    (Pause in proceedings.)

14    THE COURT:  All right.  We'll give him some time.

15    I'm sure he'll have something to say later.

16    Just identify yourself.  Everyone when they speak

17    should identify themselves for the court reporter.

18    So, go ahead.

19    MR. SHAPIRO:  Akiva Shapiro, A-K-I-V-A, from Gibson

20    Dunn, counsel for the Plaintiff.

21    I will be calling Joseph J. Esposito.

22    THE COURT:  All right, Mr. Esposito?

23    MR. ESPOSITO:  Good afternoon, your Honor.

24    THE COURT:  Please swear in the witness.

25    THE COURTROOM DEPUTY:  Sir, please raise your right

1  hand.

2         Do you solemnly swear the testimony you shall give

3  to the Court will be the truth, the whole truth, and nothing

4  but the truth, so help you God?

5         MR. ESPOSITO:  I do.

6         THE COURTROOM DEPUTY:  Thank you.

7         THE COURT:  You may proceed.

8         MR. SHAPIRO:  Thank you, your Honor.

9  **JOSEPH J. ESPOSITO**,

10        called by the Plaintiff, having been

11        first duly sworn, was examined and testified

12        as follows:

13 DIRECT EXAMINATION

14 BY MR. SHAPIRO:

15 Q     And good afternoon, Commissioner Esposito.  Thank you for

16 taking the time to be with us.

17        If we just start out, if you could give the Court a

18 little bit of a background, a brief overview of your

19 professional background?

20 A     Sure.  I started in New York City Police Department in

21 1968 as a police trainee.  I rose through the ranks during the

22 next 45 years, ultimately became the chief of the department.

23 The chief of the department is the highest-ranking uniformed

24 member of the NYPD.  I held that position for almost 13 years.

25        After my mandatory retirement at age 63, I was hired

1  as the Commissioner for New York City Emergency Management,

2  where I served from 2014 to 2019.

3          THE COURT:  Before you go any further, the Court is

4  very familiar with Commissioner Esposito from his service as

5  the head of the Office of Emergency Management and also his

6  tenure in the police department and has the greatest respect

7  for his accomplishments serving the New York City community.

8          So, let's go on.

9          THE WITNESS:  Thank you, your Honor.

10          MR. MASTRO:  Can you hear me now?

11          THE COURT:  Yes, I can.  Thank you, Mr. Mastro.

12          MR. MASTRO:  I'm back.  Thank you.

13          THE COURT:  Let's proceed.

14          MR. SHAPIRO:  Certainly, your Honor.  I'm going to

15  ask only one more question about background just because it

16  ties in directly to the substance of what we're talking about.

17  Q    As Commissioner of New York City Emergency Management,

18  were you involved in preparing for infectious disease

19  outbreaks or pandemics?

20  A    Sure.  I mean, in my role in the NYPD also, we managed

21  emergencies and prepared for emergencies.  But as my role as

22  Commissioner of Emergency Management, that was one of our

23  primary responsibilities:  To train people, to look at plans,

24  to help City agencies make plans, and actually have tabletop

25  exercises where we would deal with certain disasters.  And on

1  a number of occasions, we would deal with pandemic in New

2  York.

3  Q     Thank you.  I'll move on past background now.

4         Do you have in front of you a document titled,

5  "Declaration of Joseph J. Esposito in support of Plaintiff's

6  application for a temporary restraining order and preliminary

7  injunction"?

8  A     Yes, I have it in front of me.

9  Q     Okay.  And that document is titled or marked Document 6

10 at the top, the front page?

11 A     Yes, it is.

12 Q     Great.  I'm going to call that document your declaration.

13        Did you review your declaration before signing it on

14 the last page?

15 A     Yes.

16 Q     And at that time of signing it, you certified, affirmed,

17 that it was true under penalty of perjury; is that right?

18 A     Yes.

19 Q     Great.  And to the best of your knowledge, are the

20 content of your declaration true and correct?

21 A     Yes, they are.

22 Q     Okay.  And have you re-read your declaration since you

23 signed it?

24 A     Yes.

25 Q     And is there anything that you'd like to modify or

1  correct?

2  A     No.

3  Q     Okay.  Now I'm going turn your attention to the Diocese's

4  response to the COVID-19 pandemic.  And just so we're all on

5  the same page, as far as my colleague Mr. Moccia, when I refer

6  to "the Diocese," I'm referring to the Roman Catholic Church

7  of Brooklyn, New York, which is the Plaintiff in this action.

8         How did you come to be involved -- did you come at

9  some point in time to be involved in the Diocese's response to

10 the COVID-19 pandemic?

11 A     Yes, I was.

12 Q     How did you come to be involved in it and what was your

13 role?

14 A     Well, I'm a practicing Catholic in Brooklyn.  I'm well

15 known to the Diocese; members of the Diocese, bishops,

16 monsignors, a lot of the local priests.  I've actively served

17 on a committee since 2013.  I'm the chair of a committee,

18 voluntary work, where I investigate misconduct by clergy.  So,

19 in that role, I became very familiar with the Bishop and the

20 staff of the Diocese.

21        So, and, again, when Corona hit, I was asked to come

22 onboard and help with the opening of the churches in a safe

23 manner.

24 Q     And, so, what did the church do or the Diocese do to --

25 in response to the coronavirus?

A    Well, we formed a committee, as the Bishop had stated.

We met on a regular basis.  We looked at the federal, state,

and city guidelines, we made sure that we used them as our

guidelines to open up the churches.  Multiple, multiple

meetings, communications back and forth with the pastors of

the churches, getting their feedback on our plans that they

developed.  Ultimately, the plans were okayed.

Again, we spoke to medical professionals.  We had

people on the committee who were planners, who had planned

major events in the NYPD.

As a result, we come up with these guidelines.  I

believe it's your Exhibit A.  Those were the final plans that

went out to the parishes.  And we went out and put those plans

in effect.

MR. SHAPIRO:  And just for the record, that's

Exhibit A to Commissioner Esposito's declaration.

Q    Okay.  And when you made the various protocol

recommendations, safety recommendations, were those all made

or done in consultation with medical professionals?

A    Yes, yes, I spoke to a number of medical people to get

their input, especially on the Communion issue, receiving

Communion.

The other restrictions, again, we complied with the

federal, state, and city restrictions, but we also talked with

medical experts for their input if they thought we had

1   anything we could modify the plans or add to them.  But they

2   were really concerned with the part of receiving Communion.

3   Q    And the Bishop has covered the changes that were made to

4   the Holy Communion, so I won't walk through that again, it's

5   in the record.

6           But if you could, just summarize the other changes

7   that were made or the other protocols that were put in place

8   for the churches in the Diocese to ensure the safety.

9   A    Sure.  I'd just like to re-stress what the Bishop said

10  about receiving Communion.

11          Receiving Communion is a very, very important part

12  of the Mass service.  There are people that feel they haven't

13  really gone to Mass and done their responsibility if they

14  haven't received.  So, that was a real big sore point for a

15  lot of the parishioners, especially the older parishioners.

16  It's a very, very important piece to keep in mind.

17          Things that we did:  The churches should be

18  sanitized following protocols based on federal, state, and

19  city; social distancing measures; pews, we knocked off a --

20  every other pew was closed to ensure that social distancing of

21  the six feet.  All the pews were marked six feet apart, so

22  that we had stickers or tape or some kind of marker that

23  people would stay six feet apart.  Unless you were a family

24  member and you lived together with the family, then you could

25  sit together.

1           Occupancy was limited.  Again, everyone had to wear

2    a face mask.  We encouraged gloves also, if you had them, to

3    wear gloves.

4           Well-ventilated.  We made sure that the churches

5    kept the windows open a lot of time so that the air could come

6    through.

7           Hand sanitizer was provided.

8           We encouraged the at-risk population, people with

9    prior medical conditions, we asked them it might be best to

10   stay away.

11          We reinforced all the hygiene protocols, hand

12   washing.  We closed the bathrooms.  Many of the churches have

13   restrooms; we closed the restrooms.

14          Things of that nature.

15   Q    And how about the entrances and exits and the way that

16   people came in and out of the church?

17   A    You know, I'll just mention Saint Athanasius.  I'm very

18   familiar with Saint Athanasius.  That's my own personal

19   parish.

20          They have at least five entrances.  On a normal

21   Sunday, the parishioners enter and leave from that main

22   entrance because they would have the priest who conducted that

23   Mass be generally at the door of the church or on the

24   sidewalk.  And he greets the people; he'll shake their hand,

25   he'll bless an object if they brought for the kids, they sign

1  papers to show that the kids were at church.

2          So, we eliminated that.  There's no more proceeding

3  into the church, and the priest comes on the altar from the

4  sanctuary door.  And, again, he doesn't greet the people at

5  all.

6          And again, Saint Athanasius has five doors.  On a

7  normal Sunday, the main door is used, the side door, we're

8  making people go out another two doors to really get the back

9  of the church.  We encourage, a lot, not congregating in front

10  of the church the way they normally would do.

11

12          (Continued on the following page.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1  BY MR. SHAPIRO:   (Continuing)

2  Q     And to your knowledge, is that representative of the

3  changes that other churches within the Diocese have made in

4  the way that they enter and exit?

5  A     Oh, yes, sure.  I visited a number of churches as a

6  result of this, St. Athanasius in Williamsburg, Mount Carmel

7  in Greenpoint, and more churches in Queens, and all of the

8  protocols we've put in place, I've seen them being used in all

9  of the churches that I've been to.

10 Q     And you had mentioned limiting the occupancy.  Was there

11 any specific cap or percentage that you were limiting

12 occupancy to?

13 A     Yes, the 25 percent.

14 Q     Okay.  Great.  And that was for all the churches in the

15 Diocese, is that right?

16 A     Yes.  And then some of the churches had to modify their

17 schedule.  Some added masses.  Some removed masses.  We

18 adapted.  Just even the scheduling of the masses was, was

19 restructured to help with the, with the problem.

20 Q     And were there any changes made or steps taken with

21 respect to additional employees or individuals in the

22 churches, inside the churches to ensure compliance?

23 A     Sure.  We go back to the original opening.  We opened up

24 originally just for prayer on a Monday to Friday basis where

25 people go into the church, say a prayer and leave.  And then

1   after that, we went to a Monday to Friday mass where we have a

2   mass Monday to Friday, a daily mass.  Then, ultimately, we

3   went to the masses on the weekend, Sundays, and we limited

4   those folks and we had ushers, some churches hired security

5   guards.  I know at St. Dominic's, they had a security guard

6   and he would make sure that everyone wore a mask, social

7   distancing.  The numbers were kept to the acceptable level.

8            So, yes, every church did something.  Either they

9   organized, as the Bishop had mentioned, different groups to

10  sanitize the churches, but they all added ushers or people.

11  Q    And to your knowledge, were the protocols that your group

12  put together, the commission put together communicated to

13  individual churches in the Diocese?

14  A    All of them.

15  Q    And I don't know if I asked before.  What was your role

16  in the commission that the Diocese put together?

17  A    The chairperson.

18  Q    And to your knowledge, have the protocols that your

19  commission put together been adopted by all the churches in

20  the Diocese?

21  A    They were mandated to accept it.  If you know anything

22  about the Catholic church, when the Bishop says something, the

23  parishes listen.

24  Q    And, in fact, in your, from what you saw with your own

25  eyes, they did, in fact, listen, right?

1  A     Without a doubt.

2  Q     And I guess, you know, I mean, I imagine the parishioners

3  and the priests throughout the Diocese have the utmost respect

4  for the Bishop and would certainly follow any directive that

5  he put out, any mandate that he put out?

6  A     Yes.  As a matter of fact, I was, I went to

7  St. Athanasius.  I guess it was ten days ago or so, Bishop?

8  We had the confirmation.  We had a double session

9  confirmation.

10          We had to split the ceremony to accommodate the

11  crowd.  We probably had 120, maybe 150 kids receiving

12  confirmation, and we had to use strict regulations because

13  it's a very, very important sacrament to receive and usually

14  you bring your whole family.  We limited it.  You only had the

15  sponsor and mother and father and it was very, very -- it

16  wasn't easy to do.  We had people at the church trying to get

17  in with more and more people.  We had to stop them.  So, yes,

18  they complied but when they don't, we have ushers there to

19  make sure they comply.

20          THE COURT:  I'm sorry.  Where did this event take

21  place?

22          THE WITNESS:  The confirmation?

23          THE COURT:  Yes.

24          THE WITNESS:  This was at St. Athanasius.  And I

25  guess it was about 10 days ago, Bishop?  I think it was last

1   Tuesday, I believe.

2          THE COURT:  All right.  Thank you.  Go ahead.

3   Q    And did the Diocese, to your knowledge, have any protocol

4   or instructions in place for priests to report on any COVID-19

5   instances that they become aware of coming out of church

6   services?

7   A    Yes.  They've been instructed -- the priests will

8   instruct the parishioners to stay home if they're sick and if

9   they do feel sick and they were at church there, we've asked

10  them to report it to their local parish.

11  Q    And would you be told, would you be informed if there had

12  been any reported outbreaks or cases that were reported of

13  that structure?

14  A    I would have been notified, yes.

15  Q    And are you aware of any outbreaks of COVID-19 or spread

16  in any of the Diocese churches or parishes since the

17  reopening?

18  A    Not to my knowledge.

19  Q    Just a couple final questions and I'll wrap up.

20          You're familiar with the order, the executive order

21  from the Governor that this proceeding is about which, in

22  practice, limits attendance at churches and the Diocese to a

23  fixed cap of 10 or 25 people regardless of the size of the

24  church, right?

25  A    Yes.

1    Q     Since that order came out about a week and a half ago,

2    what has the effect been on the churches of the Diocese in

3    your experience?

4    A     We've been devastated.  We've been devastated.  I was at

5    church on Sunday just to help communicate that St. Athanasius

6    was closed.  There were people at the front door of churches

7    crying because they can't go to church.  They showed with

8    their entire family, they want to come in and celebrate the

9    mass.  We had to turn them away.  It's very, very

10   disheartening especially because, really, talking about

11   Brooklyn and Queens, would have complied, we've gone above and

12   beyond what the regulations have asked us to do and I think

13   it's just unfair the way they've done this, with a blanket

14   statement:  Close all the houses of worship.

15         I think what would be a better way of doing this, if

16   you want my opinion, is the Health Department has thousands of

17   people working for them and they have a multitude of

18   inspectors.  Well, get a hundred, get 200 inspectors and go

19   out and visit on a Friday, visit a mosque.  That's their big

20   prayer day.  On a Saturday, visit the synagogues.  That's

21   their big prayer day.  On a Sunday, go to the Catholic

22   churches, Christian churches, all churches.  And if you find

23   that house of worship was in violation, well, then you give a

24   warning, you close them down, take some kind of action against

25   them, but to do a blanket statement where you're closing all

1  houses of worship, those that have been complying, ones that

2  are doing what they can to do the right thing, to close them,

3  you're really defeating the purpose.  You're smacking the

4  people that are listening to you.  A better way would be smack

5  the people that aren't listening to us.

6  Q    Thank you for that.

7        Based on your experience in emergency management,

8  NYPD and information you've obtained chairing the Diocese

9  COVID-19 commission, do you believe that it's safe for the

10 churches and the Diocese to stay open as long as they comply

11 with the 25 percent capacity cap and all of the safety

12 protocols the Diocese has instituted?

13 A    Without a doubt.  Without a doubt.  I've been there.

14 I've been in church every Sunday.  I've been at a number of

15 special events, weddings and funerals, Communions,

16 Confirmations.  They have been, they have been abiding by the

17 rules to the umpteenth percent and to criticize them or to,

18 you know, make them close as a result of them doing the good

19 thing is just counterproductive.

20 Q    And last question.  Is there anything else that you'd

21 like to tell the Court about why the Diocese churches should

22 be permitted to reopen Sunday for mass, Sunday, subject to the

23 25 percent cap and the all the other safety measures?  Any

24 other additional thoughts you want to give the Court?

25 A    Well, I think I've articulated it but, again, I just want

1  to tell you how important it is for the parishioners to go to

2  church on a Sunday.  They want to meet their fellow

3  parishioners.  They want to relate to them and talk to them.

4          It's been very, very stressful.  You know, I talk to

5  so many people and they're stressed out to the max.  They need

6  communication with their co-parishioners.  You know, you watch

7  it on Facebook.  They do a great job, the Diocese is doing

8  great, putting the masses out, but there's nothing to replace

9  going to church, seeing your fellow parishioners, seeing your

10 local, you know, your local religious leader, shaking his

11 hand, getting a blessing from him on a Sunday.  There's

12 nothing better than that and we're missing that every Sunday.

13 And, again, doing it virtually, it helps us but it doesn't

14 replace being there.

15         MR. SHAPIRO:  No further questions on direct,

16 Your Honor.

17         THE COURT:  Thank you very much.

18         Mr. Farber, any question?

19         MR. FARBER:  Very brief, Your Honor.

20 CROSS-EXAMINATION

21 BY MR. FARBER:

22 Q    Good afternoon, Mr. Esposito.

23 A    Good afternoon.

24 Q    My name is Seth Farber.  I'm with the Attorney General's

25 Office.  I'm representing the defendant Governor Cuomo today.

1          In brief, sir, you've acknowledged that social

2     interaction is a big part of the experience of going to

3     church.  Is that fair to say?

4     A     Yes.

5     Q     Okay.  Is it fair to say, sir, you have no training in

6     epidemiology or infectious disease?

7     A     The only training I have is the tabletops that I would

8     conduct at Emergency Management.  No, no official medical

9     training.

10    Q     Okay.  All right.  Thank you, sir.

11               THE COURT:  Anything else from plaintiff?

12               MR. SHAPIRO:  Yes, very briefly, Your Honor.

13    REDIRECT EXAMINATION

14    BY MR. SHAPIRO:

15    Q     Commissioner Esposito, Mr. Farber was asking you about

16    social interactions, but all social interactions that occur in

17    churches since they have reopened have been subject to the

18    protocols that you and your commission put in place, right?

19    A     Yes.  There's one thing that wasn't mentioned.  You know,

20    during the mass, we greet one another.  You know, we'll say,

21    you know, "Peace be with you," and people will shake hands,

22    they'll hug, they'll do a cheek kiss.  That has been

23    eliminated also.  When you say, "Peace be with you," the most

24    you are going to get is you turn around, wave at your fellow

25    parishioners and say, "Peace be with you."  So that social --

1   and we've modified the way we're doing mass.

2   Q    And just to be clear, nobody is shaking the priest's hand

3   nowadays?

4   A    No contact.

5   Q    And everyone is social distanced 6 feet or more apart

6   both during mass and afterwards?

7   A    Yes.

8   Q    Okay.  And everyone's wearing a mask the entire time that

9   they're in the church except for the brief moment when they've

10  stepped to the side and take from the Holy Communion?

11  A    No mask, no mass.  That's been our slogan.

12  Q    And so the parishioners know that the socializing that

13  they are doing in church is not like any kind of socializing

14  they would have done in the old days before COVID, right?

15  A    That's correct.

16  Q    And everyone is very careful to maintain all of the

17  requirements that the Bishop has put in place and mandated

18  that everyone comply with?

19  A    Very much so.  And if they don't do it by themselves, we

20  have enough additional ushers and security to mandate that

21  they do.  We, we -- a fellow was giving us a bit of a hard

22  time the other day about putting a mask on.  I had to go over

23  and tell him, "No mask, you can't come in."  He ultimately put

24  on a mask and came in.

25  Q    But to your knowledge, even that kind of brief

1  intransigences happen very infrequently, right?

2  A    Yes.  Well he was there for a Confirmation.  He was not a

3  regular churchgoer, I could tell, so he wanted to be a little

4  defiant and we put him in check.

5  Q    Very good.

6       And the, the social interaction that people are

7  really coming to church for nowadays is to be, to gather as a

8  spiritual community and celebrate mass together under the very

9  strict guidelines that the church has put in place, fair to

10 say?

11 A    Without a doubt.  Without a doubt.

12      Look, I mean a lot of these folks, they want to be

13 in that building.  They want to be in that church.  They want

14 to go up to the front.  They want to kneel down and pray in

15 front of the holy statutes.  They want to be in that church.

16 We don't even have Holy Water.  Another thing.  We've

17 eliminated the Holy Water.  The fountains are empty.  We've

18 gone above and beyond.  I'm telling you.

19 Q    Okay.  Great.  Thank you, Commissioner Esposito.  I

20 appreciate the time.

21      MR. SHAPIRO:  No further questions from us,

22 Your Honor.

23      THE COURT:  Anything further from you, Mr. Farber?

24      MR. FARBER:  No, Your Honor.

25      THE COURT:  All right.  Does the plaintiff have any

1    other witnesses?  Mr. Mastro?

2              MR. MASTRO:  No, Your Honor.

3              THE COURT:  Thank you.

4              All right.  At this point, Mr. Farber, do you want

5    to call your witness?

6              MR. FARBER:  I do.  I would call Bryon Backenson.  I

7    believe he is on.

8              THE COURT:  Yes, he is here on video.

9              MR. FARBER:  Okay.

10             THE COURT:  So let's swear in the witness.

11             (The witness is duly sworn/affirmed by the Clerk of

12   the Court under penalties of perjury.)

13             THE COURT:  You may proceed, Mr. Farber.

14             MR. FARBER:  Thank you, Your Honor.

15   DIRECT EXAMINATION

16   BY MR. FARBER:

17   Q    Mr. Backenson, what is your current position?

18   A    I'm a research scientist 5 with the New York State

19   Department of Health.  I'm the Deputy Director of the Bureau

20   of Communicable Disease Control for the State Department of

21   Health.  I'm an Assistant Professor of Epidemiology and

22   Biostatistics at the University at Albany School of Public

23   Health.

24   Q    And how long have you been with the State Department of

25   Health?

1   A    Twenty-four years.  I've been with the Department

2   consecutively now since 2000.

3   Q    Can you describe your educational background for the

4   court?

5   A    I have an undergraduate degree from Drew University in

6   Madison, New Jersey, a Master of Science in epidemiology and

7   biostatistics from the University of Albany.

8   Q    As a general matter, you are familiar with

9   epidemiological issues, is that correct?

10  A    I am.

11  Q    Can you tell the Court who is Debra Blog?

12  A    Debra Blog is the director of the Division of

13  Epidemiology in New York State.  She's also the State

14  epidemiologist.  There is one designated for each state.  Deb

15  Blog is the State epidemiologist for New York.  She -- my

16  bureau, the Bureau of Communicable Disease Control, falls

17  under Deb Blog.

18  Q    Okay.  And do you work with Ms. Blog, Dr. Blog?

19  A    I do.

20  Q    And in what capacity?  What is your relationship with

21  Dr. Blog?

22  A    So my group, the bureau of communicable disease control

23  is one of 5 bureaus that work under Dr. Blog.  There are about

24  75 or so different diseases in New York State, infectious

25  diseases, that are mandated to be reported to New York State

1    and county health departments and our group basically

2    investigates those as well as other issues that come up that

3    require investigation that may not have made that list quite

4    yet.  Basically, what we do is we look, we investigate

5    individual cases of disease and clusters of cases of disease,

6    depending on the pathogen or the disease involved.

7    Q    Are you aware that Dr. Blog has filed a declaration in

8    this case?

9    A    I am.

10   Q    Have you had a chance to review that declaration?

11   A    I have.

12   Q    Have you had a chance to review the exhibits to that

13   declaration?

14   A    I have.

15   Q    All right.  Is there anything in that declaration that

16   contain any statements that you disagree with?

17            MR. MASTRO:  Objection, Your Honor.  May I please be

18   heard?

19            THE COURT:  Yes, Mr. Mastro.

20            MR. FARBER:  I can rephrase.

21            MR. MASTRO:  It's not a question of rephrasing.  The

22   questioner is leading his own witness, but this witness, you

23   know, he's not in a position, he's not qualified as an expert

24   in the way that the State presented Dr. Blog.  He said he's

25   generally familiar with epidemiology and he is now going to be

1   asked to adopt opinions given by Dr. Blog that were really

2   general conclusions that other courts in this state and

3   recently in Washington, D.C. found were conclusory and not

4   based on a sufficient record under Daubert.

5            This is actually trying to not have the real witness

6   here who might actually have been qualified to give an

7   opinion, although challenge it.  We have a subordinate who is

8   not a doctor, not a Ph.D., and who's now being asked to adopt

9   in its entirety an affidavit or a declaration over 90

10  paragraphs, 37 exhibits, and he's simply not qualified to give

11  the opinions that are given in the declaration and it is, you

12  know, at its core, putting words in the witness' mouth when

13  the other person should have been here.

14           So, Your Honor, I don't mean belabor the point but

15  we would have objected to opinions being rendered in this

16  conclusory fashion just as the Northern Division of New York

17  rejected the Commissioner of Health doing the same thing in a

18  case in August and a DC district court just did last Friday,

19  but this witness isn't even qualified to give those conclusory

20  results.  He read her declaration.  Now he's going to say I

21  agree with everything in it?  I don't think that's proper

22  testimony, Your Honor, certainly not proper expert testimony.

23           THE COURT:  Mr. Farber, you're not providing this

24  witness as an expert on the issues that would require

25  expertise of the type that Dr. Blog may or may not have, are

1  you?

2          MR. FARBER:  I'm not offering the witness for

3  Dr. Blog's expertise, Your Honor.  I'm offering the witness on

4  the background of this policy, public health practices and

5  other matters with which he is eminently familiar since he

6  works in that area and has worked in that area for many years.

7          MR. MASTRO:  Your Honor, may I talk, please?

8          THE COURT:  Wait, Mr. Mastro.

9          In that case, why don't you ask him specific

10  questions which relate to his responsibility in his position

11  and leave Dr. Blog's declaration as a separate matter that can

12  be argued about.  Dr. Blog did not, is not being presented as

13  a witness and the Court may or may not take her declaration

14  into account in reaching the determination, but I think this

15  witness certainly can speak to certain issues.  I have a few

16  questions myself so why don't we go ahead with some specific

17  questions as to issues or --

18          MR. FARBER:  Right.

19          THE COURT:  -- facts that he has specific knowledge

20  of and then we'll move on from there.

21          MR. FARBER:  I will move on, Your Honor.

22          MR. MASTRO:  Thank you, Your Honor.

23          THE COURT:  Okay.

24  Q    Mr. Backenson, can you tell the court what your role in

25  your position with the Department of Health is and New York

1   State's response to the COVID-19 pandemic?

2   A    So I over -- in my role, I oversee our case investigation

3   of communicable diseases in New York State.  I've been doing

4   that since 2009.  I investigate outbreaks and direct

5   individuals to investigate outbreaks across New York State.  I

6   am the, I'm the person who people call at 2 in the morning

7   when a physician has a question about a case that they don't

8   know what to do with with regards to reporting that.

9            My first instance with regards to COVID was in

10  January when I wound up getting phone calls with regards to

11  individuals who had recently returned from China and I've

12  worked with other members of the Department ever since in

13  order to help develop some of the surveillance techniques in

14  order to, in order to identify cases, some of the policies

15  involved in trying to address issues when it comes to

16  isolation and quarantine and so forth with regards to this.

17  I've also been directly involved in contact tracing and

18  contact elucidation with all the counties of New York State.

19  Q    Okay.  And what is the role of your particular section of

20  the division of epidemiology, is it infectious diseases?

21  A    It's communicable disease, right.  It's the Bureau of

22  Communicable Disease Control and we investigate outbreaks and

23  we try and implement public health measures to help mitigate

24  spread of outbreaks.

25  Q    Okay.  And what is the role of the Division of

1  Epidemiology in response to the COVID pandemic?

2  A    The Division of Epidemiology encompasses five different

3  groups.  Ours is kind of general communicable disease.  There

4  is a group that deals with hospital-acquired infections.

5  There's a group that deals with tuberculosis.  There's a group

6  that deals with communicable disease data.  So we're basically

7  broken up by individual subject matter fields, if you will.

8  Q    Okay.  To your knowledge, how is the SARS-CoV-2 virus

9  transmitted?

10  A    It's a respiratory virus.  It is transmitted primarily by

11  inhaling particles that have, that are infected with the

12  virus, be them aerosols or be they droplets.  They are --

13  again, that's primarily how this happens.  There is some

14  indication that there may be some transmission of this through

15  picking up the virus on surfaces and then, you know, wiping it

16  into a mucous membrane like a mouth or an eye.  It appears the

17  vast majority of transmission is via the respiratory route.

18          MR. MASTRO:  Your Honor, I have to object because it

19  was represented that he wasn't going to try to solicit expert

20  opinion from the witness and he just elicited the witness',

21  you know, opinion about how the virus is transmitted.

22  Your Honor, I didn't hear the witness say and I'm happy to

23  voir dire him on it, I didn't hear him say he considers

24  himself to be an expert on COVID-19.  I didn't hear that at

25  all.  So he's being called to give testimony about, really in

1    the nature of expert testimony about how the virus --

2            THE COURT:  Well, your point is well taken but

3    anyone who's listened over the last eight months to Dr. Fauci

4    has become an expert on how COVID-19 is transmitted.  It's a

5    generally understood situation, it would seem, and I'm not

6    taking his statement as an expert statement.  It just

7    reinforces what we have been, we have come to understand about

8    the pandemic.  There are millions of Americans who are now

9    experts on how COVID-19 is transmitted and then there are a

10   few who have no idea whatsoever.

11           So let's just move ahead.  Your point is well taken.

12   I am not going to rely on this witness on that particular

13   issue.

14           MR. MASTRO:  Thank you, Your Honor.  Let's move on.

15           THE COURT:  Yes.  Let's move on, please.  I'd like

16   to hear more about the specifics of this particular executive

17   order and how it came about, 202.68 which imposed new

18   restrictions in certain neighborhoods in Queens and Brooklyn

19   which is the subject of this application.

20           Okay.  Let's go ahead, Mr. Farber.

21           MR. FARBER:  Sure.

22   Q    Mr. Backenson, can you tell the Court what a COVID

23   cluster is?

24   A    Yes.  A cluster of COVID is a group of cases that are all

25   related in one way or another.  It could be related through an

1  occupational exposure, it could be related through a home

2  exposure, it could be related through some sort of gathering

3  but, basically, it's a link between a number of people who are

4  positive and it's basically, it's, you know -- typically it's

5  assumed to be three or more individuals who are all linked

6  together.

7  Q    Can you tell the court what a superspreader event is?

8  A    A super spreader event is something where one particular

9  infected individual disproportionately infects a number of

10 other individuals.  It is something that we've seen in

11 multiple circumstances with regards to COVID and other

12 illnesses for that matter but, typically, that can be from

13 when one particular individual is in a position where they may

14 be sharing more virus particles than they would, than another

15 individual might, particularly a situation that they might be

16 placed in where people are close together and there are a

17 number of people who may be susceptible to becoming infected

18 but, in general, again, it is one individual

19 disproportionately infecting a number of others.

20 Q    Is there a relationship to your knowledge between houses

21 of worship and superspreader events?

22       MR. MASTRO:  Objection, Your Honor.  Foundation and

23 he's asking him for, again, expert testimony.

24       THE COURT:  Sustained.

25 Q    Okay.  Superspreader events take place, as you just said,

1    when there are large groups of people present, is that fair to

2    say?

3    A    Yes.

4            MR. MASTRO:  Leading the witness, Your Honor.

5            THE COURT:  Go ahead.

6    Q    Can you describe the data that was relied on by the State

7    of New York in determining that there were COVID clusters?

8    A    These would be the data on human cases as well as the

9    proportion of tests that are testing positive so the number of

10   people getting tested and the number of percentage of those

11   tests that are returning positive within a different time

12   period.

13   Q    Are you familiar with what the State is calling the

14   cluster initiative?

15   A    I am.

16   Q    Can you tell the Court what the cluster initiative is?

17   A    So the cluster initiative is a, it's -- first of all,

18   it's an identification of areas of increased incidents of

19   cases in a particular area, particularly compared to other

20   locations, and it's basically a targeted return to some of the

21   techniques that were done when New York went on pause back in

22   March.  It's limiting businesses, it's limiting movement, it's

23   basically trying to reduce density in areas where there are

24   large or larger proportions of people who are testing

25   positive.

1    Q    Are you familiar with the Governor's executive order

2    number 202.68?

3    A    Yes.

4    Q    Okay.  Are you familiar with the terms "red zone,"

5    "orange zone" and "yellow zone" as set forth in that executive

6    order?

7    A    Yes.

8    Q    Okay.  And briefly, can you say what the red zone and

9    orange zone and yellow zone are?

10   A    So these zones are basically ways that, they're -- the

11   individual zones have been set up so that the red zone is an

12   area that has the highest incident of new cases in an area

13   that go through the highest proportion of tests being, coming

14   back positive.  Orange is less than that and yellow then is

15   less than that.

16        In each of those, there are a number of different

17   mitigation measures that are taking place.  They are

18   temporary.  They're there to try and help reduce the spread

19   that had been increasing in those particular areas.

20        They include limits on gatherings from none in the

21   red to 10 in the orange to 25 in the yellow to business just

22   being essential, just essential businesses being open in the

23   red zone to some closing of high risk businesses in the orange

24   zone to all businesses being open in the yellow zone.  There

25   are restaurant restrictions from takeout only in the red zone

1  to outdoor dining limited to four at a table only in the

2  orange zone to indoor and outdoor dining limited to four at a

3  table in that yellow zone.  Schools are closed in both the red

4  and the orange zones.  They're open in the yellow zones but

5  with required testing.  And churches are limited in the red

6  zones to 25 percent or 10 -- 25 percent capacity or 10

7  individuals whichever is smaller, the orange zone is

8  33 percent capacity or 25 individuals, whichever is smaller,

9  and in the yellow, it's listed to 50 percent capacity.

10 Q    Are you aware of the data that was used in creating these

11 zones?

12 A    The data that was used for these was a combination of

13 case data as well as testing data.

14 Q    All right.  As far as you're aware, the red zones, do the

15 red zones represent, you know, the highest concentration of

16 COVID cases, the orange zones the less highest and the yellow

17 zones the less highest, is that fair to say?

18 A    Having looked at the data --

19         MR. MASTRO:  Objection, Your Honor.

20         THE COURT:  I'm allowing the answer.

21         Go ahead.

22 A    Having looked at the data, the zones certainly correspond

23 to the highest incidence rates and the highest testing rates.

24         THE COURT:  Let me just ask this.  Excuse me,

25 Mr. Farber, if I may.

1      Is your office the office that collects this data
2  and examines and interprets this data?  Is that what you do?
3      THE WITNESS:  Our office and other offices in the
4  Department of Health collect data.  We do analyze data.  We do
5  try and clean data to make sure that the data that's being
6  used is, is appropriate and, you know, placed in the right
7  locations and so forth.  So, yes, that is what our office
8  does.
9      THE COURT:  And in establishing the zones, is it
10 your office that established these zones when they became
11 necessary when the positive test results reached a certain
12 level of positivity, of testing?
13     THE WITNESS:  No, Your Honor, my office was not
14 involved in the creation of a threshold for a particular zone
15 if that's what you're asking.
16     THE COURT:  Well, then, if not your office, who's
17 office calculates the level of positivity and what needs to be
18 done with a zone a community needs to be placed in?
19     THE WITNESS:  These, as I understand it, the
20 creation of the zones were done by the executive office.
21     THE COURT:  I know what we're talking about.  You
22 mean, the Governor's office, the defendant's office, right?
23     THE WITNESS:  Correct.
24     THE COURT:  And Mr. Farber, the question is, and I'm
25 sure that you'll asking it eventually on cross-examination,

1  but my question is you're not, you're not providing any

2  witness to elucidate that a certain level of positivity

3  requires a certain level of limiting community activity;

4  that's not why, why this witness is here, I take it?

5       MR. FARBER:  That's correct, Your Honor.  This

6  witness is going to, you know, testify about the general

7  policy, its reasonableness as a matter of sound

8  epidemiological and public health practice, but he did not,

9  you know, create the specific policy of, you know, X percent

10  do this, X minus Y percent do that.  That's not this witness.

11       THE COURT:  And he's not an epidemiologist.  In

12  other words, he's not the person or group of persons who are

13  being consulted by the Governor as to establishing these,

14  these standards or cutoffs for red zones and orange zones and

15  the yellow zones, correct?

16       MR. FARBER:  He's in the group that is.  I can't say

17  that he personally is part of that.

18       THE COURT:  Well, let me cut to the chase here for a

19  minute.  I think that in Dr. Blog's declaration, there was,

20  and correct me if I'm wrong, Mr. Farber, a representation that

21  the red zone consists of a positivity rate of at least

22  8 percent.  Is that your understanding?

23       MR. FARBER:  That is, that is my understanding.  I

24  think that, I think that's an approximation and I think

25  that's --

1          THE COURT:  Okay.

2          MR. FARBER:  -- that's an average but I think that's

3    correct.  I think that's correct.

4          THE COURT:  Well, it was brought to my attention

5    this afternoon that the Governor held a press conference at

6    11:30 this morning at which he indicated that the numbers show

7    that there are, the positivity rate in the red zone is

8    4.84 percent at present.  Are you are of this?

9          Do you have a witness who can talk about what's

10   going on with the positivity rate and how that might affect

11   this litigation?

12         MR. FARBER:  I, you know, I am not, I am not aware

13   of that, Your Honor.  And the witness I, you know, the witness

14   I have today is, you know, can address it if he knows.

15         I can tell the Court that Dr. Blog herself

16   unfortunately had a medical issue.  I don't know, you know,

17   her availability, for example, for tomorrow but, you know,

18   that's what I have.  Unfortunately, Your Honor, we're in

19   difficult circumstances, you know, as we indicated in our

20   letter so, you know, we're, we're all, you know, in a

21   difficult position.  You know, we are dealing with this.

22         THE COURT:  Mr. Farber.  Mr. Farber.

23         MR. FARBER:  Yes.

24         THE COURT:  This was scheduled -- this hearing was

25   scheduled over the weekend.  All right.

1          MR. FARBER:  Yes, Your Honor.

2          THE COURT:  And the Governor is giving, is giving a

3     press conference this morning and the numbers that he

4     apparently, you can correct it, I'm not saying this is, this

5     is just hearsay on my part, but it's valuable here since we're

6     trying to figure out what to do here.  He's now saying that

7     the red zone is now under 5 percent and that's what I'm,

8     that's what I'm understanding from this press conference that

9     he had.

10         This is a court.  I don't go to press conferences.

11    So, you know, I think it is important for your client to be

12    able to tell you what the latest move is so that we can have

13    an up to date understanding of what's going on with regard to

14    this COVID outbreak which I do not minimize in any way, shape

15    or form, you understand.  I'm just trying to get the latest

16    picture that is available so that if it is useful, if it is

17    useful in what we are doing, at least we will have it and be

18    able to consider it.

19         So I'm going to let you go ahead.

20         MR. FARBER:  Okay.

21         THE COURT:  I just point that out to you and ask you

22    to provide any additional information by tomorrow morning at

23    9 o'clock --

24         MR. FARBER:  Yes, Your Honor.

25         THE COURT:  -- on this subject and possibly some

1    sort of declaration by someone who is crunching the numbers as

2    to how this might affect all these zones that have been

3    created and affect the rights of the plaintiff in this case

4    and the parishioners of the Roman Catholic Diocese of

5    Brooklyn.

6            So having said all that, you can go back to your

7    questioning of the witness.  Thank you.

8            MR. FARBER:  Thank you, Your Honor.

9    Q    Backenson, are you familiar with the term "nonessential

10   gatherings"?

11   A    Yes.

12   Q    Okay.  And are you familiar with how Executive Order

13   202.68 treats nonessential gatherings in the red and orange

14   zones?

15   A    Yes.

16   Q    How does it treat them?

17   A    Gatherings are -- there are no nonessential gatherings in

18   the red zone and gatherings are limited to ten or less in the

19   orange zone.

20   Q    Okay.  And are you familiar with the term "essential

21   business"?

22   A    Yes.

23   Q    All right.  And can you please describe that term in the

24   context of Executive Order 202.68?

25   A    Essential businesses have been defined earlier, in

1  earlier executive orders as businesses that are, that are

2  allowed to remain open because they provide essential services

3  to the State and to New Yorkers.  And with regards to those,

4  and this particular executive order, essential businesses are

5  allowed to stay open when in the red zone, other businesses

6  must close; in the orange zone, they are open, there are

7  personal care and other high risk businesses that are, that

8  should be closed; and in the yellow zone, there's no

9  restrictions.

10 Q    Okay.  The plaintiff has offered us, the plaintiff

11 offered evidence that the church officials are not aware of

12 COVID outbreaks from its churches in red and yellow zones and

13 that the church has imposed its own hygiene, social

14 distancing, masking mitigation measures.

15      In your view as a epidemiologist with New York

16 State, is that, in your view, an adequate public health

17 measure?

18      MR. MASTRO:  Objection, Your Honor.  And it's

19 also --

20      THE COURT:  No.  I'm allowing it.  Go ahead.

21 A    So the measures that have been undertaken were, are

22 certainly appropriate with regards to the phased entry that

23 has happened starting in mid May.  What we're trying to do now

24 is trying to have a targeted approach to try and address areas

25 that have extraordinarily high rates of positivity.  It may --

1    in situations like this, taking additional steps in order to

2    try and minimize spread and minimize risk to other individuals

3    and potentially trying to stop spread from catching hold in

4    certain areas is appropriate.

5    Q    All right.  And plaintiff, plaintiff argues that it

6    actually has lower capacity than the State requires in its

7    churches.  It's at a maximum of 25 percent capacity and when

8    in cases, the State permits 33 or even higher.

9         Why, again, as an epidemiologist with the State of

10   New York, would it be of concern if the churches in the red

11   and orange zone continue to operate at 25 percent capacity?

12        MR. MASTRO:  Same objection, Your Honor.

13        THE COURT:  Your objection is noted.

14        You may answer.

15   A    It is -- I mean, I think the main concern again is not

16   what actions the church has taken, but the actions that are

17   around the church and the individual, the increasing rate of

18   positivity in the communities surrounding it.  It's a concern

19   about then potential spread inside, inside this particular

20   church, potential spread to other people outside the

21   community.

22        The goal of COVID mitigation is to try and keep

23   COVID numbers as small as possible because as we've seen in a

24   number of situations in New York and nationally and

25   internationally for that matter, this is a disease that can

1  spread very, very quickly both in terms of time and a place.

2  Q    Are you familiar with the CDC's guidance for community

3  mitigation where there are high positive, positivity COVID

4  rates in a given area?

5  A    Yes.

6  Q    And can you describe what the CDC's guidance is for such

7  community mitigation?

8  A    In short, the CDC takes escalating steps as they're

9  increasing rates of number of cases and of incidence rates in

10  particular areas.  So if incidence rates or positivity rates

11  or a combination of both as we're doing here increases in a

12  particular area, CDC would recommend that additional steps get

13  taken in order to try and prevent future spread, particularly

14  in areas of high density.

15  Q    Okay.  And I'm nearly, nearly done here.

16        Can you explain what you meant concerning density?

17  A    Sure.  So density is a -- one of the main concerns about

18  the spread, transmission of COVID involves density.  The main

19  concern that we have is when there are a number of people

20  present, that it's much easier for one person to infect more

21  than one individual.

22        What we want to do as epidemiologists, as public

23  health professionals is try and, whenever there is a case, we

24  want to have fewer than one case, have that person transmit to

25  fewer than one individual.  That's a term called the

1  reproductive rate.  And so one of the things that we -- one of

2  the best ways to do that is to limit the number of people that

3  a positive individual is --

4            THE COURT:  Hold on.  Hold on a minute.

5            There is someone who's on a telephone call in the

6  middle of this proceeding and it's very distracting.  So

7  either hang up the phone or terminate your involvement in this

8  proceeding.

9            THE CLERK:  Judge, I can mute everybody but I was

10 just going to wait.

11           THE COURT:  Thank you very much.

12           I'm sorry to interrupt, sir.  Please complete your

13 statement.

14           THE WITNESS:  Certainly.

15 A    So density is important, basically, in trying to limit

16 the number of people that one individual can potentially

17 transmit to.  It's why we went on pause back in March.  It is

18 why we are, we recommend masking and social distancing.  It's

19 why we have certain limits for gatherings, why we have

20 staggered workplaces, why we have staggered school settings,

21 why we have no fans in stadiums.  It basically is trying to

22 prevent events where one or two positive individuals who may

23 or may not know that they are ill or positive can potentially

24 give this to many, many other people at once.

25 Q    Okay.  Thank you, Mr. Backenson.

1             MR. FARBER:  That actually concludes my direct.

2             THE COURT:  All right.  Thank you, Mr. Farber.

3             Cross-examination?

4             MR. MASTRO:  Yes, Your Honor.  Thank you,

5    Your Honor.

6             THE COURT:  Introduce yourself to the witness.

7             MR. MASTRO:  Yes.

8    CROSS-EXAMINATION

9    BY MR. MASTRO:

10   Q    Mr. Backenson, I have a few questions.  I look forward to

11   doing this as quickly as possible.  First --

12            THE COURT:  This is Mr. Mastro.

13            MR. MASTRO:  Yes.

14            THE COURT:  All right.  Go ahead, Mr. Mastro.  I

15   introduced you to the witness.

16            MR. MASTRO:  Thank you.  I'm sorry.

17   Q    Mr. Backenson, I did see you went to Drew University.  I

18   hope you took my father's course, Dr. Julius Mastro?

19   A    Unfortunately, I spent all my time in biology classes but

20   I am familiar with your father, yes.

21   Q    Well, God rest his soul.  He was a great, great professor

22   and a great father.

23            So, Mr. Backenson, just to clarify, you didn't speak

24   to the Governor about the executive order that's at issue in

25   this litigation, did you, sir?

1  A    I did not.

2  Q    You didn't speak to the Executive Office about what that

3  particular executive order should say, did you, sir?

4  A    Before it was created?

5  Q    Yes.

6  A    I wasn't.

7  Q    So you were not consulted in any way on what that

8  executive order should say, the parameters that were defined;

9  you had nothing to do with that, correct?

10  A    I did not.

11  Q    You had nothing to do with what geographic areas

12  qualified as red zones, did you, sir?

13  A    I did not.

14  Q    Or orange zones or yellow zones for that matter, correct?

15  A    No, sir.

16  Q    And you had no role in defining how this executive order

17  restricted houses of worship in those zones, correct, sir?

18  A    Correct.

19  Q    And you said the, those decisions about which areas

20  qualified for which zones, they were made in the Governor's

21  office, correct?

22  A    To my knowledge.

23  Q    And, sir, who in the Governor's office, the Governor's

24  office specifically, is, in fact, an epidemiologist?  Is there

25  is any?

1   A    I do not know, sir.

2   Q    Who in the Governor's office is a doctor or a scientist

3   who specializes in infectious disease, do you know, sir?

4   A    I do not know, sir.

5   Q    Is it typical in your experience that -- strike that.

6   Strike that.

7              Are you aware that the Governor announced today that

8   the test results as of yesterday for red zones are down to

9   4.84 percent positivity?  Are you aware of that, sir?

10  A    I heard it earlier in this, here.

11  Q    But you said your job is tracking trends and rates,

12  right?  Didn't you say that earlier?

13  A    The role of our unit is, yes.

14  Q    So are you aware that the test results reported yesterday

15  for red zones are down to 4.84 percent positivity?  You're

16  aware of that?

17  A    I'm aware that the rates have lowered.  I was not aware

18  of the specific number for this specific region in, in -- I'm

19  unsure if the term you're talking about is for all the red

20  zones or just one in particular.

21  Q    Sir, I want to ask you a few questions.

22             You said this executive order, they put this

23  together in the Governor's office, right?

24  A    That is my, that's my, that is my understanding.

25  Q    Yes.  Thank you.  I want to ask you the following

1    questions.

2           Are you aware that the Governor has said publicly

3    that his latest, that as to his latest executive order, "The

4    issue is with the ultra-Orthodox community"?  Are you aware

5    the Governor said that publicly, sir?

6    A    I am not.

7    Q    Do you agree with the Governor that "the issue is with

8    the ultra-Orthodox community"?  Sir, do you agree that's the

9    issue?  Yes or no.

10   A    The, the issue, I believe, is more so with a --

11   Q    Yes or no, sir.  Yes or no, please.

12          THE COURT:  I'll allow him to answer.

13          MR. FARBER:  I'm going to object -- okay.

14          THE COURT:  I'm going to allow him to answer.

15          We'll take your answer on that, please, sir.

16   A    No.

17   Q    Am I correct that the cluster that you're referring to in

18   these red zones is, as the Governor has said, predominantly an

19   ultra-Orthodox cluster"?  Do you agree with that?

20   A    These are areas that have a high population of Orthodox

21   population.

22   Q    So you agree with that, correct?

23   A    These zones are --

24          THE COURT:  I'm sorry.  You can finish your answer.

25   Go ahead.

1  A     These areas are areas that do have a high proportion of

2  the Orthodox population.

3  Q     And do you agree, sir, that the ultra-Orthodox community

4  in these neighborhoods is an insular community?

5            MR. FARBER:  Objection.

6            THE COURT:  Sustained.

7  Q     Do you agree, sir, that the ultra-Orthodox community in

8  these neighborhoods tends not to interact with its neighbors?

9            MR. FARBER:  Objection.

10            THE COURT:  Sustained.

11  Q     Sir, you said in your testimony that one of the things

12  that you do is contact tracing, right?

13  A     Correct.

14  Q     Have you attempted to do any contact -- contract -- have

15  you attempted to do any contact tracing work in connection

16  with these clusters in these red zones in Brooklyn?

17  A     I have not.  That's the jurisdiction, that's the

18  jurisdiction of the New York City Health Department.

19  Q     Am I correct, sir, that the New York State Health

20  Department has jurisdiction to enforce the government's

21  executive orders?

22            MR. FARBER:  Objection.

23            THE COURT:  No, whether he knows.  If he knows.

24            MR. FARBER:  Okay.

25            THE COURT:  Do you know?

1              THE WITNESS:  Yes.

2    A    Yes.

3    Q    Sir, do you know whether the Department of Health, the

4    State Department of Health has taken any steps to enforce the

5    Governor's executive order at issue here in relation to COVID

6    cluster in the ultra-Orthodox community in these Brooklyn red

7    zone neighborhoods?  Do you know whether the Health Department

8    has done that?

9    A    I do not.

10   Q    Now, sir, I want to also ask you the following.

11             You were here listening to the testimony of

12   Bishop Chappetto and Commissioner Esposito, correct?

13   A    Correct.

14   Q    And you heard Commissioner Esposito say that to his

15   knowledge, there have not been any outbreaks of COVID-19

16   stemming from any Catholic church or congregation in New York

17   City including Brooklyn or Queens.

18             Did you hear his testimony on that score, sir?

19   A    I did.

20   Q    And as far as you know, that's true and correct

21   testimony, right, sir?

22   A    Clusters in, outbreaks in New York City are the

23   jurisdiction of the New York City Department of Health.  There

24   may be ones that I am not privy to.

25             (Continued on the following page.)

1  CROSS EXAMINATION

2  BY MR. MASTRO:  (Continuing.)

3  Q    And as far as you know, that's true and correct

4  testimony; right, sir?

5  A    Clusters in -- outbreaks in New York City are the

6  jurisdiction of the New York City Department of Health.

7          There may be ones that I'm not privy to.

8  Q    Sir, a simple question.  Commissioner Esposito said that

9  to his knowledge there hasn't been any outbreak or spread of

10 COVID 19 in any of these catholic churches in Brooklyn or

11 Queens.  As far as you know, he's correct, there hasn't been

12 any spread or outbreak of COVID-19 in any of the diocese's

13 churches; correct?

14 A    To the best of my knowledge, there have been no outbreaks

15 specifically originating in a church in this particular

16 diocese, however, that is the jurisdiction of New York City

17 Department of Health for investigation.

18 Q    But it's the State, the Governor who imposed this

19 executive order; right, sir?

20 A    Correct.

21 Q    Now, sir, you mentioned the CDC --

22          MR. MASTRO:  Your Honor, I'm having such a good

23 time.  I see my battery is running low and I need my experts

24 to help me make sure I get it plugged in and that's my wife.

25 Can I please have a very brief break so I make sure she plugs

1   in the batteries so I do not lose power here.

2          THE COURT:  All right.  Let's take a two-minute

3   break to plug in Mr. Mastro's battery.

4          MR. MASTRO:  Thank you, Your Honor, much

5   appreciated.  My technical skills are lacking.

6          THE COURT:  That's apparent.

7          (Brief recess.)

8          MR. SHAPIRO:  Mr. Mastro just called me.

9          THE COURT:  I'm sorry.

10          MR. SHAPIRO:  He is trying to get back on.

11          THE COURT:  I don't know what we are getting right

12   now.

13          MR. SHAPIRO:  Your Honor, Mr. Mastro called me and

14   his computer had died, so he is trying to get back on as

15   quickly as possible.  He said in a few more minutes, I

16   apologize.

17          THE COURT:  That's all right.  We will know when he

18   is back.

19          Everyone should remain muted except the speaker.

20          Is there any word from Mr. Mastro?

21          MR. SHAPIRO:  I'll try calling him again, Your

22   Honor.

23          THE COURT:  Mr. Farber, you are still there, I take

24   it?  Mr. Farber?

25          MR. SHAPIRO:  If there is a way for Mr. Mastro to

1  continue the cross by phone, he would do that.

2         THE COURT:  That would be fine.  I will be happy

3  take his cross by phone, but I'm also looking for Mr. Farber.

4         MR. SHAPIRO:  Is there a number that he should use,

5  Mr. Reccoppa, for calling so that he can speak?

6         THE COURTROOM DEPUTY:  571-353-2300.  Then he enters

7  798200928.  That's the dial in number.

8         MR. FARBER:  Can you hear me?

9         THE COURT:  Mr. Farber?

10        MR. FARBER:  Yes, Your Honor.

11        THE COURT:  I'm glad you are back.  We are still

12  waiting.  Mr. Mastro is going to call in because he is having

13  trouble with his computer.

14        MR. FARBER:  He has my sympathies.

15        THE COURT:  Yes, I understand that.  Thank you for

16  your patience, everyone.

17        MR. MASTRO:  Am I back?

18        THE COURT:  You are back.  Please sit down.

19        MR. MASTRO:  My perfuse apologies to the witness

20  and, Your Honor.

21        THE COURT:  All right.  You have to promise me you

22  will have a heart-to-heart conversation with the IT department

23  at Gibson Dunn before you do another one of these.

24        MR. MASTRO:  I promise, Your Honor.  I'm still using

25  a Blackberry.

1        THE COURT:  Some people say that's the way to go.

2   Okay.

3        MR. MASTRO:  Thank you, Your Honor.

4        THE COURT:  Let's finish up with this witness,

5   please.  Try to get it done.

6        MR. MASTRO:  I will, Your Honor.  I don't have that

7   much longer, Your Honor.

8   BY MR. MASTRO:

9   Q    Sir, you were asked questions about CDC policies --

10       THE COURT:  I hate to do this, but I see the sun

11  light coming through.

12       THE WITNESS:  Wrong window.

13       THE COURT:  I don't know if that's the sunlight or

14  someone up speaking to you, sir.

15       That's better.  Thank you very much, sir.  Go ahead,

16  Mr. Mastro.

17       MR. MASTRO:  Thank you.  Thank you, Your Honor.

18  Q    Sir, you were asked some questions earlier about your

19  familiarity with the CDC's recommendations.  Do you remember

20  that testimony?

21  A    I do.

22  Q    And, sir, you know that the CDC recommends keeping,

23  quote, at least six feet away from other people, end quote, as

24  one of their recommendations in connection with COVID;

25  correct?

1  A     Correct.

2  Q     And the diocese's churches are doing just that; correct?

3  A     From their testimony, it appears that way.

4  Q     Thank you.

5          And you're aware that the CDC recommends that social

6  distancing, quote, is one of the best tools we have to avoid

7  being exposed to the virus and slowing its spread locally, end

8  quote?  You are aware of that, sir?

9  A     Yes.

10 Q     And that's exactly what the diocese's churches are doing,

11 social distancing?

12         MR. FARBER:  Objection.

13         THE COURT:  Sustained.  Let's move on.  It's been

14 asked and answered.

15 Q     Sir, are you also aware that the CDC put out expressed

16 guidance as to considerations in connection with communities

17 of faith?

18 A     Yes.

19 Q     And that's attached as Exhibit BB to the Blog

20 declaration; correct?

21 A     Yes.

22 Q     You are aware that the CDC expressly says that, quote,

23 its guidance is not intended to infringe upon rights protected

24 by the First Amendment to the U.S. Constitution; correct?

25         MR. FARBER:  Objection.

1      THE COURT:  You may answer.

2    A    I believe that is -- I believe that's what the guidance

3    says.

4    Q    And that, quote, No faith community should be asked to

5    adopt any mitigation strategies that are more stringent than

6    the mitigation strategies as to similarly-situated entities or

7    activities, end quote, you are aware of that; correct?

8    A    That is what it says.  Correct.

9    Q    Now, sir, I want to ask you about some of the other

10   activities from the other businesses and services that are in

11   red and orange zones that aren't restricted in any way.

12        Mr. Farber asked you about what has been categorized

13   as essential businesses or services, and you said you were

14   familiar with those; correct, sir?

15   A    Correct.

16   Q    And I'm referring you specifically to Mastro declaration,

17   Exhibit 5, and from the State entitled "Guidance for

18   determining whether a business enterprise is subject to

19   workforce reduction under recent executive orders."

20        Sir, you'll see there on the first page it describe

21   essential businesses or entities; correct?

22   A    I'm actually trying to find it.  Supplemental declaration

23   five?

24   Q    No, my first declaration, declaration of Randy Mastro,

25   Exhibit No. 5.

1   A    Okay.  I'm sorry.

2   Q    I'm referring you specifically, sir, to page 4, essential

3   retail.

4          Now, essential retail, that means even in the red

5   zones, they're not subject to any restrictions at all;

6   correct?

7   A    They are.  They are subject to restrictions.  They are --

8   masking and social distancing is part of that.  They are not

9   subject to --

10  Q    There is no --

11         THE COURT:  Do not over speak the witness.

12         Go ahead, sir.

13  A    They are not subject to -- to density restrictions, yes.

14  Q    So among those essential retail businesses are grocery

15  stores, including all food and beverage stores; correct, sir?

16  A    Correct.

17  Q    Does that mean liquor stores too, sir?

18  A    Liquor stores have been considered to be essential,

19  correct.

20  Q    Liquor stores.

21         How about convenience stores?  They're also

22  considered essential?

23  A    Correct.

24  Q    Hardware, appliance, and building material stores;

25  correct, sir?

1   A    Correct.

2   Q    Pet food; correct?

3   A    Correct.

4   Q    Sir, you are aware that there is a Target store in one of

5   these red zones in Brooklyn; correct?

6   A    Correct.

7   Q    And that's an essential business?  They sell food and

8   other related items?  Target is an essential business;

9   correct?

10  A    Correct.

11  Q    And Target is a big box store, very large; correct?

12  A    Correct.  I'm not familiar with the square footage of

13  this particular one, but I know compared to other Targets,

14  yes.

15  Q    So that Target store can literally have hundreds of

16  people shopping there on any given day, there's no capacity

17  restriction; correct?

18  A    Correct.

19  Q    Staples, Staples is a hardware store; right?

20  A    No.  Staples is a stationery store.

21  Q    Staples also has hardware materials, appliances, things

22  like that.  Staples would be considered an essential business;

23  correct?

24  A    To be honest, I believe it would.  But to be honest, I'm

25  trying to remember if the Staples by me was closed during the

1  unessential business period.

2  Q    So, sir, you wouldn't be surprised to learn that the

3  Staples in one of these Brooklyn red zone neighborhood is open

4  today for business; right?

5  A    I would not.

6  Q    And operating without any capacity restriction; correct?

7          MR. FARBER:  I'm going to object to this line.

8          THE COURT:  Overruled.  You may continue.

9  A    Correct.

10 Q    Staples is a big box store with hundreds of customers at

11 a time; correct?

12 A    Correct.

13 Q    Now, sir, I want to ask you, flip to the next page,

14 because it describes financial institutions as essential, and

15 listed there are banks, insurance, payroll, accounting, even

16 services related to financial markets, like your broker,

17 right?  They are considered essential businesses?

18 A    Correct.

19 Q    And they've stayed open; correct?  No restriction on

20 capacity?

21 A    Correct.

22 Q    And there you have staff working in close quarters,

23 sometimes even confined spaces, members of the public going

24 there for those services in confined spaces; correct?

25 A    Depending on the institution.

1    Q    Correct, right?

2    A    Correct.

3    Q    Now, sir, once again I am going to ask you about

4    something the Governor said.  Would you agree that this

5    executive order restricting services in all houses of worship

6    in these red and orange zones is, quote, Not a highly nuanced,

7    sophisticated response, end quote?  Do you agree with that?

8    A    So -- I'm sorry, can you repeat the question.

9    Q    Sure.  Do you agree with the statement that the

10   Governor's executive order restricting services of all houses

11   of worships in certain geographic zones is, quote, Not a

12   highly nuanced, sophisticated response, end quote?

13   A    I'm sorry, do I -- do I need to know who the -- who the

14   quote is?

15   Q    It's a quota attributed to the Governor on October 6,

16   2020.

17   A    Okay.  I would argue that -- I'm sorry.

18   Q    Pardon?  Please, go ahead.

19   A    Was there an objection made or something like that?  I'm

20   sorry?

21        THE COURT:  You can't ask your lawyer to make an

22   objection.  That's not.

23        THE WITNESS:  I wasn't sure.  I just heard cross

24   talking.

25        THE COURT:  Just answer the question, if you can.

1   That's all.

2          THE WITNESS:  I just heard cross talk.  I wasn't

3   sure.

4   A    So I think I would disagree.  I mean, I think this has

5   been a targeted approach to -- to areas that have had high

6   incidence rates.  It is intended to be targeted and intended

7   to be temporary.

8   Q    Would you agree with the statement attributed to the

9   Governor that this is not a policy being written by a scalpel,

10  this is a policy being cut by a hatchet, end quote?  Would you

11  agree with that?

12  A    I would not.

13  Q    Would you agree with the statement attributed to the

14  Governor that if we can get the numbers down in the zip codes,

15  the anxiety comes down and we can have a smarter, more

16  tailored approach"?  Do you agree with that?

17  A    There's a lot to unpack there.

18          In general, I mean, I think the goal here is to

19  reduce the rates, the incidence rates, the percent positive

20  test rates in the zones that have been identified so that we

21  can remain open.

22          The point here is I think that this is a targeted

23  temporary action that is being put into place in order to try

24  and prevent spread before this -- before the infection kind of

25  takes hold again in certain areas of the state.

1  Q    And, sir, it's your testimony that -- strike that.

2          You would agree that what the diocese has done

3  voluntarily, limiting its church masses to 25 percent of

4  capacity, wearing masks, social distancing at least six feet

5  apart, having extra precautions taken around the holy

6  communion, extra steps taken about entering and exiting to

7  promote social distancing during -- before and after the mass,

8  you would agree that all of those things are things that those

9  catholic churches should be doing; correct?

10 A    Correct.

11 Q    You would also agree, would you not, that the offer, in

12 the context of this preliminary injunction application, to not

13 have congregations singing and to make sure that the cantor is

14 always 12 feet away from anyone else, that that also is

15 something that promotes safety in the catholic churches;

16 correct?

17 A    Eliminating risky behaviors always helps, correct.

18 Q    And, again, you personally are not aware of any evidence

19 of any spread of COVID in any of the catholic churches in this

20 diocese; correct, sir?

21 A    In this diocese, in catholic churches, correct.

22 Q    And would it be fair to say based on the things that this

23 diocese has been doing in its churches and has offered to do

24 going forward, that its doing all the right things to prevent

25 the spread of COVID in its churches?  Would that be fair to

1 | say?

2 | A    I think they are doing things to try to prevent spread

3 | among congregants who come to the churches, yes.

4 | Q    And they're succeeding, for the past three months, no

5 | incidents of COVID; correct?

6 | A    I don't know of no incidents of COVID.  We know of no

7 | outbreak, but it certainly does not mean that there may not be

8 | people who have tested positive.

9 | Q    Since there has been no outbreak or spread, even if there

10 | had been a congregant who tested positive that necessarily

11 | means that the measures that have been taken protected the

12 | rest of the congregation from outbreak or spread; correct,

13 | sir?

14 |            MR. FARBER:  I'm going to object.

15 |            THE COURT:  Sustained.

16 |            MR. MASTRO:  Your Honor, I don't have any further

17 | questions of this witness at this time.  Thank you.

18 |            THE COURT:  Mr. Farber, anything else from you?

19 |            MR. FARBER:  I have a brief recross, Your Honor.

20 |            THE COURT:  Please go forward.

21 |            MR. FARBER:  Thank you, Your Honor.

22 |            THE COURT:  I'm sorry.  That's a redirect, right?

23 |            MR. FARBER:  Yes.  Redirect.  I'm sorry, Your Honor.

24 | I forgot where I am.

25 |            THE COURT:  Okay, go ahead.

1          MR. FARBER:  A few redirect questions.  My

2   apologies.

3   REDIRECT EXAMINATION

4   BY MR. FARBER:

5   Q    Mr. Backenson, Mr. Mastro just asked you -- he described

6   for you a number of measures taken by churches in the diocese,

7   social distancing, masking, reduced singing, changes to the

8   service.

9          In the context of an area undergoing an increase in

10  COVID cases, are the measures Mr. Mastro described sufficient

11  in your view as an epidemiologist?

12  A    The measures described are the measures -- I'm sorry.

13         MR. MASTRO:  Your Honor, I object.

14         THE COURT:  He may answer.

15  A    The measures described are measures that have been

16  recommended to churches throughout New York State and many, if

17  not all churches, are -- many of them are implementing them.

18         Having -- in an area of increased risk, the same --

19  you know, additional measures may be needed in order to try to

20  minimize spread from the community, throughout the community.

21  Q    Okay.  Now, Mr. Mastro asked you about a variety of

22  stores.  He has Target, Staples, and some other ones in there.

23         As an epidemiological matter, are those situations

24  the same as a church service in your view?

25  A    In many cases --

1      MR. MASTRO:  Objection, Your Honor.  Objection this

2  is not even --

3      THE COURT:  Overruled.  You can ask on recross.  Go

4  ahead.

5  A    In many instances, they may not be.  The retail

6  establishments are often go in, pick something up, leave.

7  Being in, you know, one of these establishments for a very

8  short period of time, oftentimes with -- where people are not

9  doing things like, you know, talking, singing, chanting,

10  things of that nature.  So in some ways they are very

11  different.

12      THE COURT:  Sir, have you ever been in a Trader

13  Joe's?

14      THE WITNESS:  I have.

15      THE COURT:  Go ahead.

16      THE WITNESS:  Right.  I can't -- I will not say that

17  all of them will be.  But, you know, going in a Trader Joe's

18  is certainly different than going into, you know, my local

19  Staples or my local hardware store.  You know, they're

20  definitely -- the Trader Joe's where I live still has a line

21  around the block because they are restricting entry and

22  limiting the number of people that are inside at any given

23  time.

24      THE COURT:  But for Trader Joe's the State isn't

25  doing an inspection as to the circulation of air in the Trader

1   Joe's, with lots of people coming and going even if there is a

2   certain restriction of the number, there is not a restriction

3   on how long they can stay inside and how many aisles they can

4   go in, and so forth.  The Trader Joe's, for instance -- and

5   that's not about a big supermarket -- will have a certain

6   amount of activity over a long period of time by any given

7   individual and there are the epidemiological issues having to

8   do with the circulation of air and the circulation of people,

9   and there's no regulation of that in the state, right?

10          THE WITNESS:  Correct, because it's been deemed an

11  essential business.  Risk and -- I'm sorry?

12          THE COURT:  Right.  And so you enter one of these

13  facilities at your own risk, basically?

14          THE WITNESS:  Correct.  And risk is typically a

15  function of distance and time.  So it's a function of your

16  distance to somebody who is positive to be able to be exposed

17  to that air and/or how long you are exposed to that particular

18  individual as well.  It's how we define contact through a

19  particular case.

20          THE COURT:  Does the State have any rules regarding

21  providing early shopping for senior citizens in some of these

22  more crowded venues that are not subject to other rules?  In

23  other words, from just to 7:00 a.m., if you are a senior

24  citizen, you can go in and do your shopping to the exclusion

25  of other people so that you maintain social distancing and

1   limit the number of people in the facility, does the State

2   have rules about that?

3            THE WITNESS:  To the best of my knowledge that is

4   something that is voluntarily being implemented by stores

5   themselves as opposed to there being a specific suggestion or

6   regulation from the State.

7            And the other thing, with grocery stores it's -- my

8   particular grocery store that I go to, for example, has all

9   sorts of arrows on the ground and they say that put it in a

10  layout of how people are supposed to flow through the store,

11  but they clearly do not.  So sometimes what businesses say is

12  being done in order to try, you know, prevent spread may not

13  necessarily be followed by their customers no matter what the

14  business or industry may be.

15           THE COURT:  These are steps that are implemented by

16  the store voluntarily to help maintain social distancing, but

17  it's not something that the State has mandated?

18           THE WITNESS:  There definitely are suggestions that

19  are put in in terms of the right way in terms of people flow,

20  and so forth.  But it's not -- I don't think there's a

21  mandate, enforcement of any of that.

22           THE COURT:  All right.  Thank you.

23           Do you have more, Mr. Farber?

24           MR. FARBER:  Very brief, Your Honor.

25           THE COURT:  Go ahead.

1    BY MR. FARBER:

2    Q    Mr. Mastro asked you about alleged prior outbreaks or

3    prior infections at the churches in the diocese.  I believe

4    this concerned the three or four months prior to the discovery

5    of the COVID clusters.  Are you aware of that?

6    A    I believe so.  I think the -- the identification of the

7    most recent clusters of the zones, is that what you're getting

8    at?

9    Q    Yes.  When was the most recent timing of the most recent

10   clusters?

11   A    I'm sorry.  I'm not understanding your question.

12   Q    I'm sorry.  My fault.

13        Do you recall when the clusters that resulted in the

14   cluster initiative were identified?

15   A    Yeah.  These were based on rolling averages of -- I

16   believe it's seven days of data.  So, seven previous days of

17   increasing rate -- of increasing incidents and rates of

18   positive test results.

19   Q    Do you recall in what month these clusters were

20   discovered?

21   A    September.

22   Q    What were the State's overall positivity rates in the

23   three months before that, in June, July, August?

24   A    Approximately one percent.  On some days it was as low as

25   .6 or .7 percent.

1  Q    So, in fact, it would be -- so during that period, it

2  would not be particularly surprising to you if a number of

3  churches or a great number of churches did not report

4  outbreaks of COVID-19?

5  A    Correct.  It seemed that there was less virus circulating

6  in the community at that point in time as well.

7  Q    And, in fact, is the fact that there were no prior

8  outbreaks relevant with respect to a situation where clusters

9  do develop in these given areas?

10 A    It is more difficult to -- it's less likely to have an

11 outbreak or a cluster if there's less virus circulating in the

12 community.

13 Q    So in your view, if there's more virus circulating in the

14 community, there is more likelihood of an outbreak?  Is that

15 fair to say?

16 A    Correct.

17 Q    Okay.  And as far as you know, the areas designated red,

18 orange, yellow, do, to the best of your knowledge, reflect

19 data points showing higher incidents of COVID-19; is that

20 correct?

21        MR. MASTRO:  Objection to form.  Leading his own

22 witness.

23        THE COURT:  You may answer.

24 A    From the data I've seen, the clusters reflect the

25 geographic distribution of higher incidence rates.

1          THE COURT:  Have you ever heard of micro clusters,

2     sir?

3          THE WITNESS:  Sure.

4          THE COURT:  Now, apparently, the Governor takes the

5     position that the orthodox community is not following red zone

6     rules, and that, for the most part, they never followed

7     general rules, even though the orthodox community is trying to

8     be cooperative according to the Governor.

9          Is that your understanding of what's going on in the

10    orthodox community?

11         THE WITNESS:  I've had experience with the orthodox

12    community in the past and they can be a very difficult

13    community to deal with.  I think our main concern here is

14    trying to prevent, you know -- if there is illness circulating

15    in a portion of a community, I think our concern is trying to

16    prevent it from spreading into other areas of the community.

17         THE COURT:  I see.

18         THE WITNESS:  We've seen this in other parts of the

19    State where we have had, you know -- I'm working on outbreaks

20    now in the southern tier of New York where we had clusters

21    associated one with a church, one with a bar and that have

22    basically led to broad non-cluster community outbreaks across

23    the entirety of three counties.  That's what we're trying to

24    prevent here.  We're trying to prevent a small group of people

25    that are all connected to one another to turning into a large

1    group of people that may be not as connected with one another.

2    That's where the virus sort of gets a foothold in a particular

3    area and it's sort of difficult to sort of squash it back out

4    again.

5              I'm a little concerned that that has happened in

6    some cases in parts of the southern tier already, and part of

7    these rules are to try and see if there is a way to minimize

8    that here in portions of New York State.

9              THE COURT:  I see.  Well, take these numbers and

10   tell me what you think, according to the information that I

11   have from the Governor's press conference today, as I

12   mentioned earlier, it is recorded that 4.84 percent positivity

13   rate in the red zone overall, .99 outside the red zone, and an

14   overall aggregate of 1.09 percent, if that's the case, would

15   you be recommending an adjustment of the limitation based upon

16   what appear to be a reduction from eight percent of positivity

17   in the red zone?  Is this something that you would recommend

18   or might recommend to your superiors to recommend to the

19   Governor?

20             THE WITNESS:  I think -- so hearing that data, it

21   makes me think that some of -- since this has gone on for

22   approximately 10 days or so now, it makes me think that some

23   of the targeted steps in red zones areas may be having an

24   impact and that the steps that were taken to reduce density,

25   to try and keep people from being in as much contact with one

1  another as they were maybe 15 days ago is supposed to

2  potentially having an impact.

3          It does show that there still remains a problem in

4  this particular area.  The fact that we can look outside this

5  particular area and see that, you know, roughly one percent

6  rate that we've seen pretty consistently for the past several

7  months, what we would like is we would like this community to

8  go back to that one percent rate that we're seeing in areas

9  sort of outside the red zone.

10          So I think the goal of all this was to try to have

11  it be something targeted so that it disrupted the least amount

12  of people but large enough so that you can actually make an

13  important impact to try and reduce that incidence rate.

14          THE COURT:  I had one other question.  You said at

15  the beginning of your testimony that the first time you

16  learned about -- I didn't write it down, but let me ask you

17  about it.  You said something about the first time that you

18  learned about someone who was positive for COVID had come from

19  China to New York; is that right?  That was in January?

20          THE WITNESS:  Yeah, what happens is we have a system

21  in place where physicians can call us any time day or night if

22  they suspect an urgent emerging disease, I'm at the top of

23  that list to get those phone calls.  The first call I got was

24  January 22nd, and I got five of them that night because that

25  was Washington State had reported their first positive case

1   that day.

2           So we obviously had a number of physicians seeing

3   people from China in emergency rooms in New York State making

4   phone calls and saying hey, might this be that particular

5   disease, how can I get a person tested.  So that's what I am

6   referring to.

7           The first real case that we wound up seeing in New

8   York, I think as we all know, was just about March -- it was

9   like February 29, March 1 or so.

10          THE COURT:  Was there any contact tracing to

11  indicate where that person had come from?

12          THE WITNESS:  So the very first case that we saw in

13  New York State was somebody from New York City who had

14  traveled to -- I want to say it was Iran.  But the second

15  case, which was the one in New Rochelle, which led to the

16  much, much larger outbreak, there was a lot of contact tracing

17  there.  We know that was a superspreader event that happened

18  in association with what appeared to be a religious

19  celebration, you know, there were people who were not part of

20  the community but were there doing things like catering, so

21  forth and so on, all tested positive.

22          THE COURT:  But the contact tracing didn't indicate

23  where that originated, whether it was Iran or China, or

24  somewhere else?

25          THE WITNESS:  Correct.  Right.  At that point in

1  time I don't know -- I'm sorry?

2          THE COURT:  Go ahead.

3          THE WITNESS:  So I don't believe that there --

4  sometimes it feels like forever ago at this point.  So I don't

5  recall that we have been able to, you know, identify where

6  that very first case in New Rochelle -- you know -- what their

7  link was or how they were exposed.

8          THE COURT:  And when was the time that you had a

9  case that was reported to you that originated in Europe, if

10  you remember?

11          THE WITNESS:  Oh, boy.  I can't tell you that it

12  would be the very first one, but I definitely remember a

13  person from Ulster County who had recently returned to the

14  United States.  We found him -- we didn't find him.  That's

15  the wrong way to say it.  He presented symptomatic after

16  spending two weeks in France.  I'm sure there were others

17  before that, but that was -- that's the first recollection I

18  have of one that I personally worked on with the individual.

19          THE COURT:  Thank you very much.

20          Anything else, Mr. Farber?

21          MR. FARBER:  Not from me, Your Honor.  Thank you.

22          THE COURT:  Okay.  I hate to ask, Mr. Mastro, do you

23  have anything else?

24          MR. MASTRO:  Well, if Your Honor would indulge me

25  for just a few minutes, I promise to be very brief.

1                THE COURT:  Go ahead.

2                MR. MASTRO:  Thank you.

3    RECROSS-EXAMINATION

4    BY MR. MASTRO:

5    Q    Sir, am I correct that you are aware of spread of COVID

6    within the ultra orthodox community in Brooklyn; correct?

7    A    That's been well reported, yes.

8    Q    But you are not aware of any evidence of the spread of

9    COVID from the ultra orthodox community to the diocese's

10   churches in Brooklyn and Queens; correct?

11   A    I am not privy to the contact tracing that's been being

12   done by the New York City Health Department, so I don't know

13   if there are New York City residents who may go to these

14   churches who may have, you know, worked with someone in the

15   orthodox community or something like that, so I can't answer

16   that.

17   Q    Sir, a simple question:  You're not aware of any evidence

18   of spread of COVID from the ultra orthodox community to the

19   diocese's churches in Brooklyn; correct?

20               MR. FARBER:  Objection.

21               THE COURT:  He may answer.  Go ahead.

22   A    I'm not aware, but it doesn't mean it doesn't exist.

23   Q    Now, sir, you said -- you talked about some important

24   factors in connection with enterprises, businesses, essential

25   businesses that are allowed to stay open without any capacity

1  restriction.  You talked about the time that someone spends in
2  a store.  Do you remember that, sir?
3  A    I do.  Yes.
4  Q    And I respectfully suggest to you that in forming the
5  question, but my wife is going to be part of these
6  proceedings, that there are people who go to Target and spend
7  hours, they shop, they clothes shop, they food shop, they do
8  all sorts of stuff at Target, and they spend hours?
9            MR. FARBER:  Objection.
10           THE COURT:  I'm sorry, the Court will take judicial
11  notice of the fact that people who go shopping at big box
12  stores sometimes browse through the store for a long period of
13  time.  It's a form of recreation for some people and sometimes
14  don't even buy anything.  So let's move on.
15  Q    Sir, the catholic churches and the dioceses have actually
16  limited the time of the mass so that parishioners spend less
17  time in the churches.  You are aware of that; right?
18  A    From earlier testimony.
19  Q    And you talked about your concern about singing and
20  chanting.  Are you aware that the diocese is prepared to
21  eliminate choirs and parishioners singing and having the
22  cantor removed at least 12 feet from anyone else in the
23  cathedral?  You heard that testimony; right, sir?
24  A    I heard that about singing.  I was born and raised a
25  catholic as well.  I mean, I know that there are many times in

1  the mass where the -- where parishioners are reciting prayers

2  out loud.  I don't know if that has been changed or not.

3  Q    And then they have been limiting the time in church,

4  according to the testimony you heard earlier; correct, sir?

5  A    Correct.

6  Q    You talked about arrows on the ground at certain of these

7  big box stores.  You know that the catholic church is doing

8  that to make sure of social distancing, sitting every other

9  row, and sitting at least six feet apart in a row, and arrows

10 on the ground?  You heard that testimony earlier; right, sir?

11 A    I did.

12 Q    And, sir, isn't it the case that you know in the catholic

13 churches they are rigorously enforcing the mask requirement

14 and social distancing?  And you heard the testimony that

15 people have to leave if they don't?  And you heard that

16 testimony; correct?

17 A    I did hear that testimony.

18 Q    Now, sir, you talked about how long somebody is in a

19 place.  Well, all of those businesses, likes the banks and the

20 accounting firms and the brokers, the employees in confined

21 spaces are going to work 8:00, 9:00 in the morning until 5

22 o'clock in the afternoon, and customers are coming out and

23 into their offices in that confined space over the course of

24 that eight-or nine-hour day; isn't that right, sir?

25 A    It is.  I mean, to the -- you know -- I'm sure there are

1  some working virtually.  I'm sure there are some who may be in

2  the office working full shifts.

3  Q    And there is no restriction on capacity in any of those

4  places; right?

5  A    Correct.

6  Q    And they are essential services; right?

7  A    Correct.

8  Q    Are you aware any COVID spike or outbreak in any house of

9  worship in a red zone in Brooklyn besides the ultra orthodox

10 community, yes or no?

11 A    I'm not aware of any at this particular point in time.

12 New York City may have additional information.

13           MR. MASTRO:  Thank you.  I have no further

14 questions, Your Honor.

15           THE COURT:  Anything else from you, Mr. Farber?

16           MR. FARBER:  I'm sorry, I'm getting some weird

17 sound.  No, Your Honor, nothing further from me.

18           THE COURT:  Okay.  All right.  Mr. Backenson, thank

19 you very much.  You are excused.

20           THE WITNESS:  Thank you.

21           THE COURT:  Does the defense have any other

22 witnesses?

23           MR. FARBER:  I do not at this time, Your Honor.

24 Your Honor has asked for a declaration to be filed by tomorrow

25 morning.

1      THE COURT:  Yes, please.

2      I don't want to take comments that are attributed to

3  the Governor at a press conference as accurate and without

4  some further delineation in a declaration and I would not want

5  to rely on it without clarification.  That is why I have asked

6  for a declaration as to current state of the positivity rate

7  in the red zone and in the yellow zones.  So you understand

8  that we're just trying to be careful not to assume or conclude

9  anything that may not be current evidence.

10      MR. FARBER:  Yes, Your Honor.

11      THE COURT:  Now, the next step, Mr. Mastro has asked

12  to make a brief closing, and I'm really not sure whether Mr.

13  Mastro wants to do that or make a submission between now and

14  tomorrow morning, but I'm happy to take your comments now.

15      We've had a substantial amount of written

16  submissions and some of these issues depend on the state of

17  the law at the present time.

18      Let me just say this, it's not clear to me what the

19  state of the law will be this month because it is all subject

20  to consideration by the appellate courts, consideration by the

21  appellate courts as to whether a situation like the

22  plaintiff's situation is subject to strict scrutiny analysis.

23  And at present, it would seem that the Supreme Court has

24  basically indicated in *South Bay* by a five to four vote that

25  that a strict scrutiny should not be applied to a free

1  exercise claim here.  But I don't know what will be the case

2  if this case -- whatever I decide -- goes up to the Second

3  Circuit, and potentially some case goes to the Supreme Court

4  in the next month or two.  So I'm just a little concerned that

5  whatever I do is going to be the subject of appellate review

6  and the rules may change depending on the composition of a

7  panel on the Circuit Court or the composition of the Supreme

8  Court.

9          So, Mr. Mastro, I would want to hear from you

10  whatever you have to say now briefly.  But I would also say to

11  the State that if the circumstances have improved, I would ask

12  to know whether the State is planning to revise the parameters

13  of the limitations that it has placed on religious worship in

14  the zones, the red, the orange, and yellow zones.  I would

15  like to know that as well from the State.  If the State's

16  position is it's going to continue with those restrictions,

17  you can put that in your declaration tomorrow morning as well,

18  so at least we know where we are as of now.

19          The defense witness indicated that the current rules

20  for these hot zones, if you will, were predicated on what

21  happened last month.  It appears that the situation has

22  improved, but whether it has improved sufficiently to permit a

23  revision of the rules is something that I would like the State

24  to opine on between now and tomorrow morning.

25          Do you understand that, Mr. Farber?

1          Mr. Farber?  Mr. Farber?

2          THE COURTROOM DEPUTY:  We lost him, Judge.

3          THE COURT:  When did we lose him?

4          THE COURTROOM DEPUTY:  We lost him a couple of

5    minutes ago.

6          THE COURT:  At what point in my statement and to the

7    parties did we lose him?

8          THE COURTROOM DEPUTY:  It was right at the end,

9    Judge.  I saw him.

10          THE COURT:  Let's wait for him to come back and then

11    I will repeat the request.

12

13          (Pause in proceedings.)

14          (Continued on the following page.)

15

16

17

18

19

20

21

22

23

24

25

1    (Continuing)

2              MR. FARBER:  Your Honor?

3              THE COURT:  Yes, Mr. Farber, how are you?

4              MR. FARBER:  I apologize.  For some reason, I am

5    muted.  I still hear the Court but the Court doesn't hear me.

6              THE COURT:  Did you hear my request regarding any

7    changes that might be under consideration for the rules

8    regarding these three zones?

9              MR. FARBER:  I did, your Honor, and we will include

10   that in our submission.

11             THE COURT:  All right.  Could you give me that by

12   10 a.m. tomorrow morning?

13             MR. FARBER:  10 a.m.

14             THE COURT:  10 a.m. would be fine.  And, of course,

15   upon receiving that, the Plaintiff can make a submission, a

16   brief submission, if it wishes, by 1 p.m. tomorrow.

17             I'm sorry, I didn't hear you, Mr. Mastro.

18             THE COURTROOM DEPUTY:  You're on mute.

19             THE COURT:  I'm reading lips.  I think he said yes.

20             (Pause in proceedings.)

21             MR. MASTRO:  Can you hear me now, your Honor?

22             THE COURT:  Yes, indeed, sir.

23             MR. MASTRO:  Thank you so much.  Thank you, your

24   Honor, we appreciate that opportunity to comment on what the

25   State submits.

1          I will be really brief now, but I really wanted to

2     address two points your Honor made.

3          THE COURT:  Please.  Go ahead.

4          MR. MASTRO:  First, your Honor's observation about

5     *South Bay*.

6          Respectfully, I don't think *South Bay* affects the

7     issues that exist at this time at all.  We are seven months

8     into the period where states have gone through litigation

9     measures and the like.  *South Bay* concerned an issue of an

10    extraordinary writ of injunction.  That's what the Supreme

11    Court grants sparingly and only in the most critical and

12    exigent circumstances when rights are indisputably clear.

13         And it was at the beginning of the pandemic, a

14    five-to-four decision, and Justice Roberts explained some of

15    the rationale of his concurrence.  But I don't have any idea

16    how the Court would break down on these issues today with a

17    track record in place.  In fact, many courts have said that

18    you have to base these decisions when you're infringing upon

19    religious rights on the circumstances as they exist and

20    subsequently develop.

21         Early on in the pandemic, the Court was not willing

22    to take up an extraordinary writ of injunction, which is

23    something the Court only does when a TRO has been denied and

24    it's trying to decide whether it's so exigent a circumstance

25    that it should under those circumstances and the Court simply

1   does not do it absent clear error.  It's almost like a

2   mandamus situation.  Early on in the pandemic, the Court five

3   to four ruled the way it did.

4          But that case and subsequent cases, including the

5   *Elrod* case in the Seventh Circuit, said circumstances change

6   over time.  So, what a Court is willing to do at the beginning

7   of the pandemic isn't necessarily what a Court should do

8   today, religious infringement, particularly in a case like

9   this.

10          I refer your Honor specifically to the Sixth

11  Circuit's decision in *Roberts v. Neace*, in which they ruled on

12  more of a record.  They ruled that, quote, "While the law may

13  take periodic naps during a pandemic, Courts will not let it

14  sleep through one."

15          And they ruled that the Baptist church there could

16  reopen; with social distancing and mitigation measures, should

17  be allowed to reopen and that its First Amendment free

18  expression rights were being violated.

19          The *Soos* case in the Northern District of New York

20  as well supports this motion.  And most recently -- their

21  finding strict scrutiny applies in those cases.  And most

22  recently the *Capitol Hill Baptist* case, decided just last week

23  by a District Court in D.C., found strict scrutiny applied and

24  that that Baptist church should be allowed to reopen by

25  implementing the social distancing measures.

1          I respectfully submit to your Honor this testimony

2   today has been elucidating because whether you apply strict

3   scrutiny or rational basis, there is no rational basis for

4   restricting the religious exercise of the Catholic churches in

5   the Diocese as this record is bereft of any evidence, any

6   evidence, that there has been any spread, surge, outbreak of

7   COVID in any of the Catholic churches in the Diocese.

8          The only evidence is of spread and outbreak in a

9   certain community, the ultra-Orthodox Jewish community, and

10  there's no evidence of any spread beyond that community into

11  the Catholic churches.  And that's a track record over three

12  plus months and includes September and early October, before

13  the Governor imposed this order.

14         Your Honor, whether you're applying strict scrutiny

15  or rational basis, what is the rational basis for restricting

16  the Catholic churches who have done everything right and had

17  no outbreak and had no surge in COVID from their free

18  exercise?

19         They have been doing everything right.  And even the

20  State's witness said that all the things they're doing are the

21  right things for them to do and candidly admitted he and the

22  State is not aware of any evidence, any evidence, of spread

23  into any of the Catholic churches.

24         And your Honor, what is the height of irrationality?

25  The health department didn't write this executive order.  The

1    health department didn't decide the cutoffs.  The health

2    department didn't decide the hatchet that was put to all

3    houses of worship.  It was done in the Governor's office,

4    where there isn't any epidemiologist, scientist, or M.D.

5    involved in the drafting.  That's the height of irrationality.

6         First Amendment requires more, your Honor.  It

7    requires strict scrutiny.  And even if your Honor were to find

8    that that's an open question, I respectfully submit there's no

9    rational basis for this.

10        The Governor's own admissions about the origins of

11   things, who is responsible, and how he approached the problem,

12   writing the executive order himself, no epidemiologist, he

13   took a blunt instrument when you're not allowed to do such a

14   blunderbuss approach when it comes to restricting religious

15   exercise.

16        So, I respectfully submit the hearing has

17   established the record that Judge Komitee said we should have

18   at a preliminary injunction.  We have more fully developed the

19   record.  We have heard from the State's witness.  The State

20   has no evidence to support the restrictions on the Catholic

21   Church.  We've heard admissions that it's conceded the

22   Catholic Church is doing everything right and hasn't had any

23   outbreak of COVID in these red and orange zones.

24        And we have heard the words of the Governor himself.

25   There's nothing tailored about this.  This is a problem in one

1   community and he's sweeping too broad a brush.  And we have

2   heard the Governor in quite graphic terms basically admit a

3   First Amendment violation.

4          So, I respectfully submit, your Honor, and I'll

5   close with this, I know the Attorney General answers to the

6   Governor, and I'm answering to a higher authority.  And I am

7   referring to you, your Honor, and referring to a higher

8   religious authority.

9          I am reminded of the immortal words of John Belushi

10  in the Blues Brothers movie, "We're on a mission from God."

11  These people, these Catholics in the Diocese, have done

12  everything right.  The City admits that they've done

13  everything right.  And the State admits they have had no COVID

14  outbreaks or spread.  They simply cannot sweep so broadly

15  under such circumstances under the First Amendment.

16         And even if your Honor thought it was a close

17  question on whether ultimately strict scrutiny were likely to

18  succeed or we met and we have stated a substantial question, I

19  respectfully submit to you that irreparable harm is presumed

20  for the constitutional law, the *Elrod* case, on whether you are

21  infringing on religious freedoms.

22         And on balance of equities, I respectfully submit to

23  you my clients, the Diocese, supported by the Archdiocese and

24  these Catholic churches and parishioners, your Honor, this is

25  vital to their life, their spirit, their soul, to be able to

1  go to Mass.

2        And the government doesn't have an interest in doing

3  something that's unconstitutional.  And when it does something

4  to infringe on religious liberties, it better have a

5  compelling interest and evidence to show that anything that is

6  happening in those Catholic churches needs to be addressed

7  because of that compelling interest.

8        I respectfully submit this hearing established

9  beyond question that the State cannot possibly meet that

10  burden.  And it is ultimately the State's burden.  But on a

11  preliminary injunction, our burden, the balance of equities is

12  decidedly in our favor.

13        I will end with this:  The Bishop -- I know the

14  Governor cares about people, but nobody cares more about the

15  safety of his parishioners in his Diocese than this bishop and

16  the bishop who testified here today.  They have done

17  everything to protect their parishioners; they closed down

18  before the State required them to, they imposed stricter

19  restrictions on themselves than the State required of them.

20        But this is a bridge too far.  The Governor has gone

21  too far by not recognizing that he should be enforcing and

22  using the health department's enforcement mechanism that this

23  witness admitted they have to go after the real problem.  He's

24  painted with too broad a brush.  Can't do that to these

25  churches.  You can't do that to all houses of worship when

1   there's no evidence of a problem there and they're doing all

2   the things the right way.  Whether it's strict scrutiny or

3   rational basis, there was none for what the Governor did here.

4            And we implore you, we pray, that our clients will

5   be able to go back to Mass this Sunday.

6            Thank you, your Honor.

7            THE COURT:  Thank you.

8            Mr. Farber?

9            MR. FARBER:  Thank you, your Honor.

10           Your Honor, this very proceeding that we are

11  proceeding, you know, by Zoom demonstrates that we are in very

12  fraught times.  New York, through the heroic measures of first

13  responders, emergency service personnel, medical personnel,

14  government officials, and, most importantly, the people of the

15  State, have successfully brought down COVID-19 infections in

16  the State to a low level, hovering around one percent or less

17  most of the time.

18           The price of liberty and the price of maintaining

19  COVID is eternal vigilance.  There are outbreaks in particular

20  geographic regions.  Whether or not those outbreaks can be

21  attributed as a fault matter to a given community is

22  irrelevant here.  The virus doesn't care whose fault it is.

23  The virus cares that there are people around capable of

24  spreading the virus.

25           And if Catholic churches are in a neighborhood with

1   a high incidence of virus, basically what the Plaintiff is

2   asking here is to be permitted to bring -- I think their

3   evidence is some of their churches hold well over a thousand

4   people -- hundreds of people together, whether or not they are

5   spread out with masks, whether or not there are other

6   measures.

7           This is risk mitigation.  And, so, the question from

8   the community standpoint is, is a temporary measure -- the

9   executive order itself runs to November 2, there's language in

10  there it will be reconsidered within a couple of weeks -- is a

11  temporary measure under these circumstances appropriate here?

12          Under the *Jacobsen* standard, there is no question.

13  As the Supreme Court said, the community has the right to

14  protect itself against an epidemic of disease which threatens

15  its members.  And in such times, judicial scrutiny is reserved

16  for measure that has no real or substantial relation to the

17  object of protecting the public or is beyond question of

18  plain, palpable invasion of rights secured by the fundamental

19  law.

20          There is no question that the objective of Executive

21  Order 202.68 is to protect the public, to hopefully stop this

22  cluster and spread, to get the statewide cases down again.

23  That's what this is about.

24          It simply does not matter that some people are

25  behaving in riskier manners than others.  Basically, this is a

1   legislative judgment and the State is imposing a reasonable

2   health measure.  The fact is, the measure is temporary, it's

3   confined to limited areas; as the witness testified to, that

4   he recognized as those areas containing the higher COVID

5   rates.

6           So, you know, this law has been the law of the land

7   between *Jacobsen* in 2020 through *South Bay* at the end of May

8   of this year.  I might add that *South Bay* was decided several

9   weeks after the *Roberts* case that Mr. Mastro was referring to.

10  I might add also that the *Capitol Hill* case he was referring

11  to was an RFRA case, not applicable here.

12          But, in any event, that long line of cases, all the

13  way through a case called *Agudath Israel*, in which Judge

14  Matsumoto, of this court, applied the *Jacobsen* standard to the

15  very executive order here because we understand no one is

16  disputing the importance of the right -- the First Amendment

17  rights and the free exercise rights here.  But in this case,

18  the risk to the community of permitting the size of the

19  gathering that the Plaintiff is seeking presents a risk that

20  the State is undertaking mitigation.

21          As we argued in our papers -- I'm not going to

22  belabor that point, but in this case, comparable secular

23  conduct is not treated more harshly.  In fact, in the red

24  zones, all other gatherings except in the essential businesses

25  are banned.  So, admittedly, 10 or 25 people is a small

1  gathering, but religion and religious activities are not being

2  discriminated against.

3         Further, the lines were drawn narrowly to reflect

4  where the outbreaks are.  We would argue, as we argued in

5  papers -- again, I'm not going to belabor that -- even if

6  strict scrutiny applies, Plaintiff's claims would still fail.

7         But, again, this is an injunction application by

8  Plaintiff.  It's a mandatory injunction against the

9  government.  They have to prove probability of success on the

10 merits, they have to prove irreparable harm, they have to

11 prove balance of the equities, and that the public interest

12 favors this release all by a heightened standard.  And the

13 fact of the matter is they haven't.

14        The fact is what they are proposing, to reopen

15 churches in the middle of hot spots in a pandemic zone, taking

16 hundreds of people, presents an unreasonable risk in the view

17 of the government as a matter of public health and safety.

18 The government is acting here.

19        So, the question, as I understand, there will be a

20 disruption in people's religious practices.  The

21 counterbalance to that is the health and safety of the

22 community.  And, you know, as we've learned too tragically

23 from earlier this year, this disease, if it gets a foothold,

24 can spread rapidly and throughout the state.  That's what

25 we're trying to avoid.  That is the Governor's interest here.

1          Thank you, your Honor.

2          THE COURT:  Thank you.

3          Apparently, the Governor said today that the

4   Orthodox community is not following the red zone rules.  And

5   I'm wondering at what point the balance will shift from the

6   general rule that you articulate regarding the responsibility

7   of the government to protect the public health to a situation

8   where if a particular part of the community doesn't follow the

9   rules, whether -- I'm going to say a victim of another's

10  negligence or misconduct is forced to have their

11  constitutional right of free exercise of religion restricted

12  by the fact that there's another part of the community that is

13  not following the rules and apparently the government is not

14  able to force that part of the community to follow the rules.

15          There has to be a tipping point here where you can

16  enter a church under these restrictive procedures in a

17  neighborhood where others are not following the rules.  I'm

18  wondering when that point is reached and who is going to

19  enforce the rules in such a way that the Plaintiff here can

20  restore activities in these churches if the Court finds for

21  the State.  And that's a problem that I don't think we've had

22  an opportunity to talk about here today.

23          Mr. Mastro would like to say something, then I'll

24  get one more comment from Mr. Farber, and we'll wind it up.

25          Mr. Mastro, briefly.

1        MR. MASTRO:  Thank you, your Honor.

2        You went right to the heart of it.  The State's

3   witness testified that the State has the authority to enforce,

4   it knows where the problem is in the ultra-Orthodox community,

5   and, yet, he said he's not aware of any efforts to have

6   enforced in that community.  That's where the government

7   should be focusing its attention.

8        And, of course, under strict scrutiny, its

9   blunderbuss approach of all houses of worship is the

10  antithesis of a narrowly tailored approach in enforcement.

11       But your Honor, I have to address this because

12  Mr. Farber keeps misstating the holding in *Jacobsen*.  The

13  holding in *Jacobsen* was that a state has discretion to protect

14  public health and safety but, but, quote, "subject, of course,

15  to the condition that no rule prescribed by a state shall

16  contravene the Constitution of the United States nor infringe

17  any right granted or secured by that instrument," end quote.

18  That's on Page 25 of *Jacobsen*.  He always leaves that out.

19       This is that case.  This is that case where the

20  State isn't enforcing where it should be and painted with too

21  broad a brush.  And it's entirely irrational to invade the

22  religious liberties of the Catholic Church.

23       And this isn't -- and I have to correct Mr.

24  Farber -- this isn't a mandatory injunction, this isn't a

25  heightened standard.  It's a prohibitory injunction.  The

1  Governor and the State shouldn't be enforcing those twelve

2  words that go too far.

3        Yes, the Catholic Church will do the 25 percent it

4  has been doing.  We'll do that even in orange and yellow

5  zones.  That's what it's been doing even though it could be

6  substantially more.  It's that it is only 10 and only 25 in a

7  red and orange zone.  In a Catholic church, that's basically

8  shutting the door.  What's the priest supposed to do, say

9  after the ninth parishioner, "No one else can come in and

10 enjoy the Holy Sacrament and the Mass"?

11       Your Honor, without any evidence of any problem in

12 any of those churches in all this time and the churches doing

13 everything right, as the State admits, I come back to where I

14 started, which is it doesn't help them.  And this is already

15 the circumstance where the State hasn't exercised its

16 authority properly and it hasn't enforced where it should be

17 enforcing.  And the Governor is still to this day talking

18 about the real problem as the Orthodox community.

19       Well, where's the enforcement there?  Where's the

20 enforcement?  Where are the fines?

21       On the face of the executive order, it says $15,000

22 an offense.  Go in there with your --

23       THE COURT:  I hate to do this, Mr. Mastro.

24       MR. MASTRO:  Sorry, your Honor.

25       THE COURT:  There's an article in today's Wall

1  Street Journal entitled, "Cuomo threatens to withhold funds

2  from New York City, other COVID-19 hot spots," and there is a

3  paragraph in here that indicates that, quote, "Last weekend,

4  New York City authorities gave out more than 100 summonses in

5  State-designated restricted zones for a variety of violations,

6  including holding mass gatherings.  Officials said they issued

7  more than $150,000 in fines," end quote.

8            So, efforts are being made according to this

9  article, which I take notice of just in connection with what

10  you just said.

11            MR. MASTRO:  Yes.

12            THE COURT:  But the question is, my question is,

13  whether a $15,000 fine is going to cause people to change

14  their behavior in large groups.  That remains to be seen.  But

15  I appreciate you're mentioning that.

16            MR. MASTRO:  I appreciate that, your Honor.  And I

17  wasn't suggesting there hasn't been any enforcement at all.

18            It happens to have happened after this latest

19  executive order for the first time.  By the City, not by the

20  State.  It should have happened before this executive order

21  and it's what should have been done repeatedly in weeks of

22  September leading into October if they're trying to address

23  the problem where it really occurs.

24            It doesn't change, your Honor --

25            THE COURT:  I understand your point.

1        MR. MASTRO:  The Catholic churches have done

2   everything right and they don't have any outbreak or spread.

3   They don't.  And they didn't into early October.  Zero.

4        So, how do you punish them for what's happening in

5   another community when there's no evidence of spread from that

6   one community into these other churches?

7        It's not right.  The First Amendment says you

8   shouldn't do it, whether it's strict scrutiny or rational

9   basis.

10        Thank you, your Honor.

11        THE COURT:  Thank you.

12        Mr. Farber, anything to close this out?

13        MR. FARBER:  Your Honor, this is not about

14   punishment, this is not about fault finding.  This is about a

15   relentless little virus who really doesn't care whose fault it

16   is.  This is about protecting the entire public, the over

17   19 million people in the State of New York, many of whom are

18   parishioners of the Diocese.

19        The fact is this is a public health measure.  It is

20   temporary, it is narrowly drawn, it will be revisited by its

21   own terms based on the data.  If the State is successful in

22   crushing this cluster, then it will be modified sooner.  If

23   things develop the other way, then other methods will be taken

24   by the government to protect the public health.  There's a

25   long line of authority that the State can do that.

1      Thank you, your Honor.

2      THE COURT:  You will concede, sir, that if the

3  Orthodox community had followed the same protocols as the

4  Diocese of Brooklyn followed in terms of holding its services

5  and following the protocols that have been described by the

6  two witnesses for Plaintiff that we wouldn't be here having

7  this discussion probably, would we?

8      MR. FARBER:  Probably, your Honor?  You know, again,

9  I don't know.

10      It is well established that these are where the

11  clusters are.  You know, we assume that some people are

12  engaging in riskier behaviors in large numbers in these

13  communities.  But, again, whether -- regardless, again, as I

14  say, regardless of fault or not fault or just happenstance,

15  whether it is or not, the Government's interest is in

16  protecting the entire community.  Sometimes in a case like

17  this, maybe it has to protect them as a result of some

18  people's actions.  That's not unprecedented.  But that's what

19  the government is doing here.

20      So, you know, with respect to the long line of

21  *Jacobsen* cases, the government is entitled to a rational basis

22  review, and what the government is doing here is rational.

23      Thank you, your Honor.

24      THE COURT:  All right, everybody, thank you very

25  much for your attention today.  The Court reserves decision

1  and will await the additional materials that it has requested

2  for tomorrow.

3           Have a good evening, everyone.  Good to see you all.

4           (A chorus of thank yous.)

5           MR. MASTRO:  I really, really appreciate all the

6  time and consideration.  Thank you, thank you, thank you.

7           MR. FARBER:  Good night.  Thank you.

8           THE COURT:  Good night, everybody.  Stay safe.

9

10          (Matter concluded.)

11

12

13  *We certify that the foregoing is a correct transcript from*

14     *the record of proceedings in the above-entitled matter.*

        */s/ Linda A. Marino            October 16, 2020*

15       *LINDA A. MARINO                    Date*

16

17

18

19

20

21

22

23

24

25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

LAM     OCR     RPR

<u>**I N D E X**</u>

<u>**WITNESS**</u>                                              <u>**PAGE**</u>

**RAYMOND F. CHAPPETTO**

    DIRECT EXAMINATION BY MR. MOCCIA                7

    CROSS-EXAMINATION BY MR. FARBER                26

    REDIRECT EXAMINATION BY MR. MOCCIA             27

**JOSEPH J. ESPOSITO**

    DIRECT EXAMINATION BY MR. SHAPIRO              31

    CROSS-EXAMINATION BY MR. FARBER                45

    REDIRECT EXAMINATION BY MR. SHAPIRO            46

**BRYON BACKENSON**

    DIRECT EXAMINATION BY MR. FARBER               49

    CROSS-EXAMINATION BY MR. MASTRO                70

    REDIRECT EXAMINATION BY MR. FARBER             89

    RECROSS-EXAMINATION BY MR. MASTRO             100